1  Mark J. Werksman, Esq. (State Bar No. 120767)
2  Kelly C. Quinn, Esq. (State Bar No. 197697)
   LAW OFFICES OF MARK J. WERKSMAN
3  888 West Sixth Street, Fourth Floor
   Los Angeles, California 90017
   Telephone: (213) 688-0460
4  Facsimile: (213) 624-1942

5  Attorneys for Defendant
   SYED QAISAR MADAD

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  THE UNITED STATES OF AMERICA,   )  Case No. CR 12-1048-PA
                                    )
12              Plaintiff,          )  DEFENDANT SYED QAISAR
                                    )  MADAD'S SENTENCING
13       vs.                        )  MEMORANDUM
                                    )
14  SYED QAISAR MADAD,              )
                                    )
15              Defendant.          )
                                    )
16                                  )  Sentencing Date:  June 24, 2013
                                    )
17                                  )  Time:  8:30 a.m.
                                    )
18                                  )
                                    )
19  _____ )

20  TO THE HONORABLE PERCY ANDERSON, UNITED STATES
21  DISTRICT COURT JUDGE AND ASSISTANT UNITED STATES
    ATTONREY RANEE KATZENSTEIN:
22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE(S)

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    MR. MADAD'S EARLY LIFE . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    MR. MADAD'S EDUCATION AND EMPLOYMENT . . . . . . . . . 5

    C.    MR. MADAD'S FAMILY LIFE . . . . . . . . . . . . . . . . . . . . . . 8

    D.    MR. MADAD'S CHARITABLE WORKS . . . . . . . . . . . . . . . . 10

III.  OBJECTIONS AND CORRECTIONS TO THE PSR . . . . . . . . . . . . . 13

IV.   SENTENCE CALCULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    SECTION 3553(A) FACTORS CONCERNING THE HISTORY
        AND CHARACTERISTICS OF MR. MADAD WARRANT A
        LESSER SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    MR. MADAD'S AGE AND PHYSICAL CONDITION . . . . 16

    B.    SECTION 3553(A) FACTORS CONCERNING THE NEED FOR
        THE SENTENCE IMPOSED . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.    THE NEED TO PROVIDE JUST PUNISHMENT . . . . . . . 18

        2.    THE NEED TO PROTECT THE PUBLIC . . . . . . . . . . . . 20

            a.    THERE IS A LOW LIKELIHOOD OF
               RECIDIVISM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.    SENTENCING GUIDELINES . . . . . . . . . . . . . . . . . . . . . . . . 24

        1.    THIS COURT CAN DISREGARD THE GUIDELINES
            CALCULATION IN ITS ENTIRETY . . . . . . . . . . . . . . . . 25

            a.    THE FRAUD GUIDELINES WERE NOT
               BASED ON EMPIRICAL EVIDENCE OR
               NATIONAL EXPERIENCE . . . . . . . . . . . . . . . . . . . 26

               i.    INCREASES IN THE FRAUD GUIDELINES
                    WERE NOT BASED ON EMPIRICAL
                    RESEARCH OR NATIONAL EXPERIENCE . 29

-i-

**PAGE(S)**

       b.    THE GUIDELINES SHOULD NOT BE
                  APPLIED BECAUSE THEY FAIL TO
                  PROPERLY REFLECT THE
                  CONSIDERATIONS OF §3553(A) . . . . . . . . . . . . . 32

D.    THE TYPES OF SENTENCES AVAILABLE . . . . . . . . . . . . . . . 38

E.    NEED TO PROVIDE RESTITUTION TO VICTIMS OF THE
      OFFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

PAGE(S)

**UNITES SATES SUPREME COURT CASES**

Gall v. United States,
552 U.S. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25, 39, 40

Kimbrough v. United States,
552 U.S. 85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Nelson v. United States,
555 U.S. 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rita v. United States,
551 U.S. 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 33

Spears v. United States,
555 U.S. 261 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28

United States v. Booker,
543 U.S. 220 . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 22, 26, 27, 36, 37

United States v. Knights,
534 U.S. 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**FEDERAL CASES**

Simon v. United States,
361 F. Supp. 2d 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

United States v. Adelson,
441 F. Supp. 2d 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 31, 34, 35

United States v. Carty,
520 F.3d 984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 25

United States v. Corner,
598 F.3d 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**PAGE(S)**

United States v. Dare,
425 F.3d 634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Emmenegger,
329 F. Supp. 2d 416 . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Fernandez-Vidana,
857 F.2d 673 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Gaind,
829 F. Supp. 669 . . . . . . . . . . . . . . . . . . . . . . . 20, 21

United States v. Henderson,
649 F.3d 955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Hildebrand,
152 F.3d 756 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Howard,
894 F.2d 1085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. McBride,
434 F.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. McKissic,
428 F.3d 719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Menyweather,
447 F.3d 625 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Mitchell,
624 F.3d 1023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Parris,
573 F. Supp. 2d 744 . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Peterson,
363 F. Supp. 2d 1060 . . . . . . . . . . . . . . . . . . . . . . . 41

-iv-

PAGE(S)

United States v. Pruitt,
    502 F.3d 1154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Ranum,
    353 F. Supp. 2d 984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Schroeder,
    536 F.3d 746 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Spigner,
    416 F.3d 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Staten,
    466 F.3d 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Stone,
    575 F.3d 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Tutty,
    612 F.3d 128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Vega,
    545 F.3d 743 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Wilson,
    350 F. Supp. 2d 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19


**STATUTES AND MISCELLANEOUS**

U.S.S.G. §lA.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

U.S.S.G. §2A1.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S.S.G. §2A2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S.S.G. §2A3.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S.S.G. §2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 28, 29, 33, 34

U.S.S.G. §2B3.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**PAGE(S)**

U.S.S.G. §2Fl.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S.S.G. §2Jl.2(b)(l)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §2K2.l(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §2Kl.5(b)(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §2Ll.2(b) (l)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §2M5.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S.S.G. §2Rl.1(b)(2)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §3Al.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. §5H1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. §3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. §3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. §3553(a)(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. §3553(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3582(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

28 U.S.C. §994(u) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§217(a), 98 Stat. 1987,

    2039 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1  **Mark J. Werksman, Esq. (State Bar No. 120767)**
2  **Kelly C. Quinn, Esq. (State Bar No. 197697)**
   **LAW OFFICES OF MARK J. WERKSMAN**
3  **888 West Sixth Street, Fourth Floor**
   **Los Angeles, California 90017**
4  **Telephone: (213) 688-0460**
   **Facsimile: (213) 624-1942**
5
   **Attorneys for Defendant**
6  **SYED QAISAR MADAD**

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  THE UNITED STATES OF AMERICA,      )   **Case No. CR 12-1048-PA**
                                       )
12                  Plaintiff,         )   **DEFENDANT SYED QAISAR**
                                       )   **MADAD'S SENTENCING**
13        vs.                          )   **MEMORANDUM**
                                       )
14  SYED QAISAR MADAD,                 )
                                       )
15                  Defendant.         )
                                       )
16                                     )   **Sentencing Date:  June 24, 2013**
                                       )
17                                     )   **Time:  8:30 a.m.**
                                       )
18                                     )
                                       )
19  _____)

20  **TO THE HONORABLE PERCY ANDERSON, UNITED STATES**
21  **DISTRICT COURT JUDGE AND ASSISTANT UNITED STATES**
    **ATTONREY RANEE KATZENSTEIN:**
22

23        Defendant, SYED QAISAR MADAD, by and through his counsel of record,

24  the Law Offices of Mark J. Werksman, hereby files his Objections to the Pre-

25  Sentence Investigation Report ("PSR") and Sentencing Memorandum. Mr.

26  Madad's position is based upon the PSR, the attached Memorandum of Points and

27  Authorities, all letters and documents filed hereto, and upon any oral argument that

28  / / /

                                       1

shall be presented at the sentencing hearing pursuant to Federal Rules of Criminal Procedure Rule 32(c)(1).

DATED: June 13, 2013

Respectfully submitted,

THE LAW OFFICES OF
MARK J. WERKSMAN

By: Mark J. Werksman
Kelly C. Quinn
Attorneys for Defendant
SYED QAISAR MADAD

2

# I.
# INTRODUCTION

On February 22, 2013, Mr. Madad entered a guilty plea. In the plea agreement, the parties agreed that the base offense level was 7 pursuant to U.S.S.G. §2B1.1(a)(1), with 22 levels for loss under §2B1.1(b)(1)(L). (Plea, ¶19.) The government reserved the right to seek an adjustment for multiple victims, pursuant to §2B1.1(b)(2)(B); use of sophisticated means, pursuant to §2B1.1(b)(10)(C); and obstruction of justice, pursuant to §3C1.1. (Id.)

Mr. Madad further agreed that the following property be forfeited to the government: 1) a 2008 Mercedes-Benz C63; 2) Mr. Madad's family residence in Diamond Bar, California; 3) real property located in Diamond Bar, California; 4) eighty-nine items of assorted personal property seized from Mr. Madad's residence on October 30, 2012; 5) twenty-one items of assorted jewelry seized on October 30, 2012; 6) nine items of jewelry seized on December 17, 2012; 7) thirty-eight pieces of jewelry seized on December 20, 2012; 8) two pure silk handmade rugs and two pure wool handmade rugs; and 9) $293,979.23 seized from Madad's bank account.

In the PSR, Probation calculates a base offense level of 7, pursuant to §2B1.1; a loss level of 22, pursuant to §2B1.1(b)(1)(L); two levels for 50 or more victims, pursuant to §2B1.1(b)(2)(B); two levels for sophisticated means, pursuant to §2B1.1(b)(10)(C); and two levels for obstruction of justice, pursuant to §3C1.1, with three levels deducted for acceptance of responsibility, for a total offense level of 32. Mr. Madad has a Criminal History Category I, for a Guideline range of 121 to 151 months.

For the reasons set forth herein, Mr. Madad requests a sentence substantially lower than the Guideline range.

/ / /

/ / /

# II.
# FACTS

## A.   MR. MADAD'S EARLY LIFE

Mr. Madad was born on January 11, 1947, in a small community of Khamla, in the province of Utter Pardesh (UP), India. This was a very chaotic and turbulent period in the Indian sub-continent. British rule had ended, and the country was divided into two parts: India and Pakistan.[1] This separation, known as partition, was intended to accommodate religious differences between the Muslim and Hindu population. However, partition left both India and Pakistan devastated. During this historic time, riots, rapes, murders, and looting were common-place. As one source notes: "Fifteen million refugees poured across the borders to regions completely foreign to them because their identities were rooted in the geographical home of their ancestors, not their religious affiliations alone. In addition to India's partition, the provinces of Punjab and Bengal were divided, causing catastrophic riots and claiming the lives of Hindus, Muslims and Sikhs alike."[2]

Partition was a very difficult time for Mr. Madad's family, who are Muslim. The Madad family had to leave behind all of their worldly possessions, house and land, and even some uncles and aunts who could not make the journey. Although the Madad family had lived a comfortable existence in India before partition, they were quickly left with nothing but each other. They spent the first year in a refugee camp in southern India before they could be transported to Pakistan.

Mr. Madad's family settled in a small and remote village in the district of Montgomery and the province of Punjab, unceremoniously called Chak 78–5/R.

---

[1] Pakistan had two territories: West Pakistan and East Pakistan separated by India. In 1971, the East Pakistan territory became an independent country, known as Bangladesh.

[2] See, http://postcolonialstudies.emory.edu/partition-of-india/#ixzz2TZgQzQhc

Chak 78- 5/R was a farming village, with mud houses and straw roofs. It had no electricity, no running water, no sewage system, and no paved roads. The village had one school with two mud-brick rooms. The school had no desks, and only one chair. In the rainy season the teacher would often be unable to bike in from a neighboring village because of flooding.

Mr. Madad's family grew wheat, cotton, rice, sugar cane, corn, and vegetables, and raised cows, sheep, goats, etc. The house was also full of people, including aunts, uncles, cousins and other relatives. Typically, 25-30 people were living in the small, rudimentary house. The village had no monetary system, and all transactions were bartered. Most farmers in the village did not believe in sending their kids to school. They expected their sons to work the land, and the girls to help their mothers milking the cows, making yogurt, etc. Even for those who went to school, most students got married at the completion of the 5th Grade and went to work full time. Mr. Madad's daughter Mahrukh recently visited the village and noted: "I was fortunate to visit [Mr. Madad's] hometown, where the nearest airport had a single dirt runway, and farm animals intermix among the street traffic. There, most women are covered from head to toe, they are sent into arranged marriages that impose a tremendous financial burden upon their families in the form of dowries, and their prospects for education - much less a career - are bleak." (See letter of Mahrukh Zehra Madad, attached as Exhibit A.)

## B.    MR. MADAD'S EDUCATION AND EMPLOYMENT

Chak 78–5/R did not offer any education above 5th grade, and the nearest school was 7½ miles away. Mr. Madad's family could not afford a bicycle, so Mr. Madad would walk several miles each day to school from the village. He had to leave early to make the journey, often leaving before morning prayers and returning home after the last call for the prayers at night. If he was tardy to school, he would receive lashes with a stick in front of the class. Despite these

circumstances, Mr. Madad excelled in studies. He was particularly good in mathematics and science. Mr. Madad finished High School (Grade 10) and ranked among the top students in the Province of Punjab. As a result, he won a merit scholarship to do pre-engineering education.

In 1957, Mr. Madad's family moved to the town of Montgomery (Sahiwal) so that Mr. Madad and his brother Sikandar could continue their education. Mr. Madad's oldest brother, Babar, dropped out of school to help support the family and to help with the schooling of Mr. Madad and his brother Sikandar. In the city of Montgomery (Sahiwal), like in Chak 78–5/R, the Madad home did not have electricity, running water, or a sewerage system. Both Mr. Madad and his brother Sikandar studied first by Vick Lamps and then later by kerosene lanterns. On a windy night they could not study because the flame would go out. When not in school, Mr. Madad sold eggs, chicken and pigeons to help pay for his education. In 1962, the family moved to Multan so that Mr. Madad's brother Sikandar could complete his medical education. In 1964, Mr. Madad finished his Pre-Engineering studies and ranked among the top 10 students out of approximately 42,000 students. At the time, only one University offered a degree in Engineering. The University had only 350 seats for some 40,000 plus graduates. Mr. Madad was accepted to the school. During his four years of engineering education, Mr. Madad remained in the top of the class.

After graduating from college, Mr. Madad went to work for an oil company known as Burmah Oil Co. Mr. Madad's brother urged him to come to the United States to further his education. In August of 1972, Mr. Madad arrived in New York for graduate studies. His English was heavily accented, and, having grown up without power or plumbing, he was not prepared for the modern life of New York. Yet, Mr. Madad persevered, completing two Master Degrees in less than two years while working part-time for $1.65/hr job at the library. Mr. Madad's brother Syed describes that time: "Those early days in [New York] were full of many sacrifices

for both of us, being so far away from our loved ones and in a country that was so different from our birthplace. Qaisar and I shared a small apartment for a few years and during that time, I saw my brother behave with nothing but honesty, integrity and compassion for others." (See letter of Syed Sikandar Madad, MD, attached as Exhibit B.) Mr. Madad did not know when he left Pakistan in 1972 that he would not see his father again. His father passed away in 1975, while Mr. Madad was in school in the United States. Mr. Madad's deep regret is that he was not with his father in the last moments of his life. However, his father was very proud and happy when Mr. Madad left Pakistan to pursue his education.

In July 1974, Mr. Madad moved to Canada and began working in the oil industry.[3] Mr. Madad worked for eleven years in Canadian Oil Industry. During that time, he authored or co-authored 45 proprietary studies, helped develop tertiary recovery techniques to enhance oil production from old oil fields, helped develop Heavy Oil Processing Technology, and worked on numerous taskforces in the provinces of Alberta, Saskatchewan, and British Columbia. Mr. Madad subsequently worked for various energy companies as an Engineer. In 1998, the California Legislature, the State Assembly, and the United States Congress recognized Mr. Madad's professional contributions and service. (See, Certificate of Recognition, attached as Exhibit C; see also, certificate from ASME, attached as Exhibit D,

/ / /

/ / /

/ / /

_____

[3] The PSR incorrectly asserts that Mr. Madad went to Canada in 1974 because his visa expired and he could not find employment. (PSR, ¶59.) However, Mr. Madad was issued an F-1 Student Visa by the United States Consulate in Karachi, Pakistan which was valid for four years from August 19, 1972 – August 29, 1976. Mr. Madad moved to Canada in 1974 after being offered a position there.

## C.   MR. MADAD'S FAMILY LIFE

Mr. Madad met his wife, Dr. Meher F. Tabatabai, in 1981, while she was doing her medical residency in Baltimore, Maryland. She had just returned from a European tour, presenting a paper in the medical conference in Lausanne, Switzerland. Mr. Madad was instantly besotted and they married the next year. Mr. Madad returned to the United States in 1983, and the couple relocated to California so Meher could accept a fellowship at the University of Southern California.

The couple then had two children, Mahvish Madad, age 29, and Mahrukh Madad, age 24. While his daughters were young, Mr. Madad took on the role of primary caregiver so that his wife could meet the demands of her career. His daughter writes: "When I was very little, he made the ultimate sacrifice when he left his own career which required him to travel for long periods of time. He came home for good to allow my mother to pursue her career as a physician, while he became Mr. Mom in the background. Your Honor, I honestly can't name many men these days who would leave the oil industry so that his wife could become the breadwinner. And he didn't just *come home* for us. He went above and beyond for us. My mom would finish her hospital rounds sometimes as late as 3 or 4 in the morning, and perhaps the fondest memory I have of my dad (which he still does today) is seeing him sleeping on the couch late at night, waiting for her to call and say that she's in the driveway. He would groggily wake himself up, every night without fail, take a flashlight or an umbrella if he needed to, and walk my mom inside. Later, around 6 in the morning, he would make breakfast and had the car running so it would be warmed up for me when it was time for him to drop me off at school - up until my senior year of high school." (See letter of Mahrukh Zehra Madad, attached as <u>Exhibit A</u>.) Mr. Madad's wife writes: "As a father, he is devoted to our two daughters and our son in law. He adores his daughters, Mahvish and Mahrnkh. When they were babies, he never hesitated to change their diapers, take them to the park, feed them, do their laundry, attend parent teacher

conferences, and so on, as I was always busy with my own medical practice. He was then, as he is now, always there for our daughters." (See letter of Meher F. Tabatabai, M.D. attached as Exhibit E.)

Mr. Madad has also been quick to help other family members. His daughter recalls: "All throughout my childhood, he went to great lengths to care for my maternal grandparents, who lived with us as they both suffered from and ultimately succumbed to difficult illnesses. He gave them dignity in their old age and at the end of life, a gift whose value I can only hope to understand as I grow older. Even among the daily chaos - the constant doctor's visits, the home care, tending to every detail of the household as well as his own business, raising two young children - he was doing so much for others, helping other families through their own darkest moments and supporting worthy causes that serve the most dire of needs." (See letter of Mahrukh Zehra Madad, attached as Exhibit A.) Mr. Madad's brother notes: "When our nephew in Pakistan (Tahir Madad), contracted Hepatitis C, a condition which requires long term and often expensive medical treatment, especially in a developing country, Qaisar came to the aid of his family without being asked. Due to Qaisar's financial generosity and compassion, Tahir was able to receive the medications and treatments he needed to keep him healthy and able to work." (See letter of Syed Sikandar Madad, MD, attached as Exhibit B.)

His niece writes: "I am Khadeeja Zehra Madad (Daisy), daughter of Akbar Madad-elder brother of Mr. Qaiser Madad. I know Mr. Qaiser Madad from my childhood, known for his kindness, love, hard work, intelligence, generosity and honesty; In 1978 my father passed away leaving my mother, 1 brother, 1 sister and me (we all being school kids at that time). Since then, being a caring uncle Qaiser Madad (even though not well established at that time) had helped us in all our difficult times and stood by our side at all occasions when we needed his support both morally as well as financially, just like our father and never let us feel his absence." (See letter of Khadeeja Zehra Madad (Daisy), attached as Exhibit F.)

Mr. Madad's brother Syed notes: "Known for his care, concern and generosity he and his family served me whenever I visited USA, mainly for medical treatments, where I got hospitalized going through complex surgeries. He aided me financially and was a major support during the period when I was going through agony." (See letter of Syed Babar Madad, attached as Exhibit G.) A family friend points out: "Helping ones family can often be regarded as an obligation rather than a selfless act. Mr. Madad has done his utmost to protect his family, workers and friends. He is generous when their efforts need to be recognized. He is devoted in supporting and promoting the well-being of his family and many others without regard for himself." (See letter of Josefina O. Leggett, attached as Exhibit H.)

## D.   MR. MADAD'S CHARITABLE WORKS

For the past thirty years, Mr. Madad and his wife have been able to support at least thirty-five charitable organizations here in the United States and many more abroad in Pakistan, India, and Egypt. Mr. Madad and his wife have helped build schools for Girls in Pakistan through an organization called Development in Literacy ("DIL"). (See documents concerning DIL, attached as Exhibit I.) This charity organization runs 150 schools in poor and undeveloped areas. Mr. Madad and his wife have also supported Tameer-e-Milat Foundation, another organization operating 350 schools in the rural areas. (See documents, attached as Exhibit J.) They have also been involved with Islamic Relief USA which funds construction of schools in remote villages around the world, AGA Kahn Foundation, Health Oriented Public Education ("HOPE"), and the Human Development Foundation ("HDF"), which all work to improve education and opportunities, particularly for girls in impoverished areas. (See documents, attached as Exhibit K, Exhibit L, Exhibit M, and Exhibit N.) Mahrukh notes that her parents "support development efforts in Pakistan and elsewhere because they understand that empowerment and education are the key to alleviating poverty and reducing the threat of religious

extremism -especially in areas of the world where groups like the Taliban literally bomb girls' schools." (See letter of Mahrukh Zehra Madad, attached as Exhibit A.) As a relative writes: "Your Honor, I have personally seen Mr. Madad's kindness and generosity for many causes such as donations to Development in Literacy which provides primary education to girls in rural areas of Pakistan, Zanabia community center, a non-profit religious place for worship in Los Angeles area, a Muslim Community Center in San Diego among other charitable organizations providing education and religious services." (See letter of Abdul H. Rajput, attached as Exhibit O.)

Additionally, Mr. Madad and his wife have been supportive of Sind Institute of Urological Technology ("SIUT") in its efforts to provide free dialysis and medical treatment to thousands of poor families every year. (See documents attached as Exhibit P.) They have supported Shifa Eye Hospital in Pakistan, providing free eye surgeries and treatment. Mr. and Mrs. Madad have also been supporters of UMMA Clinic, providing free healthcare services and medicines to the economically disadvantaged residents of West Los Angeles. (See documents attached as Exhibit Q.)

In addition, Mr. Madad and his wife have been avid supporters of the U.C.L.A. endowment for Abrahamic Religious Studies and American University Foundation to promote tolerance and understanding between people of various faiths. (See documents attached as Exhibit R.) In fact, many people also attest to Mr. Madad's desire to alleviate religious tensions: "In the wake of the terrible events on September 11, 2001, many American Muslims became the objects of fear and suspicion from their fellow Americans. My Uncle and Aunt responded to the need for further dialogue between the Muslim community and general society by helping fund and participate in local interfaith and community outreach events. Voicing his concern that the 'moderate' Muslim voice was being drowned out by more extremist views in Pakistan, Uncle Qaisar also participated in and donated to

charities that promoted better education and health standards for the poor in Pakistan, in the hope that they would not be as susceptible to recruitment by extremist groups." (See letter of Shirin ZM Kao, MD, MPH, attached as <u>Exhibit S</u>.) Mr. Madad has always preached tolerance in his faith and with others. His niece writes: "On a more personal note, Uncle Qaisar was a great advocate for me when I met my future husband, a Chinese American man, while attending medical school. As you can imagine, my choice of a potential life partner was a great shock to my family where the expectation had always been for me to marry someone from my own ethnic and religious community. When he learned about my engagement, Uncle Qaisar immediately voiced his support of myself and my parents, since he knew there would be other relatives who might not extend the same open mindedness. True to his word, Uncle Qaisar and his family celebrated my marriage with our family and made my husband and his relatives feel welcome, despite the cultural and religious differences." (See letter of Shirin ZM Kao, MD, MPH, attached as <u>Exhibit T</u> ; see additional letters from family member attached as <u>Exhibit T</u>.)

Mr. Madad and his wife have also been involved with Shine Humanity, which provides humanitarian, medical, and disaster relief. (See documents, attached as <u>U</u>.) They hosted a charity event to raise money following the earthquake in Bom, Iran. (See flyer attached as <u>Exhibit V</u>.) They similarly were proactive in participating in the Flood Relief and Donor Conference to rebuild Pakistan following the 2010 floods. (See documents attached as <u>Exhibit W</u>.) As Mr. Madad's nephew notes: "Within the past couple of years, I've had occasion to visit and spend time with my uncle on a handful of trips out to the West Coast. In all of these trips I've been witness to the generosity of my uncle, from heartily welcoming unexpected guests to the dinner table to donating his time to worthy causes; humility pervaded all his actions. On a 2010 trip to Los Angeles with my wife, we joined both Uncle Qaisar and Aunty Meher, as they were awarded for

their service to the Pakistani-American Community. As the guests of honor they were naturally the center of attention, which they happily and to great effect, used to bring attention to the earthquake ravaged regions of Pakistan." (See letter of Ali Madad, attached as Exhibit X.)

## III.
## OBJECTIONS AND CORRECTIONS TO THE PSR

Probation is seeking three adjustments not agreed to in the Plea Agreement: 1) two levels for 50 or more victims, pursuant to §2B1.1(b)(2)(B), 2) two levels for sophisticated means, pursuant to §2B1.1(b)(10)(C), and 3) two levels for obstruction of justice pursuant to §3C1.1. (PSR, ¶31-44.)

When a party is seeking to use a fact at sentencing not agreed to in the plea agreement, the Court of Appeals for the Ninth Circuit has noted that the "government should bear the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level. Since the government is initially invoking the court's power to incarcerate a person, it should bear the burden of proving the facts necessary to establish the base offense level. After that, the party seeking to alter the base offense level should bear the burden of proving the necessary facts." United States v. Howard, 894 F.2d 1085, 1090 (9th Cir. 1990). Thus, the party asserting the fact has the burden of proof, and "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." United States v. Dare, 425 F.3d 634, 642 (9th Cir. 2005); see also, United States v. Fernandez-Vidana, 857 F.2d 673, 675 (9th Cir. 1988) (finding district court judge did not err in applying "preponderance of the evidence" standard appropriate for factual findings used for sentencing). However, where the facts result in disproportionate sentencing, the government "may have to satisfy a 'clear and convincing' standard." Id.; see also, United States v. Staten, 466 F.3d 708, 717 (9th Cir. 2006).

Probation calculates a Guideline level of 32, with a range of 121-151 months. The Plea Agreement agrees to a level 26 with a Guideline range of 63-78 months. Thus, the non-agreed to enhancements effectually double the potential sentence. As a result, the party proposing the enhancements which seek to significantly increase the sentence, should have the burden of proof by clear and convincing evidence, which has not been met in this case.

## IV.
## SENTENCE CALCULATION

Title 18 U.S.C. §3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. Under §3553, factors considered to make this determination include: 1) the nature and the circumstances of the offense and the history and characteristics of the defendant; 2) the purposes of sentencing; 3) the kinds of sentences available: 4) the United States Sentencing Guideline calculation; 5) pertinent policy statements; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution. 18 U.S.C. §3553(a).

In considering §3553(a) factors, a court may consider formerly discouraged factors or facts that would not have met pre-Booker standards for departures. See United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the section 3553(a) factors . . . many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court-with greater latitude-under section 3553(a)"); see also, United States v. Booker, 543 U.S. 220, 301 (2005) (Stevens, J., dissenting) ("there can be no 'departure' from a mere suggestion.").

As set forth herein, all §3553(a) factors, considered together, warrant a sentence substantially less than the Guideline range.

## A.   SECTION 3553(A) FACTORS CONCERNING THE HISTORY AND CHARACTERISTICS OF MR. MADAD WARRANT A LESSER SENTENCE

While the Guidelines are to be respectfully considered, they are one factor among the §3553(a) factors that are to be taken into account in arriving at an appropriate sentence. See United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008.) Thus, all of the other considerations set forth in §3553, including the history and characteristics of Mr. Madad, are of equal importance as the Guidelines range. See Booker, 543 U.S. at 246; see also, United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005). As one court noted, "Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'." United States v. Adelson, 441 F. Supp. 2d 506, at 513-14 (S.D.N.Y. 2006).

In the instant case, the history and characteristics of Mr. Madad militate toward a lesser sentence. Mr. Madad has a minimal criminal record. Moreover, the numerous attached letters from people who have known Mr. Madad confirm that the charges against him are inconsistent with his past behavior and his overall character. His daughter writes: "Although words seem inadequate, I hope you will understand that my father is more than the allegations made against him. He is a kind, generous, and gentle human being." (See letter of Mahvish Zehra Madad, attached as Exhibit Y.) In fact, the outpouring of support for Mr. Madad has been truly tremendous, and many attest to his kind spirit: "Mr. Qaisar is my grandfather and I assure that he is the nicest man you can ever meet." (See letter of Syed M. Jarrar Abbas, attached as Exhibit Z.) "Qaiser Madad is known in our family for his

15

calm-temper, helpful character and love and care for everyone near him." (See letter of Amna Batool, attached as <u>Exhibit AA</u>.) "From all my personal encounters with Mr. Madad, I have never heard him say anything rude or speak in a harsh manner to anyone. I truly believe that Mr. Madad is a good and honest man. He is the most respectful man that I have ever worked for and I only wish the best for Mr. Madad and his family." (See letter of Jong R. Woo, attached as <u>Exhibit BB</u>.)

His in-law writes: "Mr. Madad is a kind hearted and very gentle person by nature. I have seen his help and generosity for all social and humanitarian causes. He is a great family man and treats friends and strangers with extreme kindness. Your Honor, I appeal to you to show Mr. Madad mercy and compassion at the time of his sentencing." (See letter of Nusrat Rajput, M.D., attached as <u>Exhibit CC</u>.) His sister describes: "My brother is a very nice and decent person. He enjoys helping people. He helped me whenever I needed him. He is very generous and hard working." (See letter of Syeda Binte Zehra Naqvi, attached as <u>Exhibit DD</u>.) Mr. Madad's niece states, "I characterize Mr. Madad as a noble, chaste, clean-hearted, honest, loving, supporting and ambitious man, being helpful to as many people as he could and therefore has earned respect and honor in our whole family." (See letter of Qamar Raza, attached as <u>Exhibit EE</u>; see additional letters of support attached as <u>Exhibit FF</u>.)

### 1.    MR. MADAD'S AGE AND PHYSICAL CONDITION

In considering Mr. Madad's history and characteristics, a relevant consideration is also the age and physical condition of the defendant. <u>See</u> <u>United States v. Schroeder</u>, 536 F.3d 746, 756 (7th Cir. 2008). Because a defendant's age is now relevant under §3553(a), a defendant need not meet the stringent requirements for a departure under U.S.S.G. §5H1.1, which requires that age is relevant only when it "distinguish[es] the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the

defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. §5H1.1; see also, United States v. Hildebrand, 152 F.3d 756 (8th Cir. 1998) (affirmed downward departure for 70-year old from range of 51-63 months to probation with 6 months in home confinement where defendant was a bookkeeper for a group convicted of mail fraud and had life-threatening health conditions).

In making this determination, it is imperative to note the type or degree of circumstances which warrant a variance under §3553(a). In Gall, 552 U.S. at 47, the Supreme Court upheld a probationary sentence in a drug case, and found that a court does not need to find "extraordinary circumstances" to find that a variance is warranted under one of the §3553(a) factors. Instead, the court "must make an individualized assessment based on the facts presented." Id. at 39. "The sentencing judge has . . . greater familiarity with . . . the individual case and the individual defendant before him than the Commission or the appeals court." Id. at 52 (citing Rita, 551 U.S. at 357-358). The courts are therefore "'in a superior position to find facts and judge their import under §3553(a)' in each particular case." Kimbrough, 552 U.S. at 109 (citing Gall, 552 U.S. at 51-52).

Here, Mr. Madad is a 66 year old man. He suffers from arthritis and high blood pressure; both conditions require doctor's care and medication. According to statistics from the World Health Organization ("WHO") 2010 study, the average lifespan of a Pakistani male is 63.78 years. That number increases to 75.35 years for men raised in the United States. See, http://esa.un.org/wpp/Sorting-Tables/tab-sorting_mortality.htm. Under either standard, a Guideline sentence of between ten and twelve years would most likely be a life sentence for Mr. Madad. His daughter notes: "My father is a simple, decent man. . . He is nonviolent, his health is problematic, and at his old age even a few years of jail time would mean dying in jail as far as I am concerned. I understand the allegations against my father are

serious, but he does not deserve to be robbed of the opportunity to be with his own family members, it will not do any good for society or the victims of this situation. I believe his benevolent character and long life of good deeds merits your leniency in sentencing him." (See letter of Mahrukh Zehra Madad, attached as <u>Exhibit A</u>.) Thus, a relevant consideration is whether the instant offense is one which warrants a de facto life sentence.

## B.   SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED

The next factors under §3553(a) concern the need for a particular sentence. The mandatory principle of §3553 is a limiting one: the sentence must be "sufficient, but not greater than necessary," to satisfy: (2) the need for the sentence imposed - - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2)(emphasis added). Courts across the country have recognized that they must honor this parsimonious provision. <u>See</u>, <u>e.g.</u>, <u>Carty</u>, 520 F.3d at 991; <u>United States v. Spigner</u>, 416 F.3d 708, 711 (8th Cir. 2005).

### 1.   THE NEED TO PROVIDE JUST PUNISHMENT

18 U.S.C. §3553 mandates that the court consider the need for the sentence imposed to provide just punishment for the offense. 18 U.S.C. §3553(a)(2)(A). In order to determine whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fits the crime." <u>Simon v. United States</u>, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005). The punishment should not be unreasonably harsh under all of the circumstances of the case. <u>See United States</u>

v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005) (citing S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59). Certainly, a defendant can be "punished" by means other than incarceration.

The instant case has been devastating to Mr. Madad and his family. Mr. Madad's daughter writes: "When our legal troubles initially started, I was in the middle of applying to graduate school, but I put my plans on hold and moved back home to support my parents. Now, I do not know what the future holds for my family. If my father goes to jail, I will of course never leave my mother by herself, I will do my best to protect her and nurture her, for it will be just her and I home alone together for as long as it has to be." (See letter of Mahrukh Zehra Madad, attached as Exhibit A.) Mr. Madad's wife writes: "I am Meher F. Tabatabai, wife of Syed Qaisar Madad. Tears are streaming down my face as I try to write the most important letter I will ever write in my life, since I am writing it for the most important person in my life. Qaisar Madad is my husband, my best friend, the father of my two beautiful daughters, my soul mate, and he is the love of my life. We have been married for over 30 years and I have seen Qaisar in many different roles. As a husband, he has always been supportive, kind, loving, and encouraged me to follow my dreams and pursue my separate career as a doctor. He always let me shine while he was in the background. He helped me take care of my sick parents as if they were his own, and he always supported our two families." (See letter of Meher F. Tabatabai, M.D. attached as Exhibit E.) His niece also notes: "I ask you to please consider leniency in regards to my Uncle's case; though Uncle Qaisar is a wonderful person of tremendous nobility and strength, this current situation has cost him his standing in the community and imposed a terrible burden on him and his family. I know Uncle Qaisar to be a truly law-abiding and trustworthy person and would request you to please take his character, as I and others know it, into consideration when making your decision." (See letter of Asma Z. Madad, MS, MPH, CP, attached as Exhibit GG.) Mr. Madad's daughter

Mahvish succinctly writes: "I understand that the offenses my father has now been accused of are serious. I also understand that others have suffered as a result of whatever mistakes he may have made. I know that some may say say that my father and his family should suffer too, and I can assure you that we have. We too have hurt deeply, and we will continue to suffer for a long time to come. My mother, Meher Tabatabai, who has worked exceptionally hard as a physician for as long as I can remember, has given up her earnings and life-savings in order to re-pay investors, and pay my father's legal bills. I cannot place a value on the mental and emotional pain she endures on a daily basis, but, I know it exists. Our hearts are broken." (See letter of Mahvish Zehra Madad, attached as <u>Exhibit Y</u>.)

## 2.   THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. As noted above, Mr. Madad's entire history shows that society needs no protection from Mr. Madad.

Furthermore, in <u>United States v. Gaind</u>, 829 F. Supp. 669 (S.D.N.Y. 1993), the court considered whether a defendant's conviction would, itself, preclude similar crimes from the defendant. In <u>Gaind</u>, the defendant was convicted of making false statements in connection with contracts for testing materials for the Environmental Protection Agency. As a result of the conviction, the defendant lost his business and was precluded from engaging in similar activities. The court noted that "the destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process. Elimination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income result from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a

source of both individual and general deterrence." Id. at 671. The court further noted that "[o]thers engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior." Id. Thus, the court found that because the defendant could no longer participate in similar crimes due to the loss of the business, the objective "to protect the public from further crimes" set forth in 3553(a)(2)(c) and to "deter crime" under §3553(a)(2)(B) were sufficiently fulfilled to warrant a lesser sentence. Id. at 670.

Like the defendant in Gaind, because of the instant plea, Mr. Madad is precluded from being able to commit similar offenses. The plea provides:

> Defendant shall not engage, as whole or partial owner, employee or otherwise, in any business involving investment services, investment advice, and/or the management of the money and/or assets of any other person, business or entity, without the express approval of the Probation Officer prior to engagement in such ownership, employment or other involvement in such business. Further, the defendant shall provide the Probation Officer with access to any and all business records, client lists and other records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer.

(Plea, ¶2.)

Because Mr. Madad is precluded from working in investing or banking, society needs no further protection from him.

### a.   THERE IS A LOW LIKELIHOOD OF RECIDIVISM

In determining whether the length of the sentence is adequate to protect the general public from further crimes of the defendant, it is also relevant to determine a defendant's likelihood of recidivism. "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21 to 9.5% over age 50. See U.S. Sentencing Commission, Measuring Recidivism: The Criminal

History Computation of the Federal Sentencing Guidelines (hereinafter Release 1) 12 (May 2004 ), available at www.ussc.gov/Research/Research_Publications.

In Simon v. United States, 361 F. Supp. 2d 35 (E.D.N.Y. 2005), the court noted that "[u]nder the Guidelines, age was not normally relevant to sentencing. . . Post-Booker, however, at least one Court has noted that recidivism drops substantially with age." Id. at 48 (citing United States v. Nellum, No. 2:04-CR-30-PS,2005 WL 300073 (N.D. Ind. Feb. 3, 2005) (granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21). The Simon court continued, "[t]he Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant." Id.

According to the Commission's Fifteen Year Report, fraud and larceny offenders in Criminal History Categories I and II have the lowest recidivism rates of all offenders measured. See Release 1, supra, 13. Further, in November 1996, the Sentencing Commission staff authored a paper titled Sentencing Options Under the Guidelines ("Paper"), which acknowledged that the Guidelines were leading to over-incarceration and exacerbating the risk of recidivism. See U.S. Sentencing Commission, Sentencing Options under the Guidelines 17 (1996), available at http://www.ussc.gov/Research/Working_Group_Reports/Simplification/SENT OPT.PDF. The Paper indicates that the Guidelines produce too many prison sentences. A compilation of ten years of data demonstrate the marked increases in prison sentences (and decreases in other types of sanctions) that followed the adoption of the Guidelines. See id. at Appendix A. Additionally, the contents of the Paper acknowledged that non-prison sentences are associated with less recidivism than prison sentences:

> The violation rates for federal offenders placed on simple probation
> or home confinement have historically been low, particularly
> violations for commission of new crimes. In recent years, about 15

percent of persons placed on probation were found to violate the conditions of their probation over the course of their supervision. Most of these were for technical violations, such as a positive drug test. About 2.7 percent of probationers were charged with a new offense or absconded while under supervision.

Supervision authorities note that the violation rates for persons under supervised release following a term of imprisonment are generally higher than for persons on probation. In 1995, 36.1 percent of supervised releasees violated the conditions of their supervision; 9.1 percent faced new charges or absconded. Thus, from a crime control perspective, intensive supervision resources perhaps are better spent on the higher-risk supervised releasees than on relatively low risk probationers.

Id. at 18.

The Paper also discusses the conundrum that "[m]any federal offenders who do not currently qualify for alternatives have relatively low risks of recidivism compared to offenders in state systems and to federal offenders on supervised release." Id. The Paper notes that the "best candidates" for crime-free futures are those who have little criminal history, a good recent employment record, are presently employed or attending school, have no history of drug abuse, have no present drug use, and have a stable living arrangement with a spouse. Id. The Commission arrived at precisely the same findings again in 2004,[4] and 2005.[5]

_____

[4] U.S. Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> (May 2004), available at http://www.ussc.gov/Publicat/Recidivism_FirstOffender.pdf.

[5] U.S. Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score (Jan. 2005), <u>available</u> at http://www.ussc.gov/Research/Research_Publications/Recidivism/20050104_Recid ivism_Salient_Factor Computation. pdf.

Moreover, as the Commission staff recognized in 1996, "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." Id. at 19. Other research has shown the negative effects of over-incarceration on recidivism. See, e.g., Miles D. Harar, Do Guideline Sentences for Low-Risk Drug Traffickers Achieve Their Stated Purposes? 7 Fed. Sent. Rep. 22, 22-23 (July/August 1994) (Bureau of Prisons research in 1994 concludes that for the 62.3% of federal drug trafficking prisoners who were in Criminal History Category I, guideline sentences were costly to taxpayers, had little if any incapacitation or deterrent value, and were likely to negatively impact recidivism); The Sentencing Project, Incarceration and Crime: A Complex Relationship 7-8 (2005), available at http://www.sentencingproject.org/doc/publications /inc_iandc complex.pdf (finding that "the rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality. . . ").

Based on Mr. Madad's age, criminal history, and the type of offense, it is unlikely that he would recidivate. Thus, the public needs no further protection from Mr. Madad.

## C.   SENTENCING GUIDELINES

As noted above, the Guidelines are now just "one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90 (2007). Further, the Court of Appeals for the Ninth Circuit stated, "The district court may not presume that the Guidelines range is reasonable." United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008); see also, Nelson v. United States, 555 U.S. 350, 352 (2009); Rita v. United States, 551 U.S.

338, 351 (2007); Gall v. United States, 552 U.S. 38, 50 (2007). Thus, even if applicable in the instant case, there is no presumption that the Guideline range sets forth a sentence that is reasonable and meets the goals of §3553(a).

However, for the reasons set forth herein, this Court should disregard the Guideline calculation in its entirety in the instant case.

## 1.    THIS COURT CAN DISREGARD THE GUIDELINES CALCULATION IN ITS ENTIRETY

The Sentencing Guidelines were intended to "reflect a rough approximation" of a sentence that meets the purposes of §3553. Kimbrough, 552 U.S. at 562. However, there are times when a Guidelines calculation fails to properly embody those goals. See, Rita, 551 U.S. at 351. In recognizing the potential for this type of discrepancy, Rita made clear, and Kimbrough affirmed, that sentencing courts are free to disregard the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under §3553(a).[6] This broad discretion exists because district courts have a co-equal role with the Sentencing Commission. As the Supreme Court set forth in Rita, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic §3553(a) objectives, the one, at retail, the other at wholesale." Id. at 348.

The Plea Agreement in the instant case precludes arguing for departures not agreed to by the parties. However, the argument under Kimbrough is not a request for a departure (per statute) or a strict variance. By definition, a deviation under

---

[6] The Supreme Court in Rita noted, "As far as the law is concerned, the judge could disregard the Guidelines . . . ." Rita, 551 U.S. at 353. Similarly, in Kimbrough, the Supreme Court noted that the government acknowledged that sentencing courts may now "vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101.

Kimbrough is not "authorized" by the Guidelines. Under the rationale of Booker, and later Kimbrough, the district courts have discretion to deviate from the Guidelines in ways not contemplated by the old departure structure, so long as the court reasonably applies §3553. See Spears v. United States, 555 U.S. 261 (2009). Further, the Court of Appeals for the Ninth Circuit has observed that while a court can choose not to exercise its authority under Kimbrough, a district court presented with a Kimbrough argument is not free to ignore it: "On the contrary, a district court commits procedural error when it fails to appreciate its Kimbrough discretion to vary from the . . . Guidelines based on a categorical policy disagreement with them." United States v. Henderson, 649 F.3d 955, 964 (9th Cir. 2011) (citing United States v. Tutty, 612 F.3d 128, 131 (2d Cir. 2010) and United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009)).

As set forth herein, the Guidelines calculation should be disregarded in the instant case because: 1) the Fraud Guidelines,[7] and the subsequent amendments, are not based on empirical evidence or national experience, and 2) even if properly promulgated, the Fraud Guidelines fail to adequately reflect §3553(a) considerations.

### a. THE FRAUD GUIDELINES WERE NOT BASED ON EMPIRICAL EVIDENCE OR NATIONAL EXPERIENCE

A court may choose to disagree with the Guidelines where the Commission did not act in the "exercise of its characteristic institutional role" when promulgating the Guidelines in question.[8] Kimbrough, 552 U.S. at 109. The

---

[7] U.S.S.G. §2B 1.1 entitled "Theft, Embezzlement, Receipt of Stolen Property, Property Destruction, and Offenses Involving Fraud or Deceit" is referred to herein as "Fraud Guidelines."

[8] In Kimbrough, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others do not. At issue in Kimbrough was the crack guideline, of which the Court said: "The crack Guidelines, however, present

Commission's institutional role has two components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision of the Guidelines in light of judicial decisions, sentencing data, and comments from participants in the field.[9] Rita, 551 U.S. at 349-350. Thus, post-Kimbrough, if a Guideline was not developed based on "empirical data and national experience," or was not revised based on problems which arise after its implementation, the district court may disregard that Guideline. Kimbrough, 552 U.S. at 109; see also, United States v. Mitchell, 624 F.3d 1023, 1030 (9th Cir. 2010) ("As the Supreme Court through Booker, Kimbrough, and Spears has instructed, and as other circuits that have confronted the crack/powder variance in the sentence of a career offender have accepted and clarified in their circuit law, sentencing judges can reject any Sentencing Guideline, provided that the sentence imposed is reasonable"); see also, United States v. Corner, 598 F.3d 411, 415 (7th Cir. 2010) ("We understand Kimbrough and Spears to mean that district judges are at liberty to reject any Guideline on policy grounds-though they must act reasonably when using that power.").

   In developing most of the Guidelines, the Sentencing Commission used "an empirical approach based on data about past sentencing practices, including 10,000

---

no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guideline ranges for crack offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'" Kimbrough, 552 U.S. at 109.

[9] The Sentencing Commission's institutional role allows the Commission to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." Kimbrough, 552 U.S. at 109 (citing United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).

presentence investigation reports." <u>Kimbrough</u>, 552 U.S. at 96 (citing U.S.S.G. §1A.1 intro. Comment, pt. A, ¶3). However, when enacting the Fraud Guidelines,[10] the Commission chose "to depart from past practices." <u>See</u>, U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform (hereinafter "Fifteen Year Report.") 15 (Nov. 2004), www.ussc.gov/Research/Research Projects/Miscellaneous/15YearStudy/index.cfm. The chief consideration for departing from the standard practice in enacting the Fraud Guidelines was a belief that too many white-collar offenders were receiving probationary sentences. <u>Id</u>. at 56. Thus, as the court in <u>United States v. Lenagh</u>, No. 8:07CR346, 2009 WL 296999 (D. Neb. Feb. 6, 2009) recognized, "[f]or policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes." <u>Id.</u> at *3 (citing Fifteen-Year Guidelines Assessment, Executive Summary at vii, 15, 56). As former federal judge Paul Cassell and former federal prosecutor Brett Tolman noted, "Rather than resting on evidence of past, national sentencing practices, the white collar Guidelines are a product of the political environment in which they were promulgated, the Commission's desire that the Guidelines reflect perceived congressional policy, and the Commission's own independent policy determinations concerning the severity of a particular class of conduct." Letter from Brett Tolman, Esq. & Hon. Paul G. Cassell to Chief U.S. District Judge Linda

---

[10] When the United States Sentencing Guidelines were originally promulgated by the United States Sentencing Commission in 1987, the Fraud Guidelines were enumerated in §2F1.1, and titled "Offenses Involving Fraud or Deceit." In 2001, the Guidelines were amended, and §2F1.1 was deleted. The amendment consolidated the guidelines for theft (§2B1.1), property destruction (§2B1.3), and fraud (§2Fl.l), into one guideline-§2Bl.l. <u>See</u> U.S. Sentencing Guidelines Manual app.C n.617 (2001).

Reade 5 (April 19, 2010), available at http://justiceforsholom.org/CassellTolman.pdf.

Thus, the Fraud Guidelines, initially set forth in U.S.S.G. §2Fl.1 and consolidated in U.S.S.G. §2B1.1 in 2001, were not based on empirical evidence of past practices but rather were based on an agenda to increase sentences for white-collar offenses.

### i.   INCREASES IN THE FRAUD GUIDELINES WERE NOT BASED ON EMPIRICAL RESEARCH OR NATIONAL EXPERIENCE

Under <u>Kimbrough</u>, this Court must also determine whether the subsequent amendments to the Fraud Guidelines were done without empirical research, and thus without the Commission exercising its institutional role. In doing so, this Court must consider the reasons why the Commission instituted heavy sentence increases into the Fraud Guidelines.

As noted above, the initial Fraud Guidelines were based on a desire for more custody sentences, not empirical research. Still, the Commission was clear that it only intended a "short but definite period of confinement for a larger percentage of . . . white collar cases," not a lengthy prison sentence in every white collar case. Fifteen Year Report, supra, at vii, 56. The Commission noted that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S. Sentencing Guidelines Manual ch.1, pt.A4(d) (1987). Thus, the Commission's stated intent was that more, not all, white-collar offenders should receive a short prison sentence. However, since that time, the Commission has seemingly forgot its goal that "short but definite" sentences should be the norm in fraud cases. Fifteen Year Report, supra, at vii. Instead, the Commission has dramatically increased the Guideline levels for fraud

offenses. As a result, "[t]he use of imprisonment for economic offenders . . . has increased steadily throughout the guidelines era." Fifteen Year Report, supra, at 56.

The most significant change to the Fraud Guidelines has been the substantial increase in the loss levels. The original 1987 Fraud Guideline had six possible additions to the base offense level, including loss amount.[11] The current Fraud Guidelines have approximately thirty different Specific Offense Characteristics. The increases to the loss table, and the ad hoc amendments, have typically been added in response to a specific event, such as the Savings and Loan scandal, which served as the impetus for the 1989 Amendments. In justifying its near doubling of incarceration in that instance, the Commission simply stated "the purposes of this amendment are . . . to increase the offense levels for larger losses to provide additional deterrence and better reflect the seriousness of the conduct." U.S. Sentencing Guidelines Manual App. C, n.154 (1989). Thus, the 1989 increase was not a result of empirical research but was instead a response to the political climate and pressure to increase sentences of white collar cases.

In light of the corporate scandals in the early 2000's, the Guidelines were amended yet again to "increase sentence severity." See, Fifteen Year Report, supra, at 56-57. These changes were done at the request of Congress, without any attempt at empirical justification. See, U.S. Sentencing Commission, Increased Penalties Under the Sarbanes-Oxley Act of 2002 (January 2003).

There has been significant recognition of the fact that the increases to the Fraud Guidelines were not based on empirical research. In discussing additions of

---

[11] Other Specific Offense Characteristics included: 1) more than minimal planning; 2) number of victims; 3) Defendant's misrepresentation that Defendant was acting on behalf of a charitable, educational, religious or political organization or government agency; 4) violation of a judicial or administrative order; and 5) use of foreign bank accounts to conceal the nature or extent of the fraudulent conduct. U.S. Sentencing Guidelines Manual §2F1.1 (1987).

Specific Offense Characteristics under §2Bl.1, the court in <u>United States v.</u> <u>Adelson</u>, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) noted "[w]hile one might theorize as to why the Sentencing Commission promulgated each of these additions, 'the [Sentencing] Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic'." <u>Id.</u> at 510 (emphasis in original) (citing Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998), affd mem., 301 Fed.Appx. 93 (2d Cir.2008)). Even the Commission itself noted: "The appearance early in the guidelines era of these mandated sentence increases for economic crimes, and the perceived absence of empirical research establishing the need for them, led one former Commissioner to warn that the SRA's promise of policy development through expert research was being supplanted by symbolic 'signal sentencing' by Congress." Fifteen Year Report, supra, at 56.

The effect of these unsubstantiated increases is evident in the instant case. The initial Guidelines provided for a base offense level of 6. <u>See</u> U.S. Sentencing Guidelines Manual §2Fl.1 (1987). At that time, a loss for between $20,000,000 and $50,000,000 added 11 levels. <u>Id.</u> In 1987, the only applicable specific offense characteristic was a 2 level increase for multiple victims. Thus, under the original Guidelines, Mr. Madad's level calculation, with acceptance of responsibility, would be at 16, with a range of 21-27 months. Under the current Guideline range, Mr. Madad faces 32 levels, with a range of 121-151 months. Thus, these increases in the Guidelines altered Mr. Madad's potential sentence to nearly six times the original range. This significant increase was wholly due to the unsubstantiated increases in the Fraud Guidelines.

Because the Sentencing Commission failed to rely on empirical data in making a substantial increase to the Fraud Guidelines, it did not fulfill its

institutional role. Thus, sentencing courts have discretion to disagree with §2B1.1's recommendations.

### b.   THE GUIDELINES SHOULD NOT BE APPLIED BECAUSE THEY FAIL TO PROPERLY REFLECT THE CONSIDERATIONS OF §3553(A)

Congress had three objectives in mind when it enacted §3553(a) and the Guidelines: honesty, uniformity and proportionality.[12] U.S. Sentencing Guidelines Manual §1A1.1 cmt. 3 (2003). Congress sought to achieve "uniformity" by "narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders." Id. Congress intended that §3553 and the Guidelines would ensure proportionality by imposing appropriately different sentences for different criminal conduct. See id. However, sometimes, despite the use of empirical data and national experience, a Guidelines calculation does not adequately reflect the conduct of a particular defendant and leads to a situation of "false uniformity." Thus, even if this Court finds that the Sentencing Commission exercised its characteristic institutional role in promulgating the Fraud Guidelines, another reason this Court may choose to disregard the Guidelines calculation entirely is that its application "'fails to properly reflect §3553(a) considerations' even in a mine-run case," and results in a sentence that does not adequately reflect the defendant's conduct. Kimbrough, 552 U.S. at I09 (citing Rita, 55I U.S. at 351).

---

[12] Congress sought to promote honesty in sentencing by eliminating the indeterminate sentencing system under which defendants often served far less than the sentence imposed by the district court. U.S. Sentencing Guidelines Manual §1A1.1 cmt. 3 (2003).

One way in which a Guideline can fail to properly reflect §3553(a) is where the Guideline has been tainted by what the Sentencing Commission calls "factor creep." See Fifteen Year Report, supra, at 137. "Factor creep" occurs because "[d]etailed rules implementing explicit policies make tinkering with the policies and adding to the rules very easy." Id. Thus, the Commission has recognized that as more adjustments are added to a Guideline, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness. See Fifteen Year Report, supra, at 137. As the Commission noted, "[c]omplex rules with many adjustments may foster a perception of a precise moral calculus, but on closer inspection this precision proves false. Adjustments that appear necessary to achieve proportionate punishment may in actuality result in arbitrary distinctions among offenders." Id. (citations omitted). Few, if any, Guidelines are as complicated, or have as many Specific Offense Characteristics, as §2B1.1. Thus, "factor creep" is most evident in the Fraud Guidelines. Although the Commission identified the "factor creep" problem six years ago, its presence remains imbedded in the Guidelines, particularly in §2B1.1.

In addition to the problems inherent in the Fraud Guidelines due to "factor creep," other aspects of §2B1.1 show that the Fraud Guidelines do not properly consider §3553(a) factors. The most conspicuous example is the loss table, which is the single most criticized aspect of the Fraud Guidelines.[13] The loss table under

_____

[13] In addition to the argument that the loss table is a poor reflection of culpability in most cases, the use of the loss table, itself, has been routinely criticized. As one commentator noted: "The commission also has arbitrarily selected the loss brackets in the table rather than using a uniform multiplier. A lower multiplier at the high-dollar end of the loss table effectively escalates penalties more rapidly, especially when used in conjunction with the sentencing table, where every increase in offense level causes a progressively greater increase in nominal months of imprisonment. The net effect of this steadily escalating mathematical structure contrasts with an arguably more reasonable and rational approach exhibited in the multiple count guidelines (in chapter three, part D). The

§2B1.1 is one of the very few Specific Offense Characteristics allowing for double digit level increases.[14] This significant increase for loss amount occurs regardless of the role of the particular defendant; thus, this substantial increase is often not a true reflection of a defendant's culpability. As one court noted, the Guidelines, "because of their arithmetic approach also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however explaining why it is appropriate to accord such huge weight to such factors." Adelson, 441 F. Supp. 2d at 509 (citing Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998)). That court also noted that the Fraud Guidelines seem to have a "fetish with abstract arithmetic." Id. at 512.

In Adelson, the defendant was convicted of securities fraud and related offenses resulting in a $260 million loss. Adelson, 441 F. Supp. 2d at 509. The total offense level determined by the court was 46, which included a 24 level increase for the loss amount. Id. at 511. This level equated to a Guidelines

---

latter structure increases guideline penalties as additional offenses occur, but it does so at a 'progressively decreasing rate'." Alan Ellis, John R. Steer, and Mark H. Allenbaugh, At a "Loss" for Justice, Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37(2011).

[14] Most of the six other Guidelines that allow for double digit level increases concern terrorism related activities. The Guidelines provide for a 12 level enhancement for obstruction of justice related to terrorism (U.S.S.G. §2J1.2(b)(l)(C)); 12 levels for a felony involving or intending to promote terrorism (U.S.S.G. §3A1.3(a)); 15 levels for willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life (U.S.S.G. §2K1.5(b)(l)); 15 levels for trafficking, receiving or possessing a portable rocket, missile, or launcher (U.S.S.G. §2K2.l(b)(3)(A)); 16 levels for unlawfully entering or remaining in the United States after being convicted of certain major felonies (U.S.S.G. §2L1.2(b) (l)(A)); and 16 levels for bid-rigging or price-fixing, if commerce volume exceeds $1,500,000,000 (U.S.S.G. §2R1.1(b)(2)(H)).

recommendation of life imprisonment "a barbarity" according to the court. Id. The district court noted: "Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." Id. at 514-515.

Further, in United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), the defendant was charged with a securities fraud scheme, resulting in a Guidelines calculation which included 18 levels for loss and several other Specific Offense Characteristics, resulting in a total offense level of 42, with an advisory range of 360 months to life. Id. at 745, 750-751. The district court, noting its burden under Kimbrough, found that the Fraud Guidelines fail "to reflect §3553(a) considerations." Id. at 745. The court observed, "It is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." Id. at 751. The court remarked that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense." Id. at 754. Even before Kimbrough, one court noted:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting -- no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes -- to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence

of the victim's security procedures as on [the defendant's] cupidity. Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more .... The rough magnitude of the theft is relevant to sentencing, but the pmiicular amount stolen is not as significant. ... Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds.

United States v. Emmenegger, 329 F. Supp. 2d 416, 427-428 (S.D.N.Y. 2004).

Additionally, judicial responses to a Sentencing Commission survey confirm that judges believe the Fraud Guidelines do not adequately reflect §3553(a) factors: "slightly more than 40 percent of both responding district and circuit court judges also would like greater availability of sentencing options (particularly probation-plus-confinement or 'split' sentences) for theft and fraud offenses." Lenagh, 2009 WL 296999, at *4 (citing U.S. Sentencing Commission, Summary Report: U.S. Sentencing Commission's Survey of A1iicle III Judges 4 (Dec. 2002)). Indeed, "[s]ince Booker, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in economic offense cases] and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, Sentencing High-Loss Corporate Insider Fraud after Booker, 20 Fed. Sent. R. 167, 169 (Feb. 2008).

As one commentator noted, under the current Guidelines "sentences for large-dollar fraud offenses can easily equal those of violent crimes such as murder . . . ." Ellis, Steer & Allenbaugh at 37. As former federal judge Paul Cassell and former federal prosecutor Brett Tolman noted, "Imposing massively lengthy

sentences in white collar cases is not only wasteful of taxpayer dollars, but it is insulting to the victims of violent crimes. It is hard for victims of truly violent crimes to understand why defendants who have violently harmed them should receive a far shorter prison sentence" than a white-collar offender. Letter from Brett Tolman, Esq. & Hon. Paul G. Cassell to Chief U.S. District Judge Linda Reade 6 (April 19, 2010), available at http://justiceforsholom.org/CassellTolman. pdf.

In the instant case, Probation requests a total offense level of 32. By comparison, the requested total offense level of 32 is one level less than conspiracy or solicitation of murder. See U.S.S.G. §2A1.5 (base offense level of 33). In fact, Mr. Madad would be facing nearly the same offense level if he had been convicted of rape, even if the rape was committed by force or fear of death. See U.S.S.G. §2A3.1(a) and (b) (providing for a base offense level of 30 for rape, with a four level specific offense characteristic for use of force or threats of harm or death). Additionally, Mr. Madad would be facing a significantly lower base offense level if he were convicted of: (1) Attempted Second Degree Murder (level 27 under U.S.S.G. §2A2.1); (2) Providing Material Support or Resources to Designated Foreign Terrorist Organizations (level 26 under U.S.S.G. §2M5.3);or (3) Armed Robbery (level 26 under U.S.S.G. §2B3.1).

There is no question that white collar fraud cases create a serious concern for society. However, an insensate calculation of the Guidelines in the instant case produces an offense level for Mr. Madad that is disproportionate. The concepts of honesty, uniformity, and proportionality are not met by treating Mr. Madad similar to a defendant who commits murder or conspires to commit murder, and certainly, based on the facts of the instant case, it seems nonsensical to treat Mr. Madad the same as someone who commits a violent rape. The onerous Fraud Guidelines calculation simply does not take the individual facts of the case into account. Thus,

based on the facts of the instant case, it seems nonsensical to treat Mr. Madad the same as someone who commits a violent rape. The onerous Fraud Guidelines calculation simply does not take the individual facts of the case into account. Thus, a Guidelines sentence for Mr. Madad would produce a classic case of false uniformity, and the Guidelines should be discarded.

## D.   THE TYPES OF SENTENCES AVAILABLE

18 U.S.C. §3582(a) provides that, "the court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in §3553(a) to the extent that they are applicable." 18 U.S.C. §3582(a) (emphasis added). §3553(a) requires consideration of the "kinds of sentences available." 18 U.S.C. §3553(a)(33). Thus, under §3582, this Court should consider whether a term of imprisonment is appropriate in the instant case and, if some term is necessary, what types of sentences are available. In determining whether to impose a term of imprisonment, it is relevant to note that in enacting the Sentencing Reform Act of 1984 ("SRA"), Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§217(a), 98 Stat. 1987, 2039 (1984). Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious

bodily injury." 28 U.S.C. §994(u) (2012). Despite the statutory goals of Congress, Guideline sentences have resulted in a larger prison population.[15] At year-end 2006, the Bureau of Prisons was 37% over capacity.[16] Increases in sentence lengths for drug trafficking offenders are the major cause of federal prison population growth over the past fifteen years. See Fifteen Year Report, supra, at 50.

Thus, under 18 U.S.C. §3582(a), this Court could determine that a term of imprisonment is not warranted, without consideration of the factors set forth in §3553(a). See 18 U.S.C. §3582(a). Indeed, under §3553(a), the "types of sentences" available absolutely include the use of probation. This finding was reinforced in Gall, where the Supreme Court recognized the value of a probationary sentence under the SRA and §3553(a), even when probation is not called for by the total offense level. 552 U.S. at 44.

The defendant in Gall was a college student who was using MDMA, or "ecstasy," and joined an ongoing conspiracy to distribute that drug. Id. at 41. The defendant, on his own accord, then decided to stop using and distributing the drug. Id. By the end of the defendant's involvement in the distribution ring, the defendant had distributed at least 2,500 grams of MDMA and netted a profit of over $30,000. Id. at 41-42. Probation recommended a guideline range of 30-37 months. Id. at 38. However, the court sentenced Mr. Gall to a term of probation. In

---

[15] The federal prison population was 44,408 in 1986, 48,300 in 1987. See Katherine M. Jamieson and Timothy Flanagan, eds., Sourcebook of Criminal Justice Statistics - 1988, tbl. 6.34, Department of Justice, Bureau of Justice Statistics, Washington, DC: USGPO, 1989. Currently, the population is approximately 201,214. See Timothy J. Flanagan & Katherine M. Jamieson, Sourcebook of Criminal Justice Statistics, 1988, tbl. 6.34 (Hindelang Criminal Justice Research Center 1989); Quick Facts About the Bureau of Prisons, www.bop.gov, (Oct. 10, 2012, 8:57 PM), http://www.bop.gov/news/quick.jsp# 1.

[16] U.S. Department of Justice, Bureau of Justice Statistics Bulletin, Prisoners in 2006 S, available http://www.ojp.usdoj.gov/bjs/pub/pdf/p06.pdf

upholding the sentencing court's finding, the Supreme Court specifically endorsed the value of probation as an available sentence under §3553(a), when reasonable as determined by the district court in a particular case. Id. at 56. The court rejected the position that probation "lies outside the range of choice dictated by the facts of this case" because "§3553(a)(d) directs the judge to consider sentences other than imprisonment." Id. at 58-59. The Supreme Court admonished sentencing courts to "consider every convicted person as an individual," remaining mindful that a sentence of imprisonment "may work to promote not respect, but derision, for the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Id. at 52.

The Gall Court also noted: "Probation is not granted out of a spirit of leniency." Id. at 48, n. 4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." Id. (citing United States v. Knights, 534 U.S. 112, 119 (2001) (finding "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'")). "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." Id. at 48 (citing U.S. Sentencing Guidelines §5B1.3). The court also noted, "Most probationers are also subject to individual 'special conditions' imposed by the court. [Defendant], for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol,

/ / /

/ / /

and must submit to random drug tests as directed by his probation officer."[17] Id. at 48-49.

Thus, this Court should consider whether, based on the unique facts of the instant case, a term of probation, or other non-custodial sentence, is available. The instant offense is not a violent crime and Mr. Madad has shown no propensity toward committing future crimes. Furthermore, Mr. Madad has complied with all of the terms and conditions of his pre-trial release and has demonstrated that he is amenable to supervision. The instant case is one where the "type of sentence" imposed need not be imprisonment. A period of probation, with serious conditions, or a term of house arrest, can adequately meet the goals of §3553.

## E.    NEED TO PROVIDE RESTITUTION TO VICTIMS OF THE OFFENSE

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." See 18 U.S.C. §3553(a)(7); see also, United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); United States v. Peterson, 363 F. Supp. 2d 1060, 1061- 62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

---

[17] Additionally, the Sentencing Guidelines provide that, "[c]ommunity service may be ordered as a condition of probation or supervised release" U.S. Sentencing Guidelines Manual §5F1.3. The Court of Appeals for the Ninth Circuit has held that community service conditions further the statutory goal of providing the defendant with correctional treatment in the most effective manner. United States v. Vega, 545 F.3d 743, 748 (9th Cir. 2008) (citing United States v. McKissic, 428 F.3d 719, 724 (7th Cir. 2005)).

In the PSR, Probation notes that the restitution due is the amount listed in the victim information. (PSR, ¶100.) However, as part of the plea, Mr. Madad gave the following property to the government: 1) a 2008 Mercedes-Benz C63; 2) Mr. Madad's family residence in Diamond Bar, California; 3) real property located in Diamond Bar, California; 4) eighty-nine items of assorted personal property seized from Mr. Madad's residence on October 30, 2012; 5) twenty-one items of assorted jewelry seized on October 30, 2012; 6) nine items of jewelry seized on December 17, 2012; 7) thirty-eight pieces of jewelry seized on December 20, 2012; 8) two pure silk handmade rugs and two pure wool handmade rugs; and 9) $293,979.23 seized from Madad's bank account. The value of this property is several million dollars. (See Exhibit HH.) Additionally, at the commencement of the instant case, Mr. Madad refunded over a million dollars to investors. (See Exhibit II.) Thus, a significant amount of restitution has been paid.

The victims in this case have stressed the need for the remaining restitution, and Mr. Madad wishes to provide it. He is college-educated and hardworking. There is every reason to believe that he can obtain a reasonably well-paying job once he is released. If Mr. Madad were sentenced within the advisory Guideline range, he would not be released until at least 2023. At that point, if Mr. Madad is still alive, his age, health problems, and life expectancy would make it nearly impossible for him to make any restitution. This Court should seek to maximize, rather than eliminate, Mr. Madad's ability to make the restitution the victims have demanded.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# V.
# CONCLUSION

For the reasons set forth above, Mr. Madad asks this Court for a sentence substantially less than the Guideline range.

DATED: May 15, 2013                    Respectfully submitted,

                                       THE LAW OFFICES OF
                                       MARK J. WERKSMAN

                         By: _____
                                       Mark J. Werksman
                                       Kelly C. Quinn
                                       Attorneys for Defendant
                                       SYED QAISAR MADAD