ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
JENNIFER M. RESNIK
Assistant United States Attorney
Asset Forfeiture Section
MIEKE BIESHEUVEL
Assistant United States Attorney
Major Frauds Section
    1100/1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-2432/6595/0687
    Facsimile:  (213) 894-6269
    E-mail:     ranee.katzenstein@usdoj.gov
                jennifer.resnik@usdoj.gov
                mieke.biesheuvel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 12-1048-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S COMBINED (1) POSITION RE SENTENCING; AND (2) RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM |
| v. | |
| SYED QAISAR MADAD, | [DECLARATIONS OF RANEE A. KATZENSTEIN, JENNIFER M. RESNIK AND GERONIMO P. CARMONA, AND EXHIBITS THERETO, FILED SEPARATELY CONCURRENTLY HEREWITH] |
| Defendant. | |
| | Hearing |
| | Date:   June 24, 2013 |
| | Time:   8:30 a.m. |

    Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California, hereby files its Combined (1) Position re Sentencing;

1 | and (2) Response to the Sentencing Memorandum of defendant Syed
2 | Qaisar Madad ("Sentencing Position").

3 | The government's Sentencing Position is based upon the attached
4 | memorandum of points and authorities; the declarations of Ranee A.
5 | Katzenstein, Jennifer M. Resnik, and Geronimo P. Carmona, and the
6 | exhibits thereto, which are separately filed concurrently herewith;
7 | the government's under seal filing, which includes three exhibits to
8 | the Katzenstein declaration and one exhibit to the Resnik
9 | declaration and one exhibit to the Carmona declaration (because
10 | these five exhibits include personal information of the victims) and
11 | letters submitted by the victims; the files and records in this
12 | case; and such further evidence and argument as the Court may
13 | permit.

15 | Dated: June 13, 2013                Respectfully submitted,

16 |                                     ANDRÉ BIROTTE JR.
                                        United States Attorney

17 |                                     ROBERT E. DUGDALE
18 |                                     Assistant United States Attorney
                                        Chief, Criminal Division

19 |
20 |        /S/ Ranee A. Katzenstein
                                        RANEE A. KATZENSTEIN
                                        Assistant United States Attorney

21 |
22 |        /S/ Jennifer M. Resnik
                                        JENNIFER M. RESNIK
                                        Assistant United States Attorney

23 |
24 |                                     Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES .................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 3

I.   INTRODUCTION ....................................................... 3

II.  SUMMARY OF THE UNDERLYING OFFENSES ......................... 4

     A.   OVERVIEW ....................................................... 4

     B.   THE WIRE FRAUD SCHEME ................................... 6

          1.   Defendant's False Statements, Representations and
               Pretenses in Furtherance of the Fraud ............. 6

               a.   Defendant's Trading Activity Actually Resulted
                    in Losses ........................................... 7

               b.   The Gains Reported on the Account Statements
                    Defendant Provided to Investors Were False .... 9

               c.   Defendant was Trading on Margin ............. 11

               d.   Defendant was taking the investors' money for
                    himself ............................................. 11

               e.   Investors' could not get their money back upon
                    request and the returns that were made were
                    Ponzi Payments ................................. 12

          2.   The Scheme's Collapse ............................... 13

          3.   Defendant's False Cover Story And Production
               Of False Documents (UBS Statements) .. . . . . . . . 15

     C.   FALSE SUBSCRIPTION TO TAX RETURNS .................... 19

III. GOVERNMENT'S SENTENCING RECOMMENDATION .................... 21

     A.   ADVISORY GUIDELINES CALCULATION ....................... 21

          1.   Stipulations of the Parties ....................... 21

          2.   Factual Support for the Stipulated Loss Amount .... 21

          3.   A 4-level Adjustment Applies Because There Were More
               Than 50 Victims ................................... 23

          4.   The Sophisticated Means Enhancement Applies ....... 26

TABLE OF CONTENTS (CONTINUED)

PAGE

5.   The Obstruction Enhancement Applies .............. 28

6.   Defendant's Challenge to the Fraud-Loss Guideline
     Should Be Rejected ............................... 31

B.   ANALYSIS OF THE § 3553(A) FACTORS ..................... 34

1.   Nature and Circumstances of the Offense .......... 34

     a.   Defendant's offenses were complex and long-
          lasting .................................... 34

     b.   Defendant's Offenses Caused Significant Harm . 37

2.   History and Characteristics of the Defendant ..... 39

3.   Goals of Sentencing .............................. 44

4.   A Guidelines Sentence Will Not Result In Any
     Disparity with the Sentences Imposed on Defendants
     Who Committed Similar Crimes ..................... 45

IV.   RESTITUTION ............................................. 45

V.   CONCLUSION ............................................... 50

# TABLE OF AUTHORITIES

CASES:                                                                      PAGE

Dolan v. United States,
  130 S. Ct. 2533 (2010) ................................ 48

Kimbrough v. United States,
  552 U.S. 85 (2007) .................................... 31

Neal v. United States,
  516 U.S. 284 (1996) ................................... 31

Rita v. United States,
  551 U.S. 338 (2007) ................................... 31

United States v. Adelson,
  , 441 F. Supp.2d 506 (S.D.N.Y. 2006) ......................... 33

United States v. Densmore,
  210 Fed. Appx. 965 (11th Cir. 2006) ..................... 25

United States v. Dorvee,
  616 F.3d 174 (2d Cir. 2010) ........................... 32

United States v. Edelmann,
  458 F.3d 791 (8th Cir. 2006) .......................... 28

United States v. Ellisor,
  522 F.3d 1255 (11th Cir. 2008) ........................ 25

United States v. Garro,
  517 F.3d 1163 (9th Cir. 2008) ......................... 27

United States v. Gilchrist,
  658 F.3d 1197 (9th Cir. 2011) ......................... 29

United States v. Gilman,
  478 F.3d 440 (1st Cir. 2007) .......................... 28

United States v. Harris,
  ___ F.3d ___, 2013 WL 2321352 (7th Cir. May 29, 2013) .......... 25

United States v. Henderson,
  649 F.3d 955 (9th Cir. 2011) .......................... 33

United States v. Lyles,
  506 Fed. Appx. 440 (6th Cir. Nov. 26, 2012) ................. 26

United States v. Marks,
  530 F.3d 799 (9th Cir. 2008) .......................... 48

United States v. Moreland,
  622 F.3d 1147 (9th Cir. 2010) ......................... 48

TABLE OF AUTHORITIES (CONTINUED)

CASES:                                                                    PAGE

United States v. Parris,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ........................... 33

United States v. Perez-Frias,
    636 F.3d 39 (2d Cir. 2011) ..................................... 32

United States v. Solano-Godines,
    120 F.3d 957 (9th Cir. 1997) ................................... 29

United States v. Wayland,
    549 F.3d 526 (7th Cir. 2008) ................................... 27

United States v. Wright,,
    498 F.3d 371 (5th Cir. 2007) ................................... 28

STATUTES:

18 U.S.C. § 1343 ................................................... 4

18 U.S.C. § 3553(a) ........................................... passim

18 U.S.C. § 3664(d)(5) ......................................... 47, 48

26 U.S.C. § 7206(1) ............................................... 4

SENTENCING GUIDELINES:

USSG § 2B1.1 .................................................. passim

USSG § 2B1.1(a)(2) ............................................... 21

USSG § 2B1.1(b)(2) ........................................... passim

USSG § 2B1.1(b)(10)(C) ....................................... 21, 26

USSG § 2B1.1(b)(1)(L) ........................................ 21, 23

USSG § 3C1.1 ................................................. passim

USSG §§ 5H1.1, 5H1.3, 5H1.4, 5H1.6 ............................. 21

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3          For more than five and a half years, defendant Syed Qaisar

4  Madad ("defendant") deceived over 70 victims into believing that he

5  was a masterful investor who could guarantee them substantial

6  returns on the money they entrusted to him.  Defendant bolstered

7  this deception by providing his victims with fraudulent account

8  statements that purported to show ever-increasing balances.

9  Defendant also lulled his victims into believing that their money

10 was secure by using newly invested funds to satisfy requests for

11 withdrawals.  In fact, the victims' money was anything but secure,

12 having been spent by defendant to purchase real estate, jewelry and

13 cars; to fund cash disbursements to himself and members of his

14 immediate family; and to bankroll gambling junkets.  When

15 defendant's scheme collapsed in March 2011, over $30 million of the

16 victims' money was gone.

17         Defendant is a highly educated man who has held significant

18 positions in the energy industry.  His wife is a successful, well-

19 compensated physician.  Nothing can account for defendant's criminal

20 conduct other than arrogance and greed.  This criminal conduct was

21 extensive, and resulted in devastating consequences for the victims.

22 The Probation Officer has determined that defendant's advisory

23 sentencing guideline range is 121 to 151 months (Presentence

24 Investigation Report ("PSR") ¶ 82).  In fact, it should be 151-188

25 months,[1] and there can be no doubt that a significant sentence is

26 _____

27         [1] Although the Probation Officer correctly found that
   USSG  §2B1.1(b)(2)(B) applied, he mistakenly increased defendant's
   offense level by only 2 levels.  Under USSG § 2B1.1(b)(2)(B), four

28 levels - not two -- are added.

called for here.  Although defendant asks for a sentence substantially less than the advisory guideline range, defendant completely ignores the havoc wreaked by his criminal conduct – indeed, he does not even mention his offense conduct – and the need for the sentence to reflect the seriousness of his offenses, promote respect for the law, provide just punishment, and afford adequate general deterrence.  For these reasons, and the reasons more fully articulated below, and in accordance with the plea agreement, the government recommends that defendant be sentenced to 151 months in custody.

## II.  SUMMARY OF THE UNDERLYING OFFENSES

### A.  OVERVIEW

On February 25, 2013, defendant pled guilty to counts 9 and 16 of the indictment, which charge, respectively, wire fraud, in violation of 18 U.S.C. § 1343, and false subscription to a tax return, in violation of 26 U.S.C. § 7206(1).  (CR 41.) [2]

Defendant admitted the following broad outlines of his criminal conduct in his plea agreement and under oath at the change of plea hearing:

> In or about 1993, defendant MADAD formed Technology for Telecommunication and Multimedia, Inc. ("TTM"). Defendant MADAD was the Chief Executive Officer, Chief Financial Officer, and Secretary of TTM, and, together with his wife, defendant MADAD owned all of the shares of TTM.  TTM maintained Bank of America business checking account number xxxxx-x3204 ("TTM Bank of America Account"). Defendant MADAD had sole signature authority over the TTM Bank of America Account.
>
> Beginning in or about 2005, defendant MADAD used TTM for the purpose of investing and managing his own funds and

---

[2] As used herein, "CR" refers to the Clerk's Record of proceedings in this case and is followed by the number of the item specified.

the funds of other investors.  Defendant MADAD operated TTM from his residence in Diamond Bar, California.

Defendant MADAD held himself out as a successful investor who had not lost money in a single day of trading except one day in November 2006 and who used a day-trading technique that was consistently profitable.  Defendant MADAD told other investors that he did not and would not trade on margin, and that he would return any funds received from other investors, together with the profits that defendant MADAD would make for the investors, upon their request.  Defendant MADAD also told investors that he would not take any fees or compensation for managing the invested funds.

Defendant MADAD received money from investors, who believed that defendant MADAD would invest their money in a way that would generate consistent profits.  After receiving their money, defendant MADAD provided monthly account statements to the investors which always showed gains in their investment accounts.

In fact, as defendant MADAD knew, defendant had and did trade on margin; his trading activity was not consistently profitable; the account balances shown on the monthly account statements were false; and defendant MADAD used investor funds to pay for his own personal expenses and the expenses of his family, and to make cash distributions to himself and members of his family.

Between October 2005 and March 2011, defendant MADAD received over $49 million from investors.  All of the money received from investors was wired or deposited into the TTM Bank of America Account and all trading by TTM was conducted through Charles Schwab brokerage accounts.  None of the money defendant MADAD received from investors was sent to any account maintained by UBS in Switzerland.  Among the monies defendant MADAD received from investors was $100,000 which was wired on May 20, 2009 by B.A.W. from JP Morgan Chase Bank in New York, New York, through the Federal Reserve Bank of New York processing office in East Rutherford, New Jersey, to the TTM Bank of America Account in Placentia, California.  Between 2006 and 2011, defendant MADAD used over $15.5 million of the funds received from investors to purchase real estate, jewelry, and vehicles; to pay credit card balances; and to fund cash disbursements to himself and family members.  Defendant MADAD returned approximately $17.7 million to investors.  The remainder of the funds entrusted to defendant MADAD by the investors was lost in unsuccessful trading.

On or about October 14, 2010, defendant MADAD signed and submitted to the Internal Revenue Service a United States Individual Income Tax Return, Form 1040, for tax year 2009 on which he reported, on line 22, that he had total income

of $4,951,654.  At the time that defendant MADAD signed the return and submitted it to the IRS he knew that he had additional income for tax year 2009 of approximately $4,896,973 and knew that he had a legal duty to disclose this additional income to the IRS.

(CR 40 at 15-17.)

**B.   THE WIRE FRAUD SCHEME**

    1.   <u>Defendant's False Statements, Representations and Pretenses in Furtherance of the Fraud</u>

From approximately November 2005 to March 2011, defendant obtained over $49 million from numerous individuals based on false representations and pretenses, namely that:

(1) defendant's day-trading methodology was successful; he had lost money on only one day since 2005 and had had substantial gains on every other day;

(2) the investments were making substantial gains, as reflected on monthly account statements that defendant created and sent to his investors;

(3) defendant did not and would not trade on margin;

(4) the invested funds were safe and would not be lost;

(5) defendant would manage the investments for free, <u>i.e.</u>, he would not take any fees; and

(6) the investments were completely liquid and the investors could get their money back at any time simply by asking for it.

(PSR ¶ 13; Exh. A (reports of interviews (FBI Forms 302) of selected victim-investors); Exh. B (selected account statements provided by defendant to victims).)[3]

---

[3] As used herein, "Exh." refers to the exhibits attached to the declaration of Ranee A. Katzenstein. "Resnik Exh." and "Carmona Exh." refer to the exhibit referred to and/or attached to the declarations of Jennifer M. Resnik and Geronimo P. Carmona, respectively.  The declarations and exhibits are filed separately concurrently herewith.  All of the exhibits are attached to their respective declarations with the exception of Exh. I, L and M; Resnik Exh. A; and Carmona Exh. B, which are filed under seal because they contain personal information of the victims.

In addition to making these false statements and causing them to be made to the victims individually, defendant made the same false statements to the public at large through interviews broadcast on media outlets aimed at the Pakistani community.  For instance, defendant appeared on the cable television program *Safeer e Pakistan* and stated during his interview:

> [Question: What kind of philosophies do you use in your trading?] [it] is a very conservative philosophy and my first and foremost part is, uh, is the preservation of capital and it's not just word, I mean it.  And I don't do margin investing, I don't do that, I think it's very, uh, very, very, risky.
>
> . . . I have been recently experimenting and studying small and mid cap [companies]. . . this is because of the in-house computer software model that we have developed, you know, my analysts have developed . . .  That has been identifying that you can actually maximize or optimize the return that we have had to date, uh, our worst return, uh, has been I think twenty-three percent.
>
> Actually every individual and common man can do it with what I did.  The results may not be the same because, I guess I was helped by my engineering background because I can analyze it, I can view charts.  We started with a hundred thousand in dollars in the pool in November 2005, and as of December last year 2010, we had over seventy-five million dollars. . .  And most of it is profit . . . In fact close to thirty-nine of it is seventy-five million is profit.

(Exh. C at 3-4, 8-9)

> a.    *Defendant's Trading Activity Actually Resulted in Losses*

Defendant's statements that the investors' funds were safe and would be successfully traded were false and defendant knew it. (PSR ¶ 14.) Defendant lost money on his trades.  Between November 2005 and March 2011, defendant lost approximately $9 million through his unsuccessful trading.  (See Exh. E at 57-59; Exhs. F, H; Carmona decl. ¶ 2.) Defendant's trading was so unsuccessful, that on August 3, 2010, Charles Schwab & Co., Inc. ("Schwab"), the brokerage

defendant used, sent defendant and his wife, as agents for TTM, a letter stating the following:

> We recently completed a routine review of your account and identified a number of transactions initiated on a short term or intra-day basis. According to our records, from September 1, 2009 through August 2, 2010, you made a total of 6,490 trades with total commission costs of $45,333.50. During that period, our review indicates that you sustained a loss, both realized and unrealized, of ($421,079.09).

(Exh. D.)

Defendant signed this letter from Schwab on August 20, 2010, acknowledging that he had each read and understood the letter. (Id.)

There can be no doubt that defendant knew that his trading was unsuccessful. Defendant's accountant, Anne Tahim ("Tahim"), spoke to him about the losses that were resulting from his trades. In her deposition in the related civil case, Omar v. Madad et al., Los Angeles Superior Court, Case No. BC 457773 ("Civil Case"), Tahim stated that she had asked defendant, "What will happen if they [the investors] ask you for the money?" (Defendant responded that he had enough "personal resources" to cover it.) (Exh. E at 57.) TTM's tax returns – which were prepared with defendant's input[4] -- showed losses from trading, for instance $3,537,224 in 2008 and $3,281,573 in 2009. (Exh. F.)

---

[4] Tahim explained the process by which the TTM tax returns were prepared. Bookkeepers working for Tahim would prepare the TTM tax returns after defendant reviewed the financial statements that Tahim and Associates prepared and was satisfied with them. Defendant reviewed the final TTM returns with Tahim and, once satisfied with the returns, would provide the authorizations for e-filing the returns. (Exh. E at 37-39.)

              b.    The Gains Reported on the Account Statements
                    Defendant Provided to Investors Were False

A comparison of the statements for TTM's brokerage and bank accounts obtained directly from Charles Schwab and Bank of America with the statements defendant produced for his investors shows that the investment pool values that defendant was reporting to the investors were false.[5]  For instance, in January 2007, the account statements that defendant sent to investors stated an ending balance for the pooled investments of $6,928,608; in fact, the combined balances in the TTM Charles Schwab and Bank of America accounts was $2,230,510 or 32.19% of the claimed balance.  (Katzenstein decl. ¶ 9; Exh. H; Carmona decl. ¶ 5.)  Every month thereafter, the stated value of the TTM pool reported on the account statements provided by defendant to the investors was likewise significantly higher than the actual combined balances of TTM's accounts.  (Exh. H.)  By

---

[5] Defendant can be directly connected with the fraudulent account statements sent to investors, which falsely represented that the balance in each investor's account was growing substantially month to month.  The statements were e-mailed by defendant to the investors from two personal e-mail accounts (qaisar2452@yahoo.com and qaisar.madad@gmail.com).  Records from Yahoo and Google (g-mail) establish that defendant owns these accounts.  One of defendant's employees, Ashvin Domadia, has explained how the statements were compiled.  According to Domadia, before 2010, the statements were generated using an Excel spreadsheet that was created and maintained by defendant.  In the beginning of 2010, Domadia created a computer program that automatically allocated any given daily TTM profit to individual investors on a pro rata basis.  Defendant told Domadia that he wanted Domadia to take over the preparation of the statements.  Defendant would provide Domadia all of the numbers, figures and information for each day of the covered period, including deposit information, withdrawal information and purported profit figures, that Domadia used to create the statements using his computer program.  (Exh. F.)  During his deposition in the related civil case, Omar v. Madad et al., Los Angeles Superior Court, Case No. BC 457773, defendant stated that he reviewed the account statements before they were sent to the investors.  (Exh. G at 4-5.)

December 2007, the actual balances were 1.8% of the stated value of the TTM pool. (Id.) In 2008, 2009, and 2010, notwithstanding significant infusions of cash from investors, the actual balances continued to be far less than the stated value of the investment pool (under 10% for all of 2008 except for December (13.3%); approximately 10% for the first 5 months of 2009 and then under 5% for the rest of the year; under 2% for all of 2010). (Id.)

Taking just one month as an example, in October 2009, defendant reported that the month-end value of the TTM pool was $50,733,070. In fact, the balance in the TTM Schwab account was $624,608, and the balance in the TTM Bank of America account was $203,556, for a total of $828,165, or 1.63% of the claimed value of the TTM pool. (Id.) This was so notwithstanding the fact that, during the month of October 2009, net receipts from investors totaled approximately $1,229,955. (Exh. I.)

Likewise, a review of the monthly brokerage statements that defendant received from Charles Schwab shows that the net result of his trading activity was not positive and that, although in some months a gain is shown, by March 2011, defendant had lost approximately $9 million through his unsuccessful trading. (See Exh. H.) Moreover, even in the months in which there were gains, the gains were far smaller than what defendant reported to his investors. For example, the Schwab statement for July 2010 reports a month-end realized gain of $6,121. In the account statement for the same period that defendant provided to his investors, defendant claimed a month-end profit of $1,215,203. (Id.)

            c.    *Defendant was Trading on Margin*

The Schwab statements also establish that defendant's representations to investors that he was not and would not trade on margin were false.  (PSR ¶ 14.)  The Schwab statements report TTM's margin loan balance as well as the margin loan rate TTM was being charged.  Although this balance was paid down in some months, many statements show a balance, sometimes a significant one.  (See, e.g., Exh. J.)

            d.    *Defendant was taking the investors' money for himself*

Defendant also knew that his investors' money was not secure because he himself was spending it, a fact that also belies his claim to be forgoing any fees or compensation for managing TTM. (PSR ¶¶ 14, 16.)  Analysis of bank records and records subpoenaed from vendors establishes that defendant used funds from TTM to pay for his personal expenses and make disbursements as follows:

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Jewelry | 373,796 | 325,703 | 492,007 | 167,446 | 100,000 |
| Real Estate/ | 251,254 | 423,333 | 1,698,636 | 1,068.051 | 510,739 |
| Vehicles | 88,464 | 76,013 | 24,697 | 19,656 | 2,451 |
| Credit Cards | 992,350 | 1,403,397 | 1,807,504 | 1,471,788 | 301,234 |
| MFT, MD, Inc. | 315,459 | 278,954 | 261,535 | 150,000 | 107,111 |
| Cash | 182,000 | 196,000 | 499,150 | 609,500 | 121,000 |
| Defendant | 390,250 | 137,000 | 380,346 | 170,000 | 46,000 |
| Family Members | 66,155 | 763,100 | 193,200 | 147,000 | 113,500 |
| TOTAL | 2,660,497 | 3,603,498 | 5,356,985 | 3,803,441 | 1,302,035 |
| GRAND TOTAL: | 16,726,456 | | | | |

(PSR ¶ 16; Carmona decl. ¶¶ 3(f)-(g), 7, 8; Carmona-Exh. A)

These takings far outstrip defendant's actual contribution of his own capital to TTM or any reasonable growth of his investment. TTM's Bank of America account for the period 2006 through 2011 has been analyzed, specifically the source of the deposits into the account.   During this period, defendant and entities related to defendant were the source of only approximately $1.9 million or 3% of the total deposits.   (Carmona decl. ¶ 3(c).)  The vast majority (89%) of the remaining deposits - approximately $54 million - came from investors or investment transfers (i.e., from the TTM Schwab account).

       e.    *Investors' could not get their money back upon request and the returns that were made were Ponzi Payments*

Defendant's promise to his investors that they could get their money back upon request was also false.   For instance, in approximately December 2010 or January 2011, an investor (S.I.A.) asked defendant to return $415,000 of his TTM investment.   By late January, the investor still had not received his money.   On January 26, 2011, the investor e-mailed defendant: "Sorry to bother you but I have not received the wire yet. I was wondering if they got into some other account."   Defendant responded with a fabricated excuse based on Charles Schwab's supposed delays:

> I did contact schwab to expedite transfer.   I am also doing a withdrawl [sic] for house renovation.   Will ask them again, when can I expect funds at Bank of America.
>
> I have been observing, since year 2009, withdrawls [sic] over $250 K takes time.

(Exh. K.)

On January 31, 2011, the investor sent another e-mail to defendant saying "as of today I have not received the withdrawal

that I requested.  It has been over two weeks now."   In his

response on February 1, 2011, defendant claimed that complex IRS

rules were the problem:

> I have followed up with Schwab again today.  Sorry that,
> you along with myself & 2 other investors are stuck in
> this situation.  It has been happening for the past two
> (2) years on large transactions.  From trading account
> because of IRS rules, there can only be inter-company
> transfer ie Tax ID has to match ie have to be the same.
> As soon as funds come to Bank of America Account, I can
> transfer straight to whichever Account or Name you want.
> Is Rizwan in New York or have gone to South America. I
> would like to find out from him, is there something in new
> financial or banking regulations that banks/brokerages are
> taking longer time to deliver funds?

(Id. at 2)

In fact, at the end of January 2011, the balance in the TTM

Schwab account was only $58,889.  (See Exh. H.)  The end of the day

balance in the Bank of America account on February 1 was $12,072.

(Exh. L.)  Defendant did eventually send the investor the requested

$415,000 on or about February 4 ($100,000) and March 2, 2011

($315,000), but only after he had received money from other

investors that he could use to fund this withdrawal.[6]  (Id.)

    2.   The Scheme's Collapse

One of the investors was Dr. Akbar Omar.  Beginning on or about

November 13, 2008, and continuing until on or about January 25,

2010, Dr. Omar invested approximately $10.6 million in TTM for

himself (including investments made from his businesses), his wife

and his children.  On April 15, 2010, defendant sent Dr. Omar a

letter stating:

> This is to certify that Dr. Akbar Omar/Mrs Rukhsana Omar
> have invested a sum of $10,625,435.90 with TTM Inc., a

---

[6] Funds were wired into the TTM Bank of America account by other
investors on February 3, 2011 ($300,000); and February 4, 2011
($200,000).  (Exhs. I, L.)

California Corporation, since November 13, 2008.  Their
current account balance as of March 31, 2010 is
$13,668,918.43, which includes a deferred & current income
of $3,043,482.93 in Nine (9) different accounts.

The funds are totally liquid and can be withdrawn at any
time.

Their investment is generating a monthly income of
$220,000-$240,000 range.  Their annual income from the
investments at TTM is estimated to be $2,750,000 for the
current year.

(Exh. V.)

On or about February 2, 2010, Dr. Omar asked for $2 million of
his money back.  On March 9 and March 25, 2010, defendant obtained
cashier's checks for $1 million and $500,000, respectively, made
payable to Dr. Omar.  Defendant paid for these checks with money in
the TTM Bank of America account that was deposited just days earlier
by another investor.[7]  In a letter to Dr. Omar, defendant asserted
that he had been visited by two IRS agents on February 9, 2010, who
were allegedly investigating Dr. Omar's "business/es & activities,"
which had caused "TTM [to] come under scrutiny."  Defendant stated

TTM does not want to get entangled in this investigation &
will be protecting its operations and other clients. . . .
Because of our long personal relationship, I will meet
your withdrawl [sic] requests from my personal funds, to
avoid any legal issues with the IRS, personal or business.

(Id.)

---

[7] On March 2, 2010, the balance in the TTM Bank of America
account was $114,499.68.  On March 3, 2010, victim-investor
M.B.A. (through his company Bristol Engineering Services) wired
$999,965 (i.e., $1 million less the wiring fee) to TTM, bringing the
balance in the account to $1,114,458.  On March 9, 2010, defendant
purchased the $1 million cashier's check with TTM funds.  On March
21, 2010, the balance in the TTM Bank of America account was
$46,413.88.  On March 22, 2010, victim-investor M.B.A. (again
through Bristol Engineering Services) wired $999,958.50 to TTM,
bringing the balance in the account to $1,046,372.  On March 25,
2010, defendant withdrew $500,000 from the TTM Bank of America
account and that same day purchased the $500,000 cashier's check.
(Exh. M.)

14

These statements were false.  First, no IRS agents had contacted defendant about the purported investigation into Dr. Omar's taxes.[8]  Second, the money for the cashier's checks did not come from defendant's "personal funds," but – as explained above -- was a Ponzi payment funded with the investments from another victim-investor.

When Dr. Omar demanded the return of all of his money, defendant continued to delay.  On March 22, 2011, Dr. Omar filed the Civil Case, suing defendant, defendant's wife, and TTM for Breach of Contract, Fraud, and other causes of action, and on April 18, 2011, obtained a writ of attachment on $9,124,435.90.  (Exh. N.)

## C.   DEFENDANT'S FALSE COVER STORY AND PRODUCTION OF FALSE DOCUMENTS (UBS STATEMENTS)

On or about May 4, 2011, the day before defendant was deposed in the Civil Case, defendant produced in discovery purported statements for UBS brokerage accounts supposedly held in TTM's name in Switzerland. (Exh. O.)  Defendant originally contended that the victims' money was in these accounts.  When it became obvious that there was no money in any such accounts, defendant claimed that the money had been stolen by none other than Dr. Omar.  On or about July

---

[8] A check of IRS databases shows that there were no open investigations of Dr. Omar for any criminal offenses in February 2011 nor prior to that date. Nor do IRS databases reflect, as of February 2011, any contact by the IRS with defendant or any third party regarding Dr. Omar's returns. Dr. Omar's tax returns have since been assigned for civil audit based on whistle-blower complaints, but these complaints were only received after the time when defendant claimed to have been contacted by the IRS about Dr. Omar's taxes. Two complaints against Dr. Omar were submitted by defendant himself on or about June 24 and December 20, 2011.  Of course, if defendant truly believed that the IRS was investigating Dr. Omar in February 2011, he wouldn't have needed to send in referrals against Dr. Omar in June and December 2011.  Two other whistle-blower complaints against Dr. Omar were received in April and May of 2012; one of these whistleblower complaints came from a financial investigator hired by defendant. (Carmona decl. ¶ __.)

18, 2012, defendant sent to the government[9] a written narrative statement (Exh. P), plus two binders and multiple manila envelopes containing various documents, including the purported UBS account statements, describing defendant's "own investigation" into this "crime."

According to defendant's written statement presented to the government, in September 2007, Dr. Omar "wanted TTM to manage his investment portfolio" because he had suffered prior losses of "$80 million in his $100 million investment portfolio," but defendant declined. (Id.) Instead, defendant offered Dr. Omar "free access to the research database, and TTM's proprietary software program/model, and [to] trade together [with defendant]." (Id.) In November 2007, Dr. Omar "started showing gratitude [to defendant] for helping him with his investment portfolio." (Id.) Defendant claimed that Dr. Omar wanted to give defendant a 50% share of the profits he had made through his trades, which was $10,005,23.37. (Id.) Defendant said he accepted this money on behalf of all of the TTM investors. (Id.) According to defendant, Dr. Omar opened an account for TTM with these funds at Bank of the West. (Id.)

According to defendant's statement, on December 17, 2007, defendant opened online an account with UBS in Geneva, Switzerland and asked Dr. Omar to fund the account with the money at Bank of the West. Defendant claimed that Dr. Omar confirmed making this transfer on December 27, 2007, and that defendant began trading in the UBS account on that date. (Id.)

---

[9] Defendant sent identical copies of the materials to AUSA Robert E. Dugdale, Chief of the Criminal Division; AUSA Steven Welk, Chief of the Asset Forfeiture Section of the USAO; FBI Special Agent Brian Schnese, who was the case agent; and AUSAs Ranee Katzenstein and Jennifer Resnik. (Katzenstein decl. ¶ 17.)

According to defendant, Dr. Omar transferred $18,572,350 to the UBS account on October 20, 2008.  (Id.)  Defendant stated that he traded on-line in the UBS account up to March 14, 2011, and was able to log into and access the account up until May 4, 2011.  (Id.)

Defendant stated that he "was ready to reach a settlement of $14 million with [Dr. Omar], and was going to fund the settlement with monies from the UBS account.  When [defendant] attempted to log-in to the UBS Online Account to arrange for the funds for settlement on May 4, 2011, he was unable to access the Online Account."  (Id.)

Defendant concluded: "[Dr. Omar] approached TTM in 2007 claiming losses of $80 Million, and had left TTM in 2011 with this same amount missing.  [Defendant] now finds himself caught in an even worse situation in which he could no longer access the UBS account online (as of May 4, 2011) and entire TTM Investment Pool of $80-81 Million at large.  [Defendant] believes he is being framed by [Dr. Omar] for the entire fraud scheme."  (Id.)

Defendant's story is false and the UBS account statements he provided to the government as proof of his story are fraudulent, as shown by the following evidence:

- The statements include misspellings (e.g., "Netflex" instead of "Netflix" and "quiickly" for "quickly") including one that is a distinctive mistake that defendant makes in his own correspondence ("withdrawl" instead of "withdrawal) (Compare Exh. O at 2, 9, 16 with Exh. B at 3; Exh. K at 1; and Exh. V at 1);

- A forensic analysis of defendant's computer revealed versions of the UBS statements from which it can be demonstrated

17

that the statements were cut-and-pasted together from generic statements appearing on the internet site www.banana.ch ; (Exh. Q.)

- Ashvin Domadia, one of defendant's employees, found a one-page UBS account statement for account number 06711 in the recycling bin of defendant's computer, which defendant had asked Domadia to back up after Dr. Omar's lawsuit was filed (i.e., after March 22, 2011). This document (Exh. G at 11) showed a month-end balance for February 28, 2011, of $14,326,177.90, which is exactly the same balance as the month-end balance for April 25, 2011, shown on the UBS statement for this account that defendant gave to the government. (Exh. O.) The April statement shows the same ending balance because it reports zero interest even though he purports to be holding $14 million in cash in the account. Further, the format used for the statement for February is completely different than the format used for the statement for April, even though both statements purport to be for the same account.

- Records for any and all accounts maintained by or affiliated with Dr. Omar at Bank of the West were obtained and there is no evidence of any transfer to UBS or to defendant. (Carmona decl. ¶ 11.)

- Haider Jawaid went to UBS in Geneva at defendant's request and showed UBS representatives copies of the purported account statements. Representatives of UBS informed Jawaid that the account statements were fake. Among other things, the account numbers were not real UBS account numbers. (Exh. R.)

- Anne Tahim has been defendant's accountant since approximately 1995. Tahim and Associates prepares TTM's tax returns, defendant and his wife's personal tax returns and TTM's

18

books and records.  Tahim stated that she had never heard of the UBS account before May 2011.  According to Tahim, it was then that defendant told her "I never told this to anybody, not even to my wife or best friends, that we have an account in UBS – a Swiss account in UBS which has approximately either 60 or 80 million." (Exh. E at 92-93.)

- The UBS statements first appeared on or about May 4, 2011, the day before defendant was deposed in the Civil Suit, when defendant produced them in discovery.  (Katzenstein decl. ¶ 16; Exh. J at 93-97.)

- Defendant admitted as part of the factual basis for his plea that none of the money defendant received from investors was sent to any account maintained by UBS in Switzerland. (CR 40 at 16.)

### D.  FALSE SUBSCRIPTION TO TAX RETURNS

Defendant's draws of cash from TTM and his use of TTM funds to pay his own expenses was reportable income, but none of this income was reported on defendant's 1040s for 2007, 2008, and 2009.  These 1040s reported only W-2 wages for defendant and his wife totaling $480,000; interest income of $50 in 2007 and 2008 and $247,037 in 2009; small amounts of dividend and partnership income; and gambling winnings in the millions.

Using a conservative analysis of defendant's use of TTM funds, and giving him credit for money that he deposited into TTM, the IRS case agent has determined the following amounts of unreported income and taxes due and owing:

| TAX YEAR | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Unreported Income | 638,825 | 2,618,982 | 3,441,812 | 4,896,973 | 2,730,821 |
| Tax Due & Owing | 215,694 | 930,223 | 1,210,149 | 1,715,154 | 940,778 |

**TOTALS FOR 2006-2010**

Unreported Income:     $14,327,413

Taxes due & Owing:     $5,011,998

(PSR ¶¶ 18-21; Carmona decl ¶ 8; Exh. A.)

Defendant signed the forms 8879 authorizing the e-filing of the returns with the false income numbers under penalty of perjury.

According to defendant's accountant Anne Tahim, defendant reviewed the returns with her in person.  Defendant told Tahim to record the money coming into TTM from investors as shareholder loans; he admitted to her that he knew he shouldn't be using the money to pay personal expenses; although he would bring bank statements, cancelled checks, check stubs and credit card statements to Tahim, he did not provide the subsidiary ledgers because he said he was maintaining those ledgers on his own.  When Tahim would ask for underlying documents pertaining to certain payables and receivables for TTM, defendant would tell her that he had a good handle on it and would not provide the requested documents.  When Tahim asked for underlying records for the shareholder's loans, defendant told her "you don't need to know; I'll keep - I'm keeping those records."  Defendant did not give those records to Tahim. (See Exh. E at 48, 54.)

///

///

///

## III.  GOVERNMENT'S SENTENCING RECOMMENDATION

As explained in the following discussion, the government's recommendation that defendant be sentenced to 151 months in custody is based on an evaluation of the advisory sentencing guidelines and the other § 3553(a) factors.

### A.    ADVISORY GUIDELINES CALCULATION

#### 1.    Stipulations of the Parties

As part of defendant's plea agreement, the parties have stipulated that the following guideline calculation applies in this case:

*Base Offense Level:*              7   (USSG § 2B1.1(a)(2))

*Loss more than $20 million*   +22   (USSG § 2B1.1(b)(1)(L))
*but not more than $50  million*

The government reserved the right to seek the application of upward adjustments for multiple victims, use of sophisticated means, and obstruction of justice pursuant to USSG § 2B1.1(b)(2)(B), § 2B1.1(b)(10)(C), and § 3C1.1, respectively, and defendant reserved the right to object to the application of these adjustments.

At the change of plea hearing, without government objection, defendant also reserved his right to argue for a downward departure based on age, mental and emotional condition, physical condition and family ties and responsibilities, under USSG §§ 5H1.1, 5H1.3, 5H1.4, 5H1.6.

#### 2.    Factual Support for the Stipulated Loss Amount

Under USSG § 2B1.1, a defendant's offense level is increased by 22 levels if the loss was more than $20 million but less than $50 million.  As a general rule, loss in a fraud case "is the greater of actual loss or intended loss." USSG § 2B1.1, comment. (n.3(A)).

"'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  USSG § 2B1.1, comment. (n.3(A)(i)). "'Pecuniary harm' means harm that is monetary or otherwise readily measurable in money."  USSG § 2B1.1, comment. (n.3(A)(iii)). "Reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  USSG § 2B1.1, comment. (n.3(A)(iv)).

In calculating the loss amount the guidelines also provide for certain credits against loss.  Of relevance here, the amount of loss is reduced by "[t]he money returned . . . by the defendant . . . to the victim before the offense was detected."  USSG § 2B1.1, comment. (n.3(E)(i)).  The time of detection of the offense is "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."  Id.  However, in a Ponzi scheme case, "loss shall not be reduced by the money . . . transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme)."  USSG § 2B1.1, comment. (n.3(F)(iv)).

Here, analysis of the Bank of America account for TTM shows that defendant received $49,493,240 from investors.  (Exh. K.) Defendant's offense was discovered by a victim (Dr. Omar) by at least March 22, 2011, when he filed the Civil Case.  Prior to March 22, 2011, defendant had returned $17,165,116 to the investors.

(Carmona Exh. B.)   Of this amount, at least $966,601 represented gains over principal investments.   Subtracting these gains from the amount returned leaves $16,198,515, which is the amount to be credited to defendant.   Therefore, the total amount of loss is $33,294,725, resulting in a 22-level upward adjustment pursuant to USSG § 2B1.1(b)(1)(L).

3.   A 4-level Adjustment Applies Because There Were More Than 50 Victims

Under USSG § 2B1.1(b)(2), a defendant's offense level is increased if the offense involved multiple victims.   Specifically, two levels are added if there were 10 to 49 victims, and four levels are added if there were 50 to 249 victims.   The application notes for this guideline explain that: "'Victim' means any person who sustained any part of the actual loss determined under subsection (b)(1) . . . 'Person' includes individuals, corporations, associations, firms, partnerships, societies, and joint stock companies."   "Actual loss" in turn "means the reasonably foreseeable pecuniary harm that resulted from the offense."   USSG § 2B1.1, comment. (n.3(A)(i)).   Pecuniary harm "means harm that is monetary or that otherwise is readily measurable in money."   USSG § 2B1.1, comment. (n.3(A)(iii)).

As discussed above, defendant sent the investors monthly account statements that purported to show the monthly increase in the TTM pool and the corresponding profit attributable to each investor account.   Defendant listed all of the investors' accounts on a single statement, with each individual account identified by the initials of the account-holder.   The monthly statement for October 2010 created by defendant and sent to the TTM investors

shows, in the summary of capital gains for October 2010, that at
that time, according to defendant, there were 76 different accounts
(each identified by the initials of the account-holder) and many of
these accounts were held by more than one individual (accounts
identified by two sets of initials). (Exh. B.) A review of the TTM
Bank of America account records revealed that there were
approximately 13 investors who were repaid in full. Therefore, a
conservative reading of defendant's own records shows that there
were at least 63 victims of the TTM fraud scheme. In his deposition
in the Civil Case, defendant stated that as of May 2011, there were
approximately 90 investors in TTM. (Exh. S at 16-17.)

A review of the TTM Bank of America account records shows that
approximately 83 persons suffered an actual loss as a result of
defendant's criminal scheme.[10] (Resnik decl. ¶ 2; Resnik Exh. A.)
The government analyzed the payors of the deposits into the TTM Bank
of America account, as well as the payees of withdrawals from the
account, and compared this information to TTM records regarding the
individual accounts held within the TTM pool to determine which
deposits/payments could be attributed to investors. This analysis
established that there were more than 50 different victims of
defendant's crimes. (See Resnik Exh. A (list of the victims and
their losses).)

It is true that many of the victims were related to other
victims, for instance as spouses. In some cases, the spouses
invested jointly; in other cases, money was separately invested by
the spouses. These facts do not alter the fact that the spouses are

_____

[10] As explained in the discussion of restitution below, the
government is still reviewing records from the victims to confirm
precise amounts of loss.

separate victims for purposes of applying the upward adjustment under § 2B1.1(b)(2). United States v. Harris, __ F.3d __, 2013 WL 2321352 (7th Cir. May 29, 2013) (spouses who jointly hold investments are each counted as victims because each sustains part of the loss); United States v. Ellisor, 522 F.3d 1255, 1275 (11th Cir. 2008) ("even in the case of money held jointly by a marital couple, both the husband and wife count as victims because each sustains a part of the actual loss") (citing United States v. Densmore, 210 Fed. Appx. 965, 971 (11th Cir. 2006) (internal quotation marks omitted))).

The same principle holds true for victims who are related as parent and child. While some of the victims may have invested money with defendant on behalf of their children, the children still sustained a pecuniary harm, because they suffered a part of the actual loss. The children lost money that would have otherwise belonged to them as a gift and thus the children must be counted as victims separate and apart from their parents. In Ellisor the defendant fraudulently promoted a non-existent Christmas show and solicited teachers and students from elementary schools to buy tickets. Id. Thousands of tickets were purchased by approximately 23 schools on behalf of students ranging from the third to the fifth grade. Id. The schools collected money from the students and parents, consolidated the funds and then mailed checks to Ellisor. Id. In determining the number of victims of Ellisor's crimes under § 2B1.1( b)(2), the district court found that the parents and students (over 2,700 persons) who paid for tickets to the show should be counted as victims in addition to the schools. Id. The Eleventh Circuit affirmed, reasoning that the parents and students

were persons who sustained a part of the reasonably forseeable harm.
Common sense dictates that, for the most part, parents gave the
schoolchildren money for purchase of the tickets, but who possessed
the money was of no significance in the court's determination to
count the students as victims, since the tickets were purchased on
their behalf and thus they suffered a loss.  See United States v.
Lyles, 506 Fed. Appx. 440, 2012 WL 5907483, *5 (6th Cir. Nov. 26,
2012) ("the specific offense characteristic for number of victims
under § 2B1.1(b)(2) punishes the impact of the crime").

Accordingly, a 4-level upward adjustment applies under USSG
§ 2B1.1(b)(2) because there were more than 50 victims of defendant's
offense.[11]

### 4.    The Sophisticated Means Enhancement Applies

The Probation Officer found that defendant's offense level
should be increased by two levels pursuant to § 2B1.1(b)(10)(C)
because defendant used sophisticated means to carry out his investor
fraud scheme.  (PSR ¶ 35.)  This finding is correct.

Advisory sentencing guideline § 2B1.1(b)(10)(C) applies if the
offense "involved sophisticated means."  The application notes for
this guideline explain that:

> "sophisticated means" means especially complex or
> especially intricate offense conduct pertaining to the
> execution or concealment of an offense.  For example, in a
> telemarketing scheme, locating the main office of the
> scheme in one jurisdiction but locating soliciting
> operations in another jurisdiction ordinarily indicates

[11] In paragraph 33 of the PSR, the Probation Officer correctly
found that USSG § 2B1.1(b)(2) applied but incorrectly only added 2
levels rather than the 4 levels called for by USSG § 2B1.1(b)(2).
The government failed to note this error in its previously filed
Concurrence in the PSR. The government withdraws its concurrence
with respect to this paragraph of the PSR and hereby requests that
the Court find that the appropriate adjustment to recognize the
number of victims is four levels.

sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1, comment. (n.8(B)).

In this case, there is no dispute that defendant hid from his victims the fact that he was not investing his victims' money as promised. He also hid the transactions by which, in contrast, he took their money for himself and used it to buy real estate, cars, and expensive jewelry, and to fund cash disbursements to himself and members of his family.  Defendant concealed these transactions by creating and sending his victims fictitious monthly account statements that purported to show legitimate trading activity and investment gains. (See Exh. B.)

This pattern of conduct, which continued for more than five years and involved defendant's creation of complex fraudulent documents to conceal the truth from his victims and lull them into a false sense that their money was invested and appreciating as promised, amply supports application of the sophisticated means enhancement.  As the reported cases show, similar and even simpler conduct has resulted in the proper application of this enhancement. See United States v. Garro, 517 F.3d 1163, 1169 (9th Cir. 2008) (use by defendant convicted of defrauding investors of "numerous confusing and misleading documents regarding the investors' funds," and manipulation of transactions to mask defendant's taking of victims' money warrant sophisticated means enhancement); United States v. Wayland, 549 F.3d 526, 529 (7th Cir. 2008) (defendant's creation of documents to maintain the fiction that a health care

27

provider existed in order to fraudulently obtain benefits warrants sophisticated means enhancement); United States v. Wright, 498 F.3d 371, 379 (5th Cir. 2007) (defendant's deposit of third party funds to purchase cashier's checks in borrower's name constituted sophisticated means in a scheme to defraud mortgage lenders); United States v. Gilman, 478 F.3d 440, 444 (1st Cir. 2007) (no challenge to sophisticated means enhancement in investment advisor fraud case where defendant hid his diversion of clients' funds by periodically issuing false account statements assuring them that their money was invested and appreciating as promised); United States v. Edelmann, 458 F.3d 791, 816 (8th Cir. 2006) (use of false documents established sophisticated means).

For these reasons, a two-level upward adjustment applies because defendant's offense involved sophisticated means.

### 5.   The Obstruction Enhancement Applies

The Probation Officer found that defendant's offense level should be increased by two levels pursuant to § 3C1.1 because defendant willfully attempted to obstruct justice by falsely claiming to the prosecutors and investigating agents that the victim-investors' money was missing because it had been stolen from him and by producing fake documents to back up this lie.  (PSR ¶ 39.)   This finding is correct.

Advisory guideline § 3C1.1 applies if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

USSG § 3C1.1.  Application note 4 to the obstruction guideline contains "a non-exhaustive list of examples of the types of conduct to which this adjustment applies," which includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." USSG § 3C1.1, comment. (n.4(C)).  The Ninth Circuit has interpreted "official investigation" for this purpose to mean "only official investigations closely associated with judicial proceedings." United States v. Solano-Godines, 120 F.3d 957, 963 (9th Cir. 1997) (explaining that this interpretation is necessary to reconcile this provision with application note 5(a), which provides for the enhancement when a defendant gives a false identification document upon arrest only if doing so "resulted in a significant hinderance to the investigation or prosecution").

Here, there can be no doubt that defendant provided counterfeit UBS account statements to the government in order to hinder the government's investigation of defendant by falsely representing that defendant had not misappropriated the investors' money and falsely bolstering defendant's phony story that the money had been stolen by Dr. Omar.  See United States v. Gilchrist, 658 F.3d 1197, 1203 (9th Cir. 2011) (affirming application of obstruction enhancement where, during the pendency of an FBI investigation, defendant blamed his own criminal fraud on an unknown thief during a deposition in a related civil matter).  Defendant was well aware of the government's investigation of his conduct prior to providing the documents; indeed he had retained counsel and met with the government regarding the investigation in March 2012.  (Katzenstein decl. ¶ 24.)

The enhancement also applies for a separate, independent reason, namely that defendant's statements significantly impeded the investigation of the instant offenses.  USSG § 3C.1.1, comment. (n.4(G)).[12]  The materials defendant sent to the government had a significant impact on the investigation of the offenses eventually charged in the indictment in this case.  In order to address defendant's contentions, among other things the government: (1) obtained and analyzed bank records for Dr. Omar, his family members, and his business entities in order to disprove defendant's contention that Dr. Omar had provided over $10 million to defendant that was used to open the purported UBS accounts (there was no such transfer); (2) conducted a forensic analysis of defendant's computer (resulting in the discovery of evidence that defendant had fabricated the purported UBS statements); and (3) interviewed and obtained sworn testimony from an associate of defendant regarding information obtained from UBS in Switzerland (i.e., that the statements were fraudulent and even the account numbers appearing on them were not true UBS account numbers).  (Katzenstein decl. ¶ 24; Carmona decl. ¶ 11.)  These were significant steps which consumed important law enforcement resources.

For these reasons, defendant obstructed justice and a two-level upward adjustment applies.

---

[12] Application note 4(G) states that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" is conduct to which the obstruction enhancement applies.  USSG § 3C1.1, comment. (n.4(G)).

6.   Defendant's Challenge to the Fraud-Loss Guideline
        Should Be Rejected

Relying on Kimbrough v. United States, 552 U.S. 85, 96 (2007),
defendant urges the Court to disregard Sentencing Guideline § 2B1.1
because it is "not based on empirical evidence or national
experience" and, in any case, "fail[s] to adequately reflect
§ 3553(a) considerations." (Def. Sentencing Memorandum ("Def.
Mem.") at 26.)  This Court should reject defendant's wholesale
challenge to USSG 2B1.1  because it is based on a misunderstanding
of the role of the U.S. Sentencing Commission and the false premise
that non-violent offenders do not deserve substantial custodial
sentences.

In Kimbrough itself, the Supreme Court made clear that,
"[e]ntrusted within its sphere to make policy judgments, the
Commission may abandon its old methods in favor of what it has
deemed a more desirable 'approach.'"  552 U.S. at 104 (quoting Neal
v. United States, 516 U.S. 284 (1996)).  The Court also described
the Commission's traditional approach as one in which it "modif[ied]
and adjust[ed] past practice in the interests of greater
rationality, avoiding inconsistency, complying with congressional
instructions, and the like."  Id. at 96 (quoting Rita v. United
States, 551 U.S. 338, 349 (2007)).  The problem with the crack
cocaine Guidelines at issue in Kimbrough (aside from their apparent
lack of any rationale) was the fact that they did not represent the
Commission's policy considerations but rather were an unreflective
adoption of Congress's mandatory minimums.  Id. at 109-10.  The
Second Circuit, which had similar problems with the child
pornography Guidelines, made clear that its objection was not a lack

31

of retrospective "empirical" sentence averaging, but rather what it saw as Congressional meddling.  <u>United States v. Dorvee</u>, 616 F.3d 174, 184-86 (2d Cir. 2010) (finding that Congress directed the amendment of the child pornography Guideline over the objections of the U.S. Sentencing Commission, resulting in Guidelines sentences in the mine-run case that approached the statutory maximum).  There is no such problem when the Commission makes its "own determination that these increased offense levels are appropriate to reflect the serious nature of these offenses."  <u>United States v. Perez-Frias</u>, 636 F.3d 39, 43 (2d Cir. 2011) (analyzing <u>Dorvee</u> and finding that enhancements to illegal reentry Guideline were not flawed based on a lack of empirical data).  Defendant's claim that the purported lack of an empirical basis for USSG § 2B1.1 requires rejecting the guideline should thus be rejected.

Further, white-collar criminals do deserve Guidelines sentences, including incarceration.  Tellingly, in 2010, 65% of district court judges surveyed reported that the Guidelines set the appropriate range for fraud offenders; 24% believed the Guidelines were too low; only 10% believed they were too high.  <u>See</u> U.S. Sentencing Commission, "Results of Survey of United States District Court Judges January 2010 through March 2010" at 13, available at http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judg e_Survey.pdf.  That is in stark contrast to the only 28% who agreed with the crack Guidelines (70% believing them too high), and the 26% who agreed with the possession of child pornography Guidelines (70% again believing them too high).

In any case, some of defendant's attacks on USSG § 2B1.1 as not reflecting § 3553(a) considerations have no applicability in this

case.  For instance, defendant complains that the increase due to the amount of loss "occurs regardless of the role of the particular defendant; thus this substantial increase is often not a true reflection of a defendant's culpability." (Def. Mem. at 34.)  This complaint has no purchase here because defendant alone conceived, implemented, and benefitted from the criminal scheme.  Likewise, any problem with USSG § 2B1.1 as used in securities fraud cases such as the ones cited by defendant, United States v. Adelson, 441 F. Supp.2d 506 (S.D.N.Y. 2006), and United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), has no relevance for the instant case. In those securities fraud cases, the number of victims and the amount of loss rose dramatically because stock in large volume was sold on the open market, and the defendants were subject to an additional enhancement because they were officers or directors of publicly traded companies.  See Adelson, 441 F. Supp.2d at 509 ("Since successful public companies typically issue millions of publicly traded shares . . . the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart.")  Here, in contrast, defendant had direct contact with, and directly caused the losses to, each of the investors whose losses are the basis for the sentencing loss figure in this case, and no securities-fraud enhancements are applied.

Finally, although the Court has discretion after Kimbrough to vary from the Guidelines based on a policy disagreement, the Court is not obligated to do so.  United States v. Henderson, 649 F.3d 955, 964 (9th Cir. 2011) ("We further emphasize that district courts

are not obligated to vary from the child pornography Guidelines on
policy grounds if they do not have, in fact, a policy disagreement
with them.")

**B.    ANALYSIS OF THE § 3553(A) FACTORS**

The factors to be considered when imposing sentence, as set
forth in 18 U.S.C. § 3553(a), include:

> (1) The nature and circumstances of the offense and the
> history and characteristics of the defendant;
>
> (2) The need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense,
> > to promote respect for the law, and to provide just
> > punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal
> > conduct; [and]
> >
> > (C) to protect the public from further crimes of
> > the defendant . . .
>
> (3) The kinds of sentences available;
>
> (4) [the applicable sentencing guidelines];
>
> (5) [the applicable sentencing guidelines policy statement];
>
> (6) The need to avoid unwarranted sentence
> disparities among defendants who have been found guilty of
> similar conduct; and
>
> (7) The need to provide restitution to the victims
> of the offense.

18 U.S.C. § 3553(a).

Factor 4 (the applicable sentencing guidelines) was discussed
above.  The remaining § 3553(a) factors are discussed below.

### 1.    Nature and Circumstances of the Offense

#### a.    *Defendant's offenses were complex and long-lasting*

For approximately five and a half years defendant held himself
out to friends, family, colleagues and other members of his

community as a successful investor who would generate substantial profits for them without taking any fees or commissions for his work.    In fact, defendant's representations were part of a complex, long-lasting fraud that allowed him to take advantage of the trust bestowed him by his community in order to steal over $32 million in college funds, life savings and hard earned income of his victims.

Defendant's actions were not the result of a single lapse in judgment or impulsive behavior.    Rather, defendant's scheme was deliberate, carefully conceived and required a great amount of planning and effort.    For example, defendant produced monthly account statements to his investors that generally showed, among other things: (1) daily performance records (i.e., the purported daily profits and losses); (2) deposits and withdrawals made by the investors; (3) snapshots of the purported total balance of funds managed by TTM along with each individual investor's percentage share of the total balance at different points throughout the month; (4) the total current investment level of funds managed by TTM along with each individual investor's percentage share of the investment level at the end of the month; and (5) the capital gain to date for all funds managed by TTM along with each investor's share of the capital gains.    (Exh. B.)    As explained above comparisons to the TTM Charles Schwab and Bank of America accounts show that these monthly statements were completely fabricated. (Exh. H.) Yet defendant took pains to carefully construct these statements to make them appear internally consistent and therefore credible.

In addition to sending monthly reports to the investors, defendant took a number of other toilsome and calculated steps to promote his Ponzi scheme and conceal the fraud.    For example,

defendant employed a staff of "equity analysts" who worked out of his garage.  (Exh. G.)  The "equity analysts" were tasked with tracking the volatility index and providing hourly updates and reports on the financial sector of the stock market among other things.  (Id.)  However, the "equity analysts" never actually participated in the trading and were merely staged to make defendant's operation appear legitimate.  Defendant's interview on the cable television program *Safeer e Pakistan* (see Exh. C) served to promote the TTM investment pool.  During the interview, defendant stated that his success was due to "the in-house computer software model that we have developed."  (Id.)  He also assured his listeners about his prudence, falsely stating that he didn't "do margin investing," because it was "very, very, risky."  (Id.)  Defendant further claimed, also falsely, that as of December 2010, there was over $75 million in the TTM account and that close to $39 million of that was profit.

Perhaps the most elaborate step that defendant took to facilitate and conceal his crime came after the collapse of his scheme.  As discussed above, defendant created false brokerage statements for purported UBS brokerage accounts held in TTM's name in Switzerland.  (Exh. O.)  Defendant originally contended that the missing victims' money was in these accounts, but when it became obvious that there was no money in any such accounts, defendant fabricated a story, falsely impugning one of his investors (Dr. Omar) by claiming that the investor had stolen the other investors' money.  (Exh. P.)

Defendant's criminal conduct was not limited to the Ponzi scheme.  Defendant drew close to $1 million in cash from the TTM

account between 2007 and 2009 and used TTM funds to pay his own
expenses, which was reportable income, but none of this income was
reported on defendant's 1040s for 2007, 2008, and 2009.  (PSR ¶¶ 19-
20; Carmona Exh. A.)  Defendant's concealment of this income
resulted in cumulative losses to the US Treasury in evaded taxes of
over $5 million.  (Id.)

The fact that defendant carried out his fraudulent scheme over
such a long period of time, with careful planning and execution, is
a factor that weighs heavily in favor of a substantial prison
sentence.

>          b.    *Defendant's Offenses Caused Significant Harm*

Defendant's crimes caused irreparable harm to many of the
victims in this case.  The victims gave money to defendant to invest
believing that their money was safe, that defendant did not and
would not trade on margin, and that defendant was earning consistent
profits for them.  The false monthly account statements produced by
defendant induced many of the victims to give defendant more money
after their initial investment, since it appeared from these
statements that the victims were earning a substantial return.  A
large portion of the victims gave defendant money that they would be
needing in the future (i.e., for education, medical expenses,
retirement, etc.) -- money that they could not afford to lose.

The victims have described the impact of defendant's fraud in
letters submitted to the government.[13]  Although the following
excerpts from these letters represent only a fraction of the victims
who lost money, their stories provide a vivid picture of the harm
that defendant's crimes have caused:

---

[13] The letters from victims received to date by the government
are included in the government's concurrent under seal filing.

<u>Victim Noor K., lost $590,000</u>

> "We have known Madad and his wife since 1989, and as is
> often the case with first generation immigrants, we
> considered each other as extended family . . . They
> spent our hard earned money on jewelry, silk carpets,
> designer clothing etc. which they flaunted to the entire
> community.  [Dr. Tabatabai] frequently boasted that some
> of the pieces she owned cost as much as a house ($250K),
> and she claimed to have over 100 designer handbags, each
> of which cost $3,000 or more.

> At one point I told [Madad] that we had given him
> everything we had, and he looked me straight in the eye
> and advised me that since interest rates were so low, I
> should access the equity in our house, and then pay it
> off when I started withdrawals. . . .

> My husband is now 62 years old, and he has never worked
> harder in his life.  For the past two years, he has been
> forced to work seven days a week, and leaves home every
> day at 6:30 a.m.  In an attempt to supplement our
> income, I sometimes work 14 to 16 hours a day. . . . We
> have lost faith in everything and everyone that we once
> thought were anchors in our lives.  We have gone through
> anger, depression, fights, phases of blaming each other,
> etc."

<u>Victims Mehar and Shaheen I., lost a total of $130,000</u>

> "Both [defendant] and [his wife] knew that I was working
> part-time due to my rheumatoid arthritis, heart-disease,
> and diabetes, and that this was a significant amount of
> money for someone in my position.

> My husband was also encouraged by the Madads to invest
> money that was going to be used to support his brother,
> who recently went blind and is currently in a nursing
> home, unable to work.  My husband is the only immediate
> family that his brother has and is responsible for him .
> . . The Madads were fully aware of my husband's
> brother's situation, especially since Meher was his
> doctor at one point.

> In this case, Qaisar and Meher stole from people they
> were close to, all-the-while smiling to our faces,
> knowing exactly what they were doing to us, and then
> spent our hard earned money in front of our eyes."

<u>Asma and Tanweer Q., lost $775,000</u>

> "[We] have been very badly affected by this chapter in
> our lives.  Financially, it has been a big burden, and
> it has derailed our plans and hopes.  Besides having
> lost most of our cash savings and our children's college
> funds, we are in debt because of the home equity loan
> that invested in [TTM]. . . . [Tanweer] will be retiring
> next year.  He will need to work after retirement in
> order to pay for our children's education and pay our
> other bills, which is a big financial concern for us."

<u>Khalid S., lost $90,000</u>

> "I am a retired person and living on my savings, losing
> such a big amount of funds, at my age, is a big mental
> shock and a constant worry to make ends meet.  At my
> age, I have to go back to a part time job to provide
> existence for my wife and me . . . [the] loss of funds
> has caused mental anguish to my wife and me and we are
> facing severe financial hardships."

As this selection of excerpts from the victim statements makes
clear, defendant's criminal scheme caused: severe financial
pressure; delayed retirement, as many victims have had to continue
to work beyond their targeted retirement to make up for the losses
they suffered; inability to pay for expenses, including college
tuition or other educational expenses, medical expenses, mortgage
payments, and credit card payments; and significant emotional
consequences, including loss of trust and increased strain on family
relationships.

    2.   <u>History and Characteristics of the Defendant</u>

Defendant did not commit his crimes out of necessity.  There is
no evidence that defendant's actions were a product of financial
distress or other significant hardship in his life.  Instead, as the
information set forth in the PSR and defendant's own Sentencing

Memorandum demonstrates, defendant had the ability to lead a successful and productive life without resorting to the fraud that he carried out on his victims.  Defendant comes from a financially stable family, he has two master's degrees and his wife is a physician with her own medical practice.  Unlike other defendants who come before this Court, defendant chose to turn to criminal conduct despite having significant other opportunities available to him.  Defendant's crimes were not part of a desperate attempt to make good on losses in an unsuccessful investment operation (as occurs in some Ponzi schemes).  Rather, his criminal conduct was part of a calculated and well-orchestrated fraud from the outset. Defendant offers no excuse for his crimes other than sheer greed.

Defendant's advantages were not just financial but also personal, being a man of intelligence who benefitted from an excellent education.  Yet defendant employed these advantages to achieve bad ends, using his sophistication and intelligence to carry out his fraud.  The level of defendant's sophistication is illustrated by the fact that defendant was able to deceive his victims, many of whom were educated professionals - doctors, lawyers and businessman - for such a lengthy period of time.  In his interview on *Safeer e Pakistan* defendant claimed that his success with the TTM investment pool was due in part to his engineering background.  While the TTM investment pool was never successful, it is true that his engineering background may have contributed to his success in developing a well-oiled Ponzi operation.  Defendant's mathematical expertise enabled him to prepare intricate and convincing charts that appeared to contain real investment data. Moreover, defendant's background, with which the victims were

familiar, helped defendant maintain the deception that he was an investment guru.

Defendant's disregard for the law and his victims is apparent from the fact that he never intended to invest their money. The TTM "investment pool" was a Ponzi scheme from the start. Defendant's callousness and disregard for his victims is most apparent in the way in which he squandered their money. Defendant did not just lose the victims money in bad or risky investments; for five years he lived an extravagant and opulent lifestyle paid for with his victims' money. In 2007, defendant bought a 5.25 carat diamond ring using victim money. (Carmona decl. ¶ 3(f).) In 2008, he gave one of his daughters $600,000 of victim money toward a down payment on a house; he purchased a Mercedes Benz C63; and used approximately $1.4 million of TTM funds to pay his personal credit cards bills – including bills for a $7,000 purchase at Jimmy Choo, two first class airplane tickets to Pakistan and over $40,000.00 in other travel expenses. (Id. at 3(h)-(i), 7) In 2009, defendant used victim money to purchase a sapphire and diamond necklace for $180,000 and an empty lot adjacent to his residence for $1,000,000. (Id. at 3(g).) That same year, he also used approximately $1.8 million of TTM funds to pay his personal credit cards bills -- including bills for a $16,279 purchase at Judith Lieber; a $13,000.00 charge at the Bellagio hotel in Las Vegas; and over $145,000 in charges at the St. Regis hotel in Dana Point. (Exh. T.) Between 2008 and 2011, defendant also spent $1,327,391 of victim funds on improvements to his home. (Carmona dec. ¶ 3(j).)

As one victim explained,

"This couple who we thought were our "friends" whom we
invited to our house, who ate at our table and spent
time with our family, they took the money we had spent
years to collect, money for college, for retirement, for
rainy days, they took it, and spent it on frivolous
things.  Our daughter's education fund paid for Mrs.
Qaiser Madad's designer handbags and shoes.  Our sons'
college funds were fed into high stakes slot machines at
Pechanga." - Victim Syed A.

While the fraud perpetrated by defendant is unfortunately not
unique, the manner in which defendant carried out the fraud was
somewhat unique and telling of defendant's willingness to violate
the law.  Defendant had no qualms about stealing money from long-
time friends, colleagues of his wife and family, including his own
brother, nieces and nephew.  In fact, he used his relationships with
his victims to further perpetuate the scheme.  Defendant exploited
the trust of those closest to him and his wife to lure investors.

"Around 2003 or 2004, the Madad's moved to our
neighborhood . . .Since then we became much closer
friends as we met quite often being practically
neighbors . . . They portrayed themselves and were
perceived as very generous and benevolent
philanthropists. . . They managed to gain everyone's
trust and respect." - Victims Asma and Tanweer Q.

Additionally, throughout the scheme defendant continued to
outwardly act towards many of the victims in a manner consistent
with that of a good friend so that he did not rouse any suspicions,
all the while continuing to lie to them about the safety of their
money.  Defendant invited the victims to lavish parties he threw
using their money.  He ate dinner with them, went on trips with them
and socialized with them, constantly reassuring - falsely -- them
that their money was safe and could be withdrawn upon request.

Defendant also knowingly capitalized on his position in the community which, according to many victims, was instrumental in their decision to entrust their money to defendant. Defendant held himself out as a generous and selfless philanthropist who was genuinely concerned with issues affecting the community. Defendant donated money to approximately 50 different charities, and hosted a number of fundraisers at his house and various hotels. Defendant also gave over $150,000 of TTM funds to politicians and political parties. In his Sentencing Memorandum, defendant presents his charitable work as a factor that this Court should consider in mitigation. (Def. Mem. at 10-13.)

In fact, over $1 million of the money defendant donated to charities was victims' money. (Carmona decl. ¶ 3(l)-(p).) Nor were the contributions entirely selfless as they served to enhance the perception that defendant was a leader in the community. Many of the victims were invited to fundraisers defendant hosted, thus becoming witnesses to defendant's "patronage" of the people and organizations that were important to the American Pakistani community. By burnishing his image in this way, defendant increased the esteem in which he was held and the likelihood that members of his community would entrust their money to him:

> "To understand this case completely you need to have an understanding of our Pakistani culture. We show the utmost amount of respect and support to our elders, in particular to those who work hard and succeed. We admire philanthropy and education. [Defendant] deceived all of us by ostensibly demonstrating generosity to charitable organizations and involvement in advancing the American Pakistani cause by supporting and schmoozing with political leaders. Our community looked up [to] [defendant]." – Victim Bashir W.

43

### 3.   Goals of Sentencing

The government agrees with defendant that, given his age, he is unlikely to recidivate and therefore the need to protect the public from further crimes by the defendant is low.  (See Def. Mem. at 20-24.)  But that is just one of the goals of sentencing set out in § 3553(a)(2).  That section also requires this Court to fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate general deterrence to criminal conduct.

These additional goals of sentencing support a significant term of incarceration in this case.  Defendant's offenses were extremely serious, resulting in vast financial and emotional harms to his victims.  The need for general deterrence is also substantial. Since 2008, the public generally and the financial services and investment industries specifically have become well aware of the existence of Ponzi schemes that prey upon individuals and destroy their hard-earned savings and hopes for a secure retirement.  The extremely large cases – such as that of Bernard Madoff -- have gotten a great deal of media attention, both for the scope and audacity of the underlying crimes (Madoff's scheme resulted in multi-billion dollar losses) and the lengthy sentence imposed (150 years).  The need for deterrence is just as great, if not greater, in cases, such as the instant one, involving frauds perpetrated by individuals operating on a smaller scale than Madoff's investment advisory firm, where the individual investment managers may operate under the mis-impression that they are "under the radar screen" and can avoid scrutiny or significant jail terms.

4.    **A Guidelines Sentence Will Not Result In Any Disparity with the Sentences Imposed on Defendants Who Committed Similar Crimes**

A guideline sentence would result in a sentence that is commensurate with the sentences imposed in Ponzi scheme cases that have been prosecuted in this district and throughout the United States.  For instance, of 31 defendants sentenced in Federal courts in Ponzi scheme cases in this district since August 2008, all but six have received within or above guidelines sentences. (Katzenstein decl. ¶ 22; Exh. U.)

**IV.   RESTITUTION**

In his plea agreement, defendant agreed to pay full restitution to his victims and waived his right to appeal the amount and terms of any restitution order, provided it requires no more than $31,756,625.00.  (CR 40 at 3, 20).  This figure was based on the government's estimate, at the time the plea agreement was executed, of the amount of restitution owed to the victims in this case. However, as of the time of this filing, the government estimates that the total amount of restitution owed to the victims in this case is approximately $32,788,314.47.  The discrepancy between these figures is due, in part, to the fact that further investigation into defendant's crimes has revealed that some of the deposits into and withdrawals from the TTM Bank of America account that were initially unidentifiable are in fact attributable to victims.  (Resnik decl. ¶¶ 2-3.)

The total amount of restitution owed in this case was calculated by tallying the individual losses for each of the victims identified by the government.  The individual losses were in turn calculated by analyzing the deposits and withdrawals into the TTM

Bank of America account, the Quick Books defendant maintained for TTM, the monthly TTM statements created by defendant as well as from information provided during interviews of some of the victims.  The government has also compared the individualized loss amounts it calculated to statements provided by the victims.  On April 25, 2013, the government sent letters to approximately 71 victims in this case requesting that all victims complete (under penalty of perjury) a Declaration of Losses (a form provided by the government) to assist the government in computing their losses.[14]  To date, the government has received 52 executed declarations from victims. Additionally, the government has received nine victim impact statements and 16 petitions for remission from the victims.[15]  A review of the information submitted by the victims has revealed at least 20 material discrepancies between the actual loss calculated by the government and the loss claimed by individual victims.  The discrepancies in the loss amounts range between a few hundred dollars and $2,992,187.00.  The government has prepared a list of victims and their individual loss amounts.  (Resnik Exh. A.)  Where there was a discrepancy and the amount of loss claimed by the victim was <u>less</u> than that calculated by the government, the government has used the amount submitted by the victim.  Where there was a

---

[14]    The government sent letters to the victims that it had identified as of that date, but has since discovered approximately 13 additional victims.  The government is working to find contact information for these additional victims and intends to send letters to them as soon as this information is obtained.

[15]    The Petitions for Remission were submitted to the government in connection with the related civil forfeiture actions against defendant's real property in <u>United States v. Real Property Located in Diamond Bar, California, Assessor Parcel Number 8713-028-004</u>, CV-12-05270-GAF-JC and <u>United States v. Real Property Located in Diamond Bar, California, Assessor Parcel Number 8713-028-003</u>, CV-12-04474-GAF-JC.

discrepancy and the amount of loss claimed by the victim was more than that calculated by the government, if the government was able to verify the information submitted by the victim, the government has used the amount submitted by the victim.  Otherwise, the government has used its own calculations.  An asterisk has been placed next to the loss amount in all instances where there was a discrepancy between the loss amount claimed by the victim and that calculated by the government.  (Resnik decl. ¶¶ 3-5.)

Due to the fact that the government has discovered a number of discrepancies in the individualized loss amounts and the final amount of restitution is not ascertainable at this time, the government respectfully requests that the Court defer the final determination of restitution and schedule a restitution hearing on August 12, 2013, or such later date as is convenient to the Court, pursuant to 18 U.S.C. § 3664(d)(5).[16]

Additional time will allow the government to contact the victims to give them the opportunity to provide supporting documentation where the deposits and withdrawals they claimed in their declarations were inconsistent with the government's evidence. It will also enable the government to attempt to contact those victims who the government was previously unaware of or unable to contact.  (Id. ¶ 6.) The government expects that it will be able to

_____

[16] Section 3664(d)(5) provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5).

advise the court of its final position on restitution by August 12, 2013.[17]

Once the Court has made a final determination on restitution and an Order has been entered, the government intends to submit a restoration request to the Department of Justice Asset Forfeiture and Money Laundering Section ("AFMLS") to have the proceeds from the sale of defendant's assets that have been forfeited be applied to the restitution order.  (Id. ¶ 7.) The assets that the government has seized and/or forfeited (both administratively and judicially) to date and their approximate values include the following:

///

///

///

///

///

///

///

_____

[17] August 12 is within the 90 days contemplated by 18 U.S.C. § 3664(d)(5) (it is 49 days from the sentencing hearing set for on July 24).  The Court may set a later date for the restitution hearing.  The Supreme Court and the Ninth Circuit have upheld restitution orders that were entered well beyond the 90-day period provided in the statute.  See Dolan v. United States, 130 S. Ct. 2533 (2010) (affirming $105,000.00 restitution order entered 180 days after sentencing and holding that the court retains power to enter restitution beyond the 90-day deadline so long as it made clear before the deadline expired that it would eventually order restitution); United States v. Moreland, 622 F.3d 1147, 1170-73 (9th Cir. 2010) (affirming $36 million restitution order entered two years after sentencing); United States v. Marks, 530 F.3d 799, 812 (9th Cir. 2008) (affirming $30 million restitution order entered 181 days after sentencing).

| ASSET DESCRIPTION | APPROX. VALUE[18] |
|---|---|
| Real Property Located in Diamond Bar with APN 8713-028-004 | $600,000.00 |
| Real Property Located in Diamond Bar with APN 8713-028-003 | $2,600,000.00 |
| 200808 Mercedes Benz C63 | $31,850.00 |
| $293,979.23 in bank funds seized from a Charles Schwab Bank account in the name of Faisal Hai Rajput | $293,979.23 |
| 89 items of assorted personal property | $25,165.00 |
| 21 items of assorted jewelry | $9,438.00 |
| 2 pure silk handmade rugs and 2 pure wool handmade rugs | $28,000.00 |
| 38 pieces of jewelry seized from Nicole-Stanton, LLC[19] | $411,730.00 |
| 9 items of assorted jewelry | $ 49,470.00 |

(Resnik decl. ¶ 8.)

Additionally, four charitable organizations have voluntarily disgorged victim funds totaling $35,000.00 that defendant donated during the course of the scheme.  These funds are currently in the custody of the United States Marshals Service and the government intends to request that they be applied to restitution. (Id. ¶ 9.)

///

---

[18]   The approximate appraisal value assigned to each asset does not take into account any bona fide liens that may be held against that asset.

[19]   While the Court has yet to issue a final order of forfeiture for the jewelry seized from Nicole Stanton, LLC, as of the date of this filing, no third party claims have been filed and the deadline for all potential claimants who received direct notice of the forfeiture to file a claim has passed.

1  **V.     CONCLUSION**

2          For the foregoing reasons, the government respectfully requests

3  that this Court:

4      • Find that defendant's total adjusted offense level is 34,

5          based on a loss of over $20 million, and the applicability of

6          upward adjustments based on more than 50 victims, use of

7          sophisticated means, and obstruction of justice;

8      • Sentence defendant to 151 months in custody, the low end of

9          the applicable advisory sentencing guidelines range; and

10     • Set a hearing on restitution for August 12, 2013, or such

11         later date as is convenient to the Court.

12

13  Dated: June 14, 2013              Respectfully submitted,

14                                    ANDRÉ BIROTTE JR.
                                      United States Attorney
15
                                      ROBERT E. DUGDALE
16                                    Assistant United States Attorney
                                      Chief, Criminal Division
17
                                      /S/ Ranee A. Katzenstein
18                                    RANEE A. KATZENSTEIN
                                      Assistant United States Attorney
19
                                      /S/ Jennifer M. Resnik
20                                    JENNIFER M. RESNIK
                                      Assistant United States Attorney
21
                                      Attorneys for Plaintiff
22                                    UNITED STATES OF AMERICA

23

24

25

26

27

28

                                    50

CERTIFICATE OF SERVICE

I, Belinda B. Tunque, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **GOVERNMENT'S COMBINED (1) POSITION RE SENTENCING; AND (2) RESPONSE TO DEENDANT'S SENTENCING MEMORANDUM**
service was:

[ ] Placed in a closed   [X] Placed in a sealed
    envelope, for collection     envelope for collection and
    and interoffice delivery     mailing via United States Mail,
    addressed as follows:     addressed as follows:

[ ] By hand delivery       [ ] By facsimile as follows:
    addressed as follows:

[ ] By messenger as follows: [ ] By federal express as follows:

**Marc Stein**
United States Probation Officer
5500 Telegraph Road , Suite 241
Ventura, CA 93003-4255

This Certificate is executed on June 14, 2013, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_Belinda B. Tunque_

1