# EXHIBIT E

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

AKBAR OMAR, an individual,       )
                                 )
            Plaintiff,            )
                                 )
     vs.                          )    Case No. BC457773
                                 )
SYED QAISER MADAD, individual;   )
MEHER F. TABATABAI, an            )
individual; TECHNOLOGY FOR        )
TELECOMMUNICATION AND MULTIMEDIA, )
INC., a California corporation;   )
and DOES 1 through 30, inclusive, )
                                 )
            Defendants.            )
                                 )

C O N F I D E N T I A L

V O L U M E   I

DEPOSITION OF ANNE TAHIM, PMK

APRIL 4, 2012



ABRAMS, MAH & KAHN
R E P O R T I N G   S E R V I C E

Reported By:  Kathleen M. O'Neill
              CSR No. 5023

4101 Birch Street • Suite 130
Newport Beach • California 92660
info@amkreporting.com • 800-622-0226

File No.:  31839

00027844

```
 1                    SUPERIOR COURT OF CALIFORNIA

 2            COUNTY OF LOS ANGELES - CENTRAL DISTRICT

 3

 4    AKBAR OMAR, an individual,          )
                                          )
 5                    Plaintiff,          )
                                          )
 6          vs.                           ) NO. BC457773
                                          )
 7    SYED QAISER MADAD, an individual;   )
      MEHER F. TABATABAI, an individual;  )
 8    TECHNOLOGY FOR TELECOMMUNICATION    )
      AND MULTIMEDIA, INC., a California  )
 9    corporation; and DOES 1 through 30, )
      inclusive,                          )
10                                        )
                      Defendants.         )(Pages 1 - 272)
11    _____)

12

13

14                   V O L U M E    I

15               C O N F I D E N T I A L

16

17

18       Videotaped Deposition of ANNE TAHIM (PMK

19    TAHIM & ASSOCIATES), taken on behalf of Plaintiff,

20    at 233 Wilshire Boulevard, Suite 400, Santa Monica,

21    California, commencing at 9:29 a.m., on Wednesday,

22    April 4, 2012, before Kathleen Mary O'Neill,

23    CSR 5023, RPR.

24

25
```

```
 1    APPEARANCES:

 2
      For Plaintiff:
 3
          ENENSTEIN & RIBAKOFF, APC
 4        BY:  MICHAEL T. ROSENTHAL, ESQ.
          233 Wilshire Boulevard
 5        Suite 400
          Santa Monica, California  90401
 6        310/899-2070

 7                -and-

 8        APEX LAWYERS INC.
          BY:  SHAZAD OMAR, ESQ.  (Pages 23 - 270)
 9        21671 Gateway Center Drive
          Suite 108
10        Diamond Bar, California  91765
          909/860-0342
11

12
      For the Deponent:
13
          WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
14        BY:  D. VICTORIA LaBRIE, ESQ.
          555 South Flower Street
15        Suite 2900
          Los Angeles, California  90071-2407
16        213/443-5100

17                -and-

18        TREDWAY LUMSDAINE & DOYLE, LLP
          BY:  PAMELA K. TAHIM, ESQ.
19        8141 East 2nd Street
          Suite 500
20        Downey, California  90241
          562/923-0971

21

22

23

24

25
```

**Abrams, Mah & Kahn**

00027846

```
 1    APPEARANCES:   (Continued)

 2

 3    For Defendants Syed Quaiser Madad, Technology for
      Telecommunication and Multimedia, Inc., and the
      Deponent:

 4

 5        LAW OFFICES OF MARK J. WERKSMAN
          BY:  MARK M. HATHAWAY, ESQ.

 6        888 West Sixth Street
          Fourth Floor
          Los Angeles, California  90017

 7        213/688-0460

 8

 9    For Defendant Meher F. Tabatabai:

10        THE FELDHAKE LAW FIRM, APC
          BY:  ROBERT JAMES FELDHAKE, ESQ.

11        650 Town Center Drive
          Suite 1590

12        Costa Mesa, California  92626
          714/352-8230

13

14

15    For Defendant Mahvish Z. Madad:

16        MICHAEL ST. DENIS, PC
          BY:  ANDRE Y. BATES, ESQ.

17        25550 Hawthorne Boulevard
          Suite 118

18        Torrance, California  90505
          310/378-4700

19

20    Videographer:

21        DANNY COLOHAN
          Dean Jones Videos

22        213/385-9756

23

24

25
```

1          MR. BATES:  Andre Bates on behalf of defendant

2    Mahvish Madad.

3          MR. FELDHAKE:  Robert Feldhake on behalf of

4    defendant Meher Tabatabai.

5          MR. HATHAWAY:  Mark Hathaway on behalf of                    09:30:01

6    defendants Syed Madad and TTM.

7          MR. ROSENTHAL:  Michael Rosenthal on behalf of

8    plaintiff, Dr. Akbar Omar.

9          THE VIDEOGRAPHER:  Please be aware the

10   microphones are very sensitive.  They will pick up all           09:30:13

11   conversations in this room.

12         Will the court reporter please administer the

13   oath.

14         THE REPORTER:  Ma'am, would you please raise

15   your right hand.

16         You do solemnly state that the testimony you

17   are about to give shall be the truth, the whole truth,

18   and nothing but the truth, so help you God?

19         THE WITNESS:  So help me God.

20         THE REPORTER:  Thank you so much.

21

22              ANNE TAHIM,

23         having been first duly placed under

24         oath, was examined and testified

25         as follows:

8

**Abrams, Mah & Kahn**

```
 1          One of your clients was a corporation called
 2   Technology for Telecommunication and Multimedia, Inc.;
 3   is that correct?
 4        A.   Yes.  That's right.
 5        Q.   And throughout this deposition I may refer to        10:11:45
 6   them as "TTM."
 7          If I say that, will you understand that I'm
 8   referring to that corporation?
 9        A.   Yes.
10        Q.   Did you receive completed organizers back from      10:11:55
11   TTM at any time since 2005?
12        A.   The process that I described is only for
13   individual accounts.
14        Q.   Right.  Fair enough.  And you're right, I did
15   ask you that.  We'll come back to the corporate tax          10:12:15
16   returns in a few minutes.
17          You also -- Mr. Madad and Ms. Tabatabai are
18   also your clients; correct?
19        A.   Correct.
20        Q.   And you prepare their individual tax returns?       10:12:27
21        A.   Correct.
22        Q.   Did they return the organizers that you had
23   sent them at any time from 2005 going forward?
24        A.   I do not recall, you know.  Some people do,
25   some don't, and I didn't review their file before           10:12:47
```

**Abrams, Mah & Kahn**

1     Q.   BY MR. ROSENTHAL:  Ms. Tahim, you understand

2   that you are still under oath?

3     A.   Yes.

4     Q.   Before our break we were discussing the process

5   that Tahim & Associates undertook to prepare individual     10:32:25

6   tax returns.

7        And I was wondering if you could describe for

8   me how that process was put into effect in the

9   preparation of the tax returns for Mr. Madad and Meher

10   Tabatabai.                                 10:32:50

11     A.   Meher Tabatabai has never come to my office.

12   It's always been Mr. Madad, and he has always come in

13   person and brought their documents.

14     Q.   So when you say he came to the office, your

15   process was to send an organizer --             10:33:18

16     A.   Uh-huh.

17     Q.   -- to Mr. Madad and Meher Tabatabai.

18        Would you send them one, or would you send them

19   each one?

20     A.   No.                                 10:33:30

21        They file jointly, so it is just one.

22     Q.   And it was addressed to both of them?

23     A.   Yes.

24     Q.   And after receiving that, Mr. Madad would set

25   up an appointment and come in for a meeting?        10:33:42

**Abrams, Mah & Kahn**

00027879

1    them.

2         Q.    And you don't remember their names?

3         A.    I know the names, yeah.

4         Q.    Can you tell me the two that you remember?

5         A.    Minal Shah.                                          10:35:34

6         Q.    Can you spell that?

7         A.    M-i-n-a-l.  Last name is Shah, S-h-a-h.

8               And the other one is Blanca Pena, P-e-n-a.

9         Q.    And when Mr. Madad would come into the office,

10   would he meet with the -- whoever -- whichever preparer      10:35:59

11   was assigned to prepare his tax return?

12        A.    As far as personal tax returns are concerned,

13   he always met with me only.

14        Q.    So when he came in he would meet with you?

15        A.    Yes.                                                10:36:20

16        Q.    And after your meeting with Mr. Madad, you

17   would assign it to one of the preparers?

18        A.    Correct.

19        Q.    And they would prepare a draft of his return?

20        A.    Correct.                                            10:36:44

21        Q.    And you would review that draft?

22        A.    Correct.

23        Q.    And then you would send the draft to Mr. Madad

24   and Ms. Tabatabai?

25        A.    Mr. Madad only.                                     10:36:53

37

**Abrams, Mah & Kahn**

1    Q.    So when you sent the draft, it was only

2    addressed to him?

3    A.    Well, he was the only one who was involved, so

4    we just sent it to the home.

5    Q.    And it's your testimony today that you recall          10:37:05

6    that the only name addressed on that envelope was his

7    name?

8    A.    No.

9          It would be addressed to both, yes.

10   Q.    And would you receive comments back from either        10:37:17

11   Mr. Madad or Ms. Tabatabai?

12   A.    I would get comments from Mr. Madad only.

13   Q.    How did you know the comments came from him?

14   A.    Telephone or in person.

15   Q.    Is that the only way you ever received comments        10:38:01

16   from him?

17   A.    Yes.

18         Mostly in person.  He wanted to come and review

19   in person.

20   Q.    And after -- so you -- if he had comments, you         10:38:09

21   would typically meet with him in person to discuss those

22   comments?

23   A.    Yes.

24         He's one of those clients -- he, as far as I

25   can remember from 2005, always wanted to come in and        10:38:29

38

**Abrams, Mah & Kahn**

1   review it in person.

2       Q.   And do you recall any of the comments that he

3   gave you?

4           MS. LaBRIE:   Counsel, what time frame?

5           MR. ROSENTHAL:   2005 forward.                    10:39:01

6           THE WITNESS:   He may recall any additional

7   information that he may have forgotten to give me, and

8   then he would say, "Hold on and I will supply you that

9   information."

10      Q.   BY MR. ROSENTHAL:   Do you recall any of the     10:39:20

11  specific comments that he gave you, or is that all you

12  recall?

13      A.   That is all what I recall.

14      Q.   And you would take those comments and then make

15  appropriate revisions to the tax return; is that         10:39:33

16  correct?

17      A.   Yes.

18      Q.   And I believe you said the next step in the

19  process was to send electronic signing vouchers?

20      A.   Yes.                                             10:39:54

21           When he -- then he would come, and if I could

22  correct while he was still there, if it was small

23  change, then I will give him the electronic vouchers

24  right there, and he would take with him to sign and have

25  his wife sign and fax back.                              10:40:10

39

**Abrams, Mah & Kahn**

1    payables?

2        A.    Yes.

3              He said he was maintaining it himself.

4        Q.    Did you ever ask for the underlying data

5    relating to those?                                          10:56:23

6        A.    I -- I might have asked, and he said that he

7    has a good handle on that.

8        Q.    So he refused to provide it to you?

9        A.    Yes.   Uh-huh.

10       Q.    You also referenced that you would have several    10:56:48

11   meetings with Mr. Madad in connection with the

12   preparation of the financial statements, and those would

13   occur until he was satisfied.

14             What did you mean by that?

15       A.    That -- everything was included in the             10:57:02

16   financial statements and categorized in terms of

17   classification properly.

18       Q.    And that included the information that he

19   provided to you in summary fashion only?

20       A.    And the checks, both.                              10:57:24

21       Q.    And over the years that you filed tax returns

22   on behalf of Mr. -- sorry, on behalf of TTM, Mr. Madad

23   approved the filing of those taxes for each of those

24   years?

25       A.    Yes.                                               10:57:56

                                                        48

1          He categorically said those were family and

2     friends.

3          Q.    What else did the two of you discuss at this

4     meeting?

5          A.    Basically he told me that all I needed to do is          11:08:38

6     just, you know, take the financial statements -- I mean,

7     the bank statements and record them as shareholder's

8     loans, and he will be responsible for keeping all the

9     detailed records.

10         Q.    Did you ask him for the underlying records?          11:09:09

11         A.    I asked him.  He says, "You don't need to know.

12    I'll keep -- I'm keeping those records."

13         Q.    He refused to give them to you?

14         A.    That's right.

15         MR. FELDHAKE:   Objection as to "he refused."          11:09:24

16    Mischaracterization.

17         MR. HATHAWAY:   Join.

18         Q.    BY MR. ROSENTHAL:   And were you comfortable

19    preparing financial statements and tax returns based on

20    his refusal?          11:09:37

21         MR. FELDHAKE:   Same objection.

22         THE WITNESS:   Yeah.  It was his representation.

23    He said they were given to him, not to TTM.

24         Q.    BY MR. ROSENTHAL:   He said what was given to

25    him?          11:09:51

**Abrams, Mah & Kahn**

00027898

1   financial statements or tax returns after 2005, 2006

2   other than what you've already testified to?

3       A.   I recall at one instance that there were quite

4   a few losses, so I asked him, "What will happen if they

5   ask you for the money?"  I didn't know any of the          11:13:33

6   investors, not their names, and he said he has enough

7   personal resources to pay it.

8       Q.   Do you recall when that conversation occurred?

9       A.   No.  I don't recall.

10      Q.   Do you know if it was more or less than two         11:13:52

11  years ago?

12      A.   Yes.

13      Q.   More or less?

14      A.   More than that.  And I may have discussed this

15  thing on multiple occasions, yeah.                          11:14:03

16      Q.   So you expressed your concern to Mr. Madad on

17  multiple occasions that TTM had incurred substantial

18  losses?

19      A.   Yes.

20      Q.   How did he respond to that?                         11:14:23

21      A.   He said the margin is very narrow, and this is

22  definitely going to make a profit next year, and it will

23  all be wiped out.

24      Q.   And do you recall whether his prediction turned

25  out to be correct?                                          11:14:52

57

**Abrams, Mah & Kahn**

00027901

1    A.   Not in 2009, but in 2010 he didn't have a loss.

2    Q.   So in 2009 he continued to have losses?

3    A.   Yes.

4         Still 2009 he continued to have losses.

5         In 2010 on account of trading, he did not have          11:15:11

6    a loss at least.

7    Q.   And did he wipe out his prior losses?

8    A.   No.

9    Q.   Did he even come close to wiping out those

10   prior losses?                                                 11:15:26

11   A.   No.

12   Q.   Do you recall how much his gains were in 2010?

13   A.   I do not recall.

14   Q.   Do you recall whether it was more or less than

15   $10,000?                                                      11:15:35

16   A.   I don't want to guess.

17   Q.   I don't want you to guess.

18        You're not able to estimate?

19   A.   Not at this time, no.

20   Q.   Are you able to estimate for me the trading          11:15:46

21   losses that he incurred in 2009?

22   A.   I cannot.

23   Q.   Was it several million dollars?

24   A.   It was a few million dollars, yes.

25   Q.   What about in 2008?                                      11:16:10

Abrams, Mah & Kahn

00027902

1        A.    A few million.  It is an estimate, and it could

2   be wrong.  Okay?

3        Q.    Fair enough.  I'm just asking you to estimate.

4        A.    Uh-huh.

5        Q.    Prior to -- so in 2010 you said that he had                    11:16:26

6   some trading gains?

7        A.    Uh-huh.  Yes.

8        Q.    Prior to 2010, do you recall any other year

9   that he had trading gains?

10       A.    No, sir.                                                        11:16:39

11       Q.    So every other year prior to 2010 he had lost

12   money?

13       A.    Yes.

14            Based on records that he provided me -- or

15   provided our firm.                                                       11:16:53

16       Q.    Now, in the last few minutes we've been talking

17   about the conversations, the communications you had with

18   Mr. Madad regarding TTM since -- regarding TTM's trading

19   activity and the preparation of their financial

20   statements and tax returns.                                              11:17:36

21            Since that initial conversation you had in

22   2005 -- roughly in 2005, 2006, do you recall any other

23   communications you had with him regarding TTM after

24   that initial conversation that you haven't already

25   testified to?                                                            11:17:54

59

00027903

1          We would ask him if he had paid any expenses

2    personally for the corporation, and certain times the

3    continuing education expenses were paid personally.  He

4    would provide us those, and we would incorporate them in

5    the financial statements.                                           11:41:25

6          MR. ROSENTHAL:  All right.  We're almost at the

7    end of the tape, so why don't we take a short break.

8          THE VIDEOGRAPHER:  Videotaped deposition is off

9    record at 11:41 A.M.

10         This will conclude tape No. 1 in today's                      11:41:46

11   deposition.

12         (Recess taken from 11:41 A.M. to 11:54 A.M.)

13         THE VIDEOGRAPHER:  Videotaped deposition is

14   back on record at 11:54 A.M.

15         This will mark the beginning of tape No. 2 in                 11:55:08

16   today's deposition.

17         MS. LaBRIE:  Counsel, Ms. Tahim would like to

18   clarify something.

19         THE WITNESS:  When I -- when Mr. Madad

20   discussed about his trading activity, initially he was              11:55:23

21   only trading on his own account.  And when he discussed

22   that there would be other people who would be giving him

23   the money, I categorically told him that based upon my

24   knowledge that unless he had a license, he could not

25   invest other people's money.                                        11:55:43

                                                                    72

**Abrams, Mah & Kahn**

1        He insisted that the money was coming in from

2    his family and friends and he was not going to charge

3    anybody anything.  And what I said, it didn't matter,

4    you know, he should get the license.  And he said, you

5    know, "I'll just show it came to me as a loan."          11:56:05

6        It was his idea, and I just did what he told me

7    to do.

8        Q.   BY MR. ROSENTHAL:  Thank you for that.

9        Prior to our break we were -- you were -- I

10   apologize.  We kind of broke in the middle of you giving    11:56:32

11   a detailed response of the process that Tahim &

12   Associates undertook in connection with preparing

13   financial statements and tax returns for Meher

14   Tabatabai, M.D., Inc.

15       I want to get back to that process, but let me      11:56:48

16   ask one or two questions as to what you already

17   testified to.

18       Is it fair to say Meher Tabatabai, M.D., Inc.

19   was another one of those clients where Tahim &

20   Associates prepared the financial statements for it?     11:57:04

21       A.   Yes.

22       Q.   Okay.

23       We were up to the point where you said

24   Mr. Madad would review the financial statements that had

25   been prepared, and so can you just continue along with    11:57:15

73

**Abrams, Mah & Kahn**

00027917

1    to your knowledge?

2         A.    Until May I did not know, May of 2011.

3         Q.    So up until May of 2011 you had never been

4    aware of any other brokerage accounts that had been

5    maintained by TTM?                                           12:29:00

6         A.    That's correct.

7         Q.    And in May of 2011, did you become aware that

8    there was another brokerage account maintained by TTM?

9         A.    That's what was informed to me by Mr. Madad.

10        Q.    And what did he tell you?                          12:29:15

11        A.    He said that, "I have never told this to

12   anybody, not even to my wife and my best friends, that

13   we have an account in UBS in -- a Swiss account in UBS

14   which has approximately either 60 million or 80

15   million."  I do not recall the number.                       12:29:45

16        Q.    And did he tell you whose money that was?

17        A.    He said it was TTM's money.  It was under TTM.

18        Q.    Were you surprised to hear about that account?

19        A.    I was really surprised and shocked that I

20   didn't know about it.                                        12:30:05

21        Q.    Prior to May of 2011, had Mr. Madad ever

22   disclosed to you that there was another UBS -- that

23   there was a UBS account that TTM maintained?

24        A.    Never.

25        Q.    Had you ever seen -- prior to May of 2011, did   12:30:23

                                                           92

**Abrams, Mah & Kahn**

00027936

1  you ever see any statements relating to such an account?

2      A.    UBS account?  No.  I wasn't even aware of it.

3      Q.    And in connection with preparing the financial

4  statements and tax returns for TTM, had you asked

5  Mr. Madad to give you -- to provide you with the          12:30:40

6  information regarding all of its brokerage accounts?

7      A.    Yes.

8      Q.    And did he tell you that he did so?

9      A.    Yes.

10     Q.    Did you ask him why he never told you about it   12:30:50

11  before?

12     A.    I did ask him, and he said that, "I did not

13  feel comfortable about it."

14     Q.    Did he say anything else?

15     A.    And he said he was keeping it for the safety of   12:31:12

16  his invest- -- people that he was investing the money

17  for.

18     Q.    Did he say anything else?

19     A.    I was quite surprised.  And then I asked him,

20  "Where did the money come from?"  You know, in the        12:31:40

21  course of our business and bookkeeping, we did not see

22  any funds going to brokerage.

23          So he said this was the new money which was

24  invested indirectly.  It was not transferred from Bank

25  of America, so you wouldn't have seen anything.           12:32:03

93

**Abrams, Mah & Kahn**

1    STATE OF CALIFORNIA    )
                            ) ss.
2    COUNTY OF LOS ANGELES  )

3

4

5        I, KATHLEEN MARY O'NEILL, Certified Shorthand

6    Reporter, Certificate No. 5023, for the State of

7    California, hereby certify:

8        The foregoing is a true and correct copy of the

9    original transcript of the proceeding taken before me as

10   thereon stated.

11

12

13

14   Dated: *May 16, 2012*

15

16

17

18                    KATHLEEN MARY O'NEILL

19                     CSR #5023, RPR

20

21

22

23

24

25

                    ABRAMS, MAH & KAHN

                                            00028117