# EXHIBIT P

# SYNOPSIS

**BACKGROUND:**

      TTM was a family business. The investment pool was initially only for immediate and extended family members. The Investment Pool expanded as friends heard of good performance & volunteered their accounts to be traded.   About 1/3rd of the accounts were opened by & for people the Defendant/Victim Syed Qaisar Madad has never met or spoken with (instead, funds were transferred on their behalf by relatives who were in direct contact with TTM). They have been identified **under Item # 8 in the Table of Contents** .Three (3) of these such investors remain anonymous to this day & have not come forward to claim their investments.

      The TTM operation was run on the basis of trust.  There was no solicitation of any family member or friends to join the Investment Pool or put  their investments under  Defendant/Victim's control or management. No fees were ever charged, and no one was ever requested to pay for the expenses. Since March 1999, the Defendant/Victim has been creating & maintaining  a research database and staff to assist with the research. TTM developed its own in-house Software Program & Proprietary Computer Model for online trading. All friends & family members were given free access to the software/database, upon request & no compensation or renumeration was ever requested nor received from anyone. Because all of the investors were family members or friends of the family, no due diligence was done on the incoming funds. None of the investors requested a contract at the time of their investment, and no contracts were ever drafted.

      TTM employees (a list attached under Item #  4) were typically referrals of friends and family. They were treated like family & there was an open door policy towards friends & investors. People were free to come and go from our gated community residence (The Country Estates). Friends & family could freely watch the Defendant/Victim trade, learn, use TTM Computer Stations to access TTM's database or TTM's proprietary software program/Software Model , and mirror trades if they wanted to trade their own accounts. Almost without any exception, every new investor was first advised to manage their own accounts themselves & if necessary they could use TTM's Research Database or Software Model for free, or could come for a few days & mirror trade with the Defendant/ Victim.

      This trusting, helping attitude , and open-door policy has become the down fall of TTM, and for so many friends & family members who invested with the pool.  The Defendant/ Victim  Syed Qaisar Madad, and Co-Defendant Dr Meher F Tabatabai, and their family are the biggest losers in this whole litigation episode with nearly $ 16 Million in financial losses. Including the extended family & two (2) of the closest friends & their families, nearly $56 Million of the $81 Million Investment Pool affects the Defendant's/Victim's closest circle.

      TTM's computers were left logged on & unsecured. Passwords, User ID, Log-in information, Account numbers, banking  & other security information were kept in drawers under the computer desks, and in the Defendant/Victim's Desk in un-locked drawers.  All the wireless networks in the house were unsecured, with open access & no password required so that staff & those investors or friends coming to learn and trade together can easily access Internet (See Item # 15).  At times computers & office (library) were left unattended by the Defendant /Victim while the Plaintiff Akbar Omar, employees, and other investors were able to come in and out of the room freely.

## THE PLAINTIFF:

Plaintiff Akbar Omar first contacted the Defendant on September 4, 2007 , concerned about what he claimed to be losses of $80 Million in his $100 Million Investment Portfolio with TD Ameritrade & Fidelity. He wanted TTM to manage his investment portfolio, but was declined & to this date TTM has never managed or traded his investment portfolio. The Plaintiff was offered free access to the research database, and TTM's proprietary software program/ model, and trade together if he so chooses. The Plaintiff / Suspect first visited the Defendant/ Victim on September 10, 2007. And from that time on and until November 13, 2008 , ie he visited TTM  2-3 times/week for a span of almost 14 months. The Plaintiff/Suspect always came to the residence with his laptop computer to trade together, a Dictaphone/voice-recording device, and 2 smart phones.

In November 2007, the Plaintiff / Suspect Akbar Omar starting showing gratitude for helping him with his investment portfolio, claiming that he has been earning a lot of profit or recovering losses, thanks to help from TTM. And that he wanted to share these profits 50/50. In talking to TTM's research staff he learned that TTM was planning to trade an overseas market. He offered help in establishing an overseas account with BNP Paribas & introduced the Defendant /Victim to Ms Nancy Kao, VP & Manager of the Bank of the West, a subsidiary of BNP Paribas at his office in West Covina, and insisted that TTM should open an account with this bank.

On November 15, 2007, the Plaintiff/Suspect brought a business account application & a signature card to the Defendant's residence to get the Defendant/Victim's signatures & to establish an account with the Bank of the West, as he indicated that he wanted to give TTM its share of profit for the help he has received with his investment portfolio. He further informed that TTM's share comes to $10,005,203.37. The Defendant/Victim Syed Qaisar Madad was reluctant to accept the money as a personal gift but instead accepted it for the benefit of the entire TTM Investment Pool and handed over the signed signature card along with the account paper work to the Plaintiff to be passed on to Ms. Nancy Kao , VP Bank of the West.

The Plaintiff /Suspect confirms opening of an account under the name of TTM on 11/21/2007, but tells the Defendant/ Victim that he forgot to bring the paper work. On November 30, 2007, the Plaintiff/Suspect gives A/C #:  677096836 as TTMs account at the Bank of the West with a closing balance of $ 10,610,000.00. Because of this increase in balance, the Defendant/Victim suspected the Plaintiff/Suspect was trading with this account, and told the Plaintiff/Suspect not to interfere and trade on TTM's account.  On December 5, 2007 the Plaintiff /Suspect took back the account number initially given to the Defendant/ Victim saying it was an error. On December 11, 2007 the Plaintiff/Suspect gave a new account number: 677113391 as TTM's account at the Bank of the West.  All throughout this period, the Plaintiff/Suspect was coming to the Defendant's/Victim's house to trade, but did not bring paper work.

On December 17, 2007, the Defendant/Victim opened an account with UBS, Geneva, Switzerland online & requested the Plaintiff /Suspect to fund it with the funds in the Bank of the West account. The Plaintiff/Suspect had been trading with TTM's Bank of the West account, and the Defendant requested that the funds be transferred to the UBS account in order for TTM to take back control over these funds in order to start trading the European Market ie London Stock Exchange from Jan 1, 2008.  On December 27, 2007 the Plaintiff/Suspect confirmed that he had transferred the funds to

UBS . Upon confirmation, the Defendant/Victim traded the UBS Account for the first time, in the presence of the Plaintiff on December 27, 2007.

The Plaintiff/Suspect made a 2nd deposit of $18,572,350.00 into the UBS account on October 20, 2008. The Defendant / Victim traded the UBS account online from December 27, 2007 to March 14, 2011, and was able to log-in to/access this account online up until May 4, 2011. No withdrawals were made from the UBS account during this time period because all requests for withdrawals were satisfied using TTM's accounts with Bank of America and Charles Schwab.

The Plaintiff/Suspect traded his own investment portfolio from September 10, 2007 to November 13, 2008 with 2 – 3 visits per week through May/June 2008, and 3 – 4 visits per week from May/June 2008 to Feb 9, 2010. The Plaintiff/Suspect was repeatedly asked during this period for the records of TTM's Account at the Bank of the West and issuance of 1099 Misc Income to TTM for the two transactions with TTM. To this date, the Plaintiff/Suspect never produced the requested paperwork.

In the fall of 2008, the Plaintiff/ Suspect Akbar Omar started to express a desire to join the TTM Investment Pool as an investor, as he was doing so well because of the research data base, the proprietary software/ model developed by TTM. On November 13, 2008, the Plaintiff/Suspect made his first wire transfer to join the TTM Pool, representing that he was transferring his personal funds. Given the friendly relationship between the Plaintiff and Defendant's families, the Defendant/ Victim did not question the Plaintiff's word or credibility, and believed whatever he was told about the origins of the funds. Between November 13, 2008 and January 25, 2010, the Plaintiff/Suspect wire transferred and deposited $ 10,625,435.90 with TTM Investment Pool  representing  all of these monies as either belonging to him  & his wife personally, or that they were from his medical practice or businesses that he owned.

On Feb 19, 2009, the Plaintiff/Suspect requested that he be issued a Transponder to the gated community to provide him free, anytime, unrestricted access to the gated community. The Plaintiff/Suspect was the only investor that possessed a Transponder, all other investors/employees/friends/family went through the usual security procedure at the gate whenever they visited. During his trips in 2009, his son Sameer Omar would accompany him most of the time during his visits to Defendant's house & spend time with TTM staff.  In October, 2009 the Plaintiff/Suspect started to bring his son-in-law Faraaz Hashemi to learn trading at TTM.  At the Plaintiff/Suspects request, Faraaz was offered full time employment on Jan 1, 2010 and remained employed with TTM until after the filing of this law suit, till March 25, 2011. Akbar Omar had more access to the gated community & our house, TTM's research, and database, and the proprietary software program/model than even TTM staff since Feb 19, 2009.

In late 2009, the Plaintiff /Suspect also started to bring a lot of cash carried in shopping bags for deposit into TTM account. The Defendant still has in possession one such bag as evidence. The Plaintiff/Suspect represented that it was excess cash lying around the house. Between November 2009 to January 2010, the Plaintiff made five (5) large cash deposits totaling $1,184,000.00. The Plaintiff/Suspect knew of the Defendant/Victim's casual visits to Pechanga and Pala Casinos on the weekends with friends, and heard through these friends when the Defendant/Victim would win a jackpot. Knowing that the Defendant/Victim tends to deposit jackpot winnings in cash, the Plaintiff/Suspect requested that the Defendant/Victim deposit his cash for him at the same time that the Defendant/Victim was going to make a cash deposit of the jackpot anyways.

The last cash deposit from of $ 330,000.00 on January 25, 2010 was followed by a request for $2 Million withdrawal on Feb 02, 2010, which raised red flags in Defendant's/Victim's mind as to why the Plaintiff would not withhold this cash & ask for the balance, if he needed the funds. One week later, on Feb 09, 2010, the Defendant/Victim was visited by two (2) IRS agents from the El Monte Division, enquiring about Plaintiff Akbar Omar & investigating him for Money Laundering, Tax Evasion & racketeering.   When the Plaintiff/Suspect returned to TTM for his funds, the Defendant/Victim confronted him with questions as to what is the source, ownership, and origin of the funds that he had been depositing with the TTM Pool. The Plaintiff /Suspect did not provide any satisfactory explanation, and promised to provide information upon his next visit.

The Plaintiff/Suspect did not return/visit for 3 weeks & would not return the Defendant/Victim's calls. In the first week of March 2010, the Plaintiff/Suspect did return.  He was provided with $ 1.5 Million in funds from Defendant's personal accounts, but the Plaintiff/ Suspect did not bring any paper work as he had promised to establish the origin, ownership, and source of his funds.  Instead, the Plaintiff wanted to withdraw the entire account & threatened that the funds in the UBS account would also belong to him, if his funds were not returned.

The Defendant/Victim became very reluctant to cooperate with the Plaintiff/Suspect for the fear of getting entangled into his money laundering, tax evasion, and any other violations that he was committing from the IRS visit of Feb 9, 2010 onward. The whole dispute mushroomed into this litigation. The Defendant/Victim was ready to reach a settlement of $14 Million with the Plaintiff/Suspect, and was going to fund the settlement with monies from the UBS Account. When the Defendant/Victim attempted to log-in to the UBS Online Account to arrange for the funds for settlement on May 4, 2011, he was unable to access the Online Account.

**LITIGATION AND INVESTIGATION:**

The Plaintiff/Suspect approached TTM in 2007 claiming losses of $80 Million, and had left TTM in 2011 with this same amount missing. The Defendant/Victim now finds himself caught in an even worse situation in which he could no longer access the UBS account online (as of May 4, 2011) and entire TTM Investment Pool of  $ 80- 81 Million at large. The Defendant/Victim believes he is being framed by the Plaintiff/Suspect for the entire fraud scheme.

The Defendant/Victim started to investigate about the origin, source and the ownership of the funds that the Plaintiff/Suspect deposited in the TTM Investment Pool from November 2008 – Jan 2010 ie the $ 28.5 Million that Plaintiff/Suspect gave the Defendant/Victim as the reward for helping his Investment Portfolio with TD Ameritrade and Fidelity. And what has emerged is alarming:

1 .    That the Defendant has been a victim of the international HAWALA NETWORK system of money mules/outlawed & parallel banking, in which members of the network are able to execute "money  transfers without money movement" through individuals who assist one another in making illicit transfers for a fee.

The Defendant/Victim believes, as suggested by  investigation of the Plaintiff/Suspsect's financial records, that the Plaintiff/Suspect is a con-artist and career white-collar criminal who utilizes the HAWALA NETWORK for moving money.

00043303

2.    That this money-mule scheme was conducted with aspects of cyber-crime and identity theft, such as breaking-in to the Defendant's e-mail and other online accounts.

3.    That the seed money for the UBS accounts of $ 28.5 Millions was not profit in the Investment Portfolio of the Plaintiff / Suspect. Instead, these are the monies that:

    3.1  Are shuttling back and forth between Canada & the United States – at least $ 20 Million of it from Plaintiff/ Suspect's sister Byma and brother-in-law Andy Merchant of Toronto, Ontario, Canada.

    3.2  are offshore & undeclared monies coming into the US through the Plaintiff's father-in-law Abdul Hamid Patel, who has been residing in the US & is a citizen of US, Canada & UK. He did bring in over $ 3.3 Millions in early 2009 from UK, which was revealed through the Discovery Process.

    3.3  are monies/ un-reported income of defunct company Sunset Garvey Medical Corp. Defunct on April 1, 2004. But remained operational thru December, 2009 and did five (5) wire transactions to TTM in 2009.

        And on November 30, 2007 , the Plaintiff gave the A/C number of this defunct corporation to the Defendant/ Victim TTM , portraying it as the TTM account at the Bank of the West.

    3.4  are monies/un-reported income of defunct company East Villa Apt, LLC, defunct on December 29, 2005. 99 % interest of this was transferred to Plaintiff/ Suspect's wife Rukhsana Omar 1 day before on December 28, 2005. And Rukhsana Omar kept it operational to December, 2009.

        And on December 11, 2007 , the Plaintiff gave the A/C number of this defunct corporation to the Defendant/ Victim TTM , portraying this as TTM's account at the Bank of the West.

4.    That many of the companies transferring funds to TTM do not exist.

5.    That the Plaintiff /Suspect has opened at least 30 businesses & companies in the US, since his arrival in the US from South Africa, of which only 11 are operational , now.

6.    That the Plaintiff/Suspect opens/closes businesses & companies to erase tracks & avoid being detected.

7.    That the Plaintiff/Suspect into very cash intensive businesses.

8.    That the Plaintiff/Suspect & his wife are opening & closing Bank Accounts at the same frequency, and the information found on the two Bank of the West Accounts 677103079 & 677103095 confirms this.

9.    That the Plaintiff and his wife are camouflaging transactions & are into double book-keeping.

10. Tips from family members/siblings of the Plaintiff/Suspect reveal that they have offshore account with UBS, where recent transactions have occurred with the Bank of the West, and that could be the monies from the missing investment pool.

11. Real estate transactions are being done with contract/sale price manipulations that involve the Plaintiff's family members.

12. That the Plaintiff, Plaintiff's wife Rukhsana Omar and son Shazad Omar each have more than one Social Security Number.
The Plaintiff and his wife each possess multiple aliases/names/identities.

13. That the Plaintiff has avoided seizure of his assets after filing for Bankruptcy in the past by transferring money or assets overseas or to friends.

14. That the Plaintiff has forged signatures of his brother in law, Andy Merchant, on some documents.

15. While the Plaintiff has represented to the court that he has no problems with IRS/taxes, the documents obtained on East LakeVilla Apt., LLC, reveal that this business has not filed tax returns for years 2008 through 2010.

15. While the Plaintiff has testified under oath that he has been married since 1979 to Rukhsana Omar, his wife Rukhsana Omar has indicated on 2 separate county records that she is an unmarried woman.

Since the beginning of litigation, the victim has learned that UBS would have sent by mail, at the time of opening the account in Dec. 2007, an access card with card-reader for the purposes of making transfers in the UBS account (which had never been necessary to the Defendant/Victim until May, 2011). The UBS account can be accessed online, but no transfers or movement of money could occur without the access card and card reader. The Defendant/Victim was never aware that he was to receive such a package and never had any such card or card reader in his possession. The Defendant/Victim strongly suspects that the package may have been stolen from his possession if it ever arrived. Another possibility is that the Plaintiff/Suspect stole the Defendant/Victim's identity by obtaining the Defendant/Victim's identifying information/SSN through the bank application and signature card which were never submitted to Bank of the West, and used the Defendant/Victim's identity to re-route/re-direct mail to a different address.

Direct communication with the UBS and through our Attorney  Manuela Robutti Croce in Geneva  has not produced any results.  On April 25, 2011 the Victim/Defendant printed a statement from the UBS Account website for positive proof of identity to request records from UBS in Geneva. The answer from UBS is that the statement does not appear to be authentic. If that is the case, whatever happened to the UBS accounts & who is controlling them? If not the actual UBS website, what site was the Defendant/Victim being redirected to when under the impression that he was trading the UBS account?

The Defendant/Victim believes that he may have been a victim of internet crimes/identity theft such as Phishing or Pharming, and became an easy target due to the easy access to online log-

00043305

ins/passwords in unlocked drawers in the home office which he regularly left unattended (and where the Plaintiff/Suspect would frequently sit when the Defendant/Victim was not at home). The Defendant/Victim experienced multiple breaches of his personal e-mail accounts throughout 2005, and in 2007 witnessed his computer being remotely accessed and controlled after stepping away from the monitor for a few moments.

Coupled with the personal identifying information given on the completed bank application/signature card that the Defendant/Victim passed on to the Plaintiff/Suspect, the Plaintiff/Suspect had all of the identifying credentials he would have needed to gain control of the UBS Account and essentially lock the Defendant/Victim out.

Additionally, since the litigation began, there has been a break-in at the Defendant/Victim's residence, which is on-file with the local Diamond Bar Police Department. No valuable household items were taken, but financial records/computer hard drives are missing. The Defendant/Victim called a locksmith to assess the situation, and the locksmith produced a report indicating that the locks on both the front and back doors to the house, in addition to the motion detector above the master bedroom, had been tampered with. Hand-written notes that were only kept at the Defendant/Victim's personal desk have been produced by the Plaintiff in case documents – the Plaintiff could not have obtained these documents without either taking them himself or having an insider (i.e. TTM employee) take them for him.

Furthermore, the Defendant/Victim has obtained gate records for their community, The Country Estates, which indicate that the son and attorney (on the case) of the Plaintiff/Suspect, Shazad Omar, made attempts to illegally enter the Defendant/Victim's gated community as a "resident" on June 15, 2011 in a Porsche car without plates, as seen in still-images taken from the surveillance cameras at the gate.

In March, 2012, police in the City of Anaheim contacted the Defendant/Victim to apprise him of the apprehension of an individual who had in their possession a USB drive which contained the Defendant/Victim's personal identifying information as well as financial information. This matter is being looked into further, as it may or may not be related to a separate break-in incident at the offices of the Victim/Defendant's CPA Anne Tahim in 2011, in which hard drives were taken.

And as the Investment Pool was being looked into, it is also becoming apparent that at least 4-5 other investors/families have also brought in offshore/undeclared funds into TTM, whose names have been revealed in this document under Item # 8.2. It appears that the open/trusting nature of the TTM operation in general may have acted as a magnet for such individuals (the Plaintiff/Suspect included) to park and launder their dirty money, and attracted illicit activity, unbeknownst to the Defendant/Victim, who had trusted these people as friends.

## CONCLUSIONS:

There is no question that lack of security at TTM and its unprotected computers/internet access & unprotected circuits combined with lack of due diligence on incoming investors appears to be where the problem started from. With such a large amount of money involved (and now missing), the Defendant/Victim should have been more strict with monies being deposited into TTM's accounts. TTM *should* have made the Networks secure & Internet access or use of its computers password-protected & computers should have never been left unattended while logged on to the accounts. Also, a breach on

the trading account  in 2007 & breach of Defendant/Victim's email account from time to time, since 2005, should have been more thoroughly investigated for the piracy of confidential information/data from our computers. And also the malfunction of our network causing computers to connect to each other through the file sharing software , instead of going onto internet should be looked into more carefully, for any foul play in-house or being triggered remotely.

While the TTM investigation is still ongoing, the size, scope, complexity, and resource requirement of this case is such that this matter will be better handled by the Internal Revenue Service, Department of Treasury, the Franchise Tax Board or the FBI.

Simultaneously, efforts need to continue to return the investments of the TTM Investors, most of whom have been very supportive & have been patiently waiting for the outcome of this litigation, as the return (personally) of nearly $ 1.1 Million of investors money to-date from June, 2011 to Jan, 2012 is not enough. More needs to be done for restitution & return of investors (who are not parties in the current litigation) their money over a period of time as independently proposed by the Defendant/Victim.

00043307