DECLARATION OF GERONIMO P. CARMONA

I, GERONIMO P. CARMONA, do hereby declare and state as follows:

1. I am a Special Agent for the Internal Revenue Service ("IRS"), Criminal Investigation. I have been so employed since February 2001. Prior to that time I was a revenue agent for the IRS. I have a Bachelor of Science degree in business administration with an emphasis on accounting from California State University, Northridge. I have also received training at the Federal Law Enforcement Training Center in Glynco, Georgia.

2. Since 2012 I have been one of the case agents assigned to the investigation and prosecution of United States v. Syed Qaisar Madad, No. CR 12-1048-PA. I make this declaration in support of the government's Combined (1) Position re Sentencing; and (2) Response to Defendant's Sentencing Memorandum. Unless indicated that a fact is based on information and belief, I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

3. I have reviewed bank records for Bank of America account number xxxxx-x3204, in the name of Technology for Telecommunication and Multimedia Inc. DBA TTM Inc. (the "TTM account") for the time period of November 2004 through and including May 16, 2011. I have also reviewed a summary of those records prepared by a Federal Bureau of Investigation analyst. My review of the bank records and the summary revealed the following:

a. At least 70 different persons/entities/families deposited funds into the TTM account.

    b. Approximately 13 people/entities that invested money with TTM were repaid their investments in full. A schedule of payments to investor from TTM is being filed under seal as Carmona Exh. B.)

    c. Defendant and entities related to defendant were the source of at most only approximately $1.9 million of the deposits into the TTM account.

    d. Approximately 83 persons suffered an actual loss as a result of defendant's crimes. This number was reached by analyzing the deposits and withdrawals into the TTM Bank of America account and comparing this data with records obtained from defendant, particularly defendant's documentation regarding the individual accounts held within the TTM pool. Some of the people that suffered losses were spouses or immediate family members.

    e. At the end of December 2010, there was just over $100,000.00 in the TTM account.

    f. On September 15, 2007, defendant purchased a 5.25 carat diamond engagement ring from Morgan's Jewelers for $75,000.00. The ring was paid for in part with a check drawn against the TTM account and in part with American Express account ending in 1004, which was in turn paid for with funds from the TTM account.

    g. On February 12, 2009, defendant purchased an 18 carat white gold diamond and sapphire necklace and earring set from Morgan's Jewelers for $180,000.00. The necklace and earrings were paid for with check drawn against the TTM account.

    h. On June 2, 2008, a check in the amount of $51,405.44, payable to Mercedes Benz of Laguna Niguel was drawn against the TTM account for the purchase of a 2008 Mercedes Benz C63.

i. On or about August 14, 2008, a check was drawn against the TTM account in the amount of $600,000.00 made payable to Mahvish Madad, his daughter. Based on my investigation of this case, I know that those funds were used in September 2008 to purchase real property located in Los Angeles, California.

j. Between April 2008 and March 2011, defendant made approximately 61 payments totaling about $1,026,248.48 from the TTM account to Chase in payment for loans on his residence. During this same period, defendant transferred approximately $1,327,391.25 from the TTM account to a general contracting company named Distinguished Homes, Inc. . According to Distinguished Homes, Inc. records, approximately $1,062,526.45 of the funds paid to the company were for various home improvements relative to the defendant's residence. The improvements included, among other things, the demolition or construction of a patio, pool, waterfall, decking, irrigation system, driveway and walkway.

k. In January 2009, defendant wired $1,008,290.32 from the TTM account to Central Escrow, Inc. for the purchase of a piece of barren real property directly adjacent to his residence.

l. Between October 2005 and March 2011, defendant gave over $1 million of funds from the TTM account to approximately 50 different charities and over $150,000.00 to politicians and political parties.

m. Between 2008 and 2011, defendant donated a total of $218,000.00 of TTM funds to Development in Literacy.

n. In 2010, defendant made two donations to Shine Humanity from the TTM account totaling $25,000.00.

  o. In 2009, defendant made a donation to SIUT in the amount of $5,000.00 with a check drawn against the TTM account.

  p. In 2010, defendant made a donation to the Islamic Relief organization in the amount of $5,000.00 with a check drawn against the TTM account.

  q. Between 2006 and 2011, defendant used over $3 million in TTM funds to pay off his American Express credit card account.

  2. In or about November 2005, defendant opened Charles Schwab Cybertrader account number xxxx0742, in the name of Technology for Telecommunication and Multimedia Inc., doing business as TTM, Inc., and in or about December 2007 defendant transferred all funds in account number xxxx0742 to Charles Schwab securities trading account number xxxx4959 in the name of Technology for Telecommunication and Multimedia Inc., doing business as TTM, Inc. (the "Charles Schwab account"). I have reviewed brokerage records for the Charles Schwab account for the time period of November 2005 through and including March 2011. A review of those records revealed that defendant lost approximately $9 million during that time period through his unsuccessful trading.

  3. Intermittently between 2005 and 2011, defendant sent via email TTM account statements to his investors. (Some of these account statements are attached as Exhibit B to the declaration of Ranee A. Katzenstein.) Usually, defendant sent the account statements monthly, but occasionally defendant sent TTM account statements or account updates more frequently. In some years, defendant also included a year-end statement with the emails he regularly sent to the investors. The TTM account statements were group statements in that defendant listed all of the investors'

accounts on a single statement, with each individual account identified by the initials of the account holder, and defendant sent them to several of the investors at the same time. The TTM account statements often included several documents which purported to show TTM investment pool historical data, including profit and principal balance information.

4.  I have reviewed many of the monthly TTM account statements maintained and disseminated by defendant. These statements would generally contain the following information: (1) daily performance records (i.e., the purported daily profits and losses); (2) deposits and withdrawals made by the investors; (3) snapshots of the total balance of funds managed by TTM along with each individual investor's percentage share of the total balance at different points throughout the month; (4) the total current investment level of funds managed by TTM along with each individual investor's percentage share of the investment level at the end of the month; and (5) the capital gain to date for all funds managed by TTM along with each investor's share of the capital gains.

5.  Comparisons to the TTM Charles Schwab and Bank of America accounts have shown that these monthly statements were completely fabricated. (A summary of this comparison is attached to the Katzenstein declaration as Exhibit H.) For example, in January 2007, the account statements that defendant sent to investors stated an ending balance for the pool of $6,928,608.00; in fact, the combined balances in the TTM Charles Schwab and Bank of America accounts was $2,230,510.00 or 32.19% of the claimed balance. Every month thereafter, the stated value of the TTM Pool reported on the monthly account statements was likewise significantly higher than

the actual combined balances of TTM's accounts. In October 2009, defendant reported to the investors that the month-end value of the TTM Pool was $50,733,070.00. In fact, the balance in the TTM Schwab account was $624,608, and the balance in the TTM Bank of America account was $203,556, for a total of $828,165, or 1.63% of the claimed value of the TTM Pool. This was so notwithstanding the fact that, during the month of October, net receipts from investors totaled approximately $929,955.

6. Recently, the government has identified approximately 13 additional investors who appear to have sent money to TTM without receiving any form of repayment. The government was The government is currently attempting to locate contact information for these additional victims

7. I have reviewed credit card statements for the American Express card associated with defendant's account number ending in 1004 between 2007 and 2011. (Some of these credit card statements are attached to the Katzenstein declaration as Exhibit T.) As discussed above, defendant in turn paid his American Express credit card bills with funds from the TTM account. My review of the American Express statements for the year 2008 revealed a significant number of substantial charges including, but not limited to the following: (1) a $7,000.00 purchase at Jimmy Choo; (2) two first class airplane tickets on Emirates Airlines from Los Angeles to Pakistan each in the amount of $10,364.40; and (3) over $40,000.00 in travel expenses from Travel Plus, a travel agency. My review of the American Express statements for the year 2009 revealed more substantial charges including, but not limited to the following: (1) a purchase at Judith Lieber for $16,279.88; (2) a $13,000.00 charge

at the Bellagio hotel in Las Vegas; and (3) over $145,000.00 in charges at the St. Regis hotel in Dana Point.

8. Attached hereto as Exhibit A is a true and correct copy of a chart I prepared summarizing benefits to defendant that were not reported as income and the resulting tax liability for 2006 through 2011.

9. Carmona Exhibit B, which is being filed under seal, is a true and correct copy of a chart identifying returns made to TTM investors between August 2006 and March 2011.

10. I checked IRS databases for any open investigations of Dr. Omar for any criminal offenses in February 2011 or prior to that date. None were indicated. Nor do IRS databases reflect, as of February 2011, any contact by the IRS with defendant or any third party regarding Dr. Omar's returns. Dr. Omar's tax returns have since been assigned for civil audit based on whistle-blower complaints, but these complaints were only received after the time when defendant claimed to have been contacted by the IRS about Dr. Omar's taxes. Two complaints against Dr. Omar were submitted by defendant himself on or about June 24 and December 20, 2011. Two other whistle-blower complaints against Dr. Omar were received in April and May of 2012; one of these whistleblower complaints came from a financial investigator hired by defendant.

11. I reviewed records obtained from the Bank of the West for any and all accounts held by TTM and/or defendant, his wife, Dr. Omar and persons and entities associated with Dr. Omar for the period July 2007 through October 2012. These records did not reflect any transfer, let alone any transfer of millions of dollars,

TOTAL P.008

from Dr. Omar or any person or entity associated with Dr. Omar, to defendant or any person or entity associated with defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on June 13, 2013.

GERONIMO P. CARMONA

NOV-17-2000 04:18 U.S. ATTORNEYS OFFICE 714 338 3708 P.008