EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
       1100 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-2432
       Facsimile: (213) 894-6269
       E-mail:    Ranee.katzenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CV 16-2519-PA |
| Plaintiff/Respondent, | No. CR 12-1048-PA |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE |
| SYED QAISAR MADAD, | |
| Defendant/Petitioner. | [DECLARATION OF RANEE A. KATZENSTEIN AND EXHIBITS (PAGES 1-210, 268-306) FILED CONCURRENTLY HEREWITH] |
| | [ADDITIONAL EXHIBITS TO KATZENSTEIN DECLARATION (PAGES 211-267) LODGED UNDER SEAL CONCURRENTLY HEREWITH] |
| | [No Hearing Requested] |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Ranee A. Katzenstein,
hereby files its Opposition To Defendant's Motion Under 28 U.S.C.
§ 2255 To Vacate, Set Aside Or Correct Sentence.

This Opposition is based upon the attached memorandum of points and authorities; the Declaration of Ranee A. Katzenstein and Exhibits thereto (pages 211-267 of the exhibits have been lodged under seal); the files and records in case numbers CR 12-1048-PA and CV 16-2519-PA, and such further evidence and argument as the Court may permit.

Dated: May 23, 2016                Respectfully submitted,

                                   EILEEN M. DECKER
                                   United States Attorney

                                   LAWRENCE S. MIDDLETON
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   _____/s/ Ranee A. Katzenstein_____
                                   RANEE A. KATZENSTEIN
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

TABLE OF AUTHORITIES.....................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.......................................1

I.    INTRODUCTION..........................................................1

II.   STATEMENT OF FACTS....................................................2

      A.    Offense Conduct................................................2

            1.    The wire fraud scheme....................................2

                  a.    Defendant's false statements,
                        representations and pretenses in furtherance
                        of the fraud.......................................2

                  b.    Defendant's creation and dissemination of
                        fraudulent account statements to conceal the
                        losses from the victim investors..................6

                  c.    The scheme's collapse and defendant's
                        further attempt to lull investors................10

            2.    False subscription to tax returns.......................12

      B.    Prior Proceedings.............................................12

            1.    Indictment, Conviction and Sentencing...................12

            2.    Direct Appeal and Petition for Certiorari...............13

            3.    The Instant § 2255 Motion...............................13

III.  ARGUMENT.............................................................14

      A.    Defendant's First Claim (Grounds One, Two, and Three)
            Is  Procedurally Defaulted....................................14

      B.    Even if Not Procedurally Defaulted, Defendant's First
            Claim (Grounds One, Two, and Three) Is Without Merit.........16

            1.    Defendant's Claims Fail in the Face of his Guilty
                  Plea....................................................16

            2.    Defendant Has Not Shown That Any of the Allegedly
                  Concealed Information Was Exculpatory...................19

      C.    Defendant Cannot Establish Ineffective Assistance of
            Counsel (Ground Four) Because He Was Not Prejudiced by
            the Alleged Deficiencies.....................................21

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

IV.   CONCLUSION...................................................23

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

3

 <u>FEDERAL CASES</u>

4

<u>Bousley v. United States</u>,

5

    523 U.S. 614 (1998)....................................14, 15

6

<u>Brady v. United States</u>,

7

    397 U.S. 742 (1970)....................................16, 18

8

<u>Doganiere v. United States</u>,

9

    914 F.2d 165 (9th Cir. 1990).............................23

10

<u>Jones v. Gomez</u>,

11

    66 F.3d 199 (9th Cir. 1995)..............................21

12

<u>Miller v. Keeney</u>,

13

    882 F.2d 1428, 1434 (9th Cir. 1989)......................22

14

<u>Reed v. Ross</u>,

15

    468 U.S. 1 (1984)........................................15

16

<u>Sexton v. Cozner</u>,

17

    679 F.3d 1150 (9th Cir. 2012)........................16, 22

18

<u>Shah v. United  States</u>,

19

    878 F.2d 1156 (9th Cir. 1989)............................21

20

<u>Strickland v. Washington</u>,

21

    466 U.S. 668 (1984)..................................15, 21

22

<u>United States v. Espinoza</u>,

23

    866 F.2d 1067 (9th Cir. 1988)............................23

24

<u>United States v. Frady</u>,

25

    456 U.S. 154 (1982)..................................14, 15

26

<u>United States v. Johnson</u>,

27

    988 F.2d 941 (9th Cir. 1993).............................14

28

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Ratigan,
    351 F.3d 957 (9th Cir. 2003)...............................15

United States v. Wynne,
    1996 WL 75287 (9th Cir. Feb. 21, 1996)....................22

FEDERAL STATUTES

18 U.S.C. § 1001(a)(3).........................................12

18 U.S.C. § 1343...............................................12

26 U.S.C. § 7206(1)............................................12

28 U.S.C. § 2255.........................................1, 13, 23

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

When defendant Syed Qaisar Madad ("defendant") pled guilty to wire fraud and subscribing to a false tax return, he admitted that he had taken and used for himself over $15.5 million of the more than $49 million that investors had entrusted to him for the purpose of trading in stocks on their behalf.  He also admitted that he had held himself out as a successful investor who had not lost money in a single day of trading except one day in November 2006, and who used a day-trading technique that was consistently profitable.  Although defendant returned approximately $17.7 million to the investors, he lost the remainder of the funds the investors had transferred to his company Technology for Telecommunication and Multimedia, Inc. ("TTM") in unsuccessful trading.  Defendant never sought to withdraw his guilty pleas, nor did he ever challenge the sufficiency of the facts supporting his convictions or the voluntariness of his guilty pleas on direct appeal.

In the instant § 2255 motion that defendant has now filed, defendant asserts that his convictions must be set aside because witnesses lied and withheld information from the government, thereby resulting in the return of a flawed indictment.  This claim, which is the basis of three of the grounds for relief asserted by defendant, is procedurally defaulted.  Furthermore, even if considered on the merits, the claim fails because of defendant's own under oath admissions and the other evidence in the case, and because defendant presents little more now than his own unsworn assertions that the evidence underlying the charges in the case was false or incomplete.  Defendant also contends that his counsel was constitutionally

ineffective, but he cannot show that his counsel's performance was deficient in failing to raise meritless claims or that the alleged deficiencies resulted in prejudice to defendant.  In sum, defendant's motion should be denied.

## II.  STATEMENT OF FACTS

### A.   Offense Conduct

#### 1.   The wire fraud scheme

##### a.   Defendant's false statements, representations and pretenses in furtherance of the fraud

Defendant was the Chief Executive Officer, Chief Financial Officer, and Secretary of TTM, which he formed in 1993.  (PSR ¶ 11.)[1] Together with his wife, defendant owned all of the shares of TTM. (Id.)  Defendant had sole signature authority over TTM's bank account.  (Id.)

Beginning in 2005, defendant used TTM for the purpose of investing and managing his own funds and the funds of other investors.  (PSR ¶ 12.)  From approximately November 2005 to March 2011, defendant obtained over $49 million from investors in TTM based on false representations and pretenses, namely that:

---

[1] As used in herein, "PSR" refers to the Presentence Investigation Report prepared for defendant in CR 12-1048-PA, and is followed by the applicable paragraph references; "PSR Add." refers to the addendum to the PSR and is followed by the applicable page reference; "CR" and "CA" refer to the Clerk's Record in the underlying criminal case, CR 10-1048-PA, and in the court of appeals, CA 13-50311, respectively, and each is followed by the applicable docket number.  "Exhs." refers to the exhibits attached to the Declaration of Ranee A. Katzenstein, which is filed concurrently herewith, and is followed by the relevant page number; pages 210 -267 of the exhibits, which contain personal financial information of victims and were filed under seal in the underlying criminal case, and have been separately lodged under seal.  Although all of the exhibits (except the transcripts of the hearings on defendant's change of plea and sentencing) were previously filed in CR 12-1048 as part of docket nos. 52 and 59, the government has collected and refiled them for the Court's convenience and ease of reference.

(1)  defendant's day-trading methodology was successful; he had lost money on only one day since 2005 and had realized substantial gains on every other day;

(2)  the investments were making substantial gains, as reflected on monthly account statements that defendant created and sent to his investors;

(3)  defendant did not and would not trade on margin;

(4)  the invested funds were safe and would not be lost;

(5)  defendant would manage the investments as a favor to friends and family, i.e., he would not take any fees; and

(6)  the investments were completely liquid and the investors could get their money back at any time simply by asking for it.

(PSR ¶ 13; Exhs. at 16, 31, 38, 45-46, 50-51, 56-57, 66-67, 76.)[2]

In addition to making these false statements and causing them to be made to the victims individually, defendant made the same false statements to the public at large through interviews broadcast on media outlets aimed at the Pakistani community.  (Exhs. at 38-39, 50-51.)

Defendant's statements that the investors' funds were safe and would be successfully traded were false and defendant knew it.  (PSR ¶ 14.)  Between November 2005 and March 2011, defendant lost approximately $9 million through his unsuccessful trading.  (See Exhs. at 32, 132-134, 141, 143, 158-159, 203.)  TTM's tax returns – which were prepared with defendant's input – showed losses from

---

[2] Defendant did not object to any of the factual findings of the PSR (PSR Add. at 3; Exhs. at 30) or to any of the exhibits submitted by the government in support of its position regarding sentencing.

trading, including $3,537,224 in 2008 and $3,281,573 in 2009.  (Exhs. at 126-129, 141, 143.)  Charles Schwab & Co., Inc. ("Schwab"), the brokerage defendant used, sent defendant written notice that "from September 1, 2009 through August 2, 2010, [defendant] made a total of 6,490 trades with total commission costs of $45,333.50 [and] sustained a loss, both realized and unrealized, of ($421,079.09)." (Exhs. at 32, 117-118.)  Defendant acknowledged that he had "read and understood" this notice by signing it on August 20, 2010.  (Exhs. at 118.)

Defendant also knew that his investors' money was not secure because he himself was spending it, a fact that also belied his claim to be forgoing any fees or compensation for managing TTM.  (PSR ¶¶ 14, 16.)  Defendant spent over $16.7 million of TTM money on jewelry, real estate, cars, credit card payments, cash disbursements to himself and family members, and other expenses.  (PSR ¶ 16; Exhs. at 201-202, 205-206, 209.)  These takings far outstripped defendant's actual contribution of his own capital to TTM or any reasonable growth of his investment.  (Exh. at 201.)

Defendant's promise to his investors that they could get their money back upon request was also false.  For instance, in approximately December 2010 or January 2011, an investor asked defendant to return $415,000 of his TTM investment.  (Exhs. at 58.) By late January, the investor still had not received his money.  On January 26, 2011, the investor again asked for his money.  (Exhs. at 33, 175.)  Defendant responded with a fabricated excuse based on Charles Schwab's supposed delays:  "I did contact schwab [sic] to expedite transfer . . .  Will ask them again, when can I expect funds

4

at Bank of America.  I have been observing, since year 2009, withdrawls [sic] over $250 K takes time." (Exhs. at 175.)

When the investor asked again, on February 1, 2011, defendant claimed that complex IRS rules were the problem:

> I have followed up with Schwab again today.  Sorry that, you along with myself & 2 other investors are stuck in this situation.  It has been happening for the past two (2) years on large transactions.  From trading account because of IRS rules, there can only be inter-company transfer ie Tax ID has to match ie have to be the same.  As soon as funds come to Bank of America Account, I can transfer straight to whichever Account or Name you want.  Is Rizwan in New York or have gone to South America. I would like to find out from him, is there something in new financial or banking regulations that banks/brokerages are taking longer time to deliver funds?

(Exhs. at 176.)

In fact, at the end of January 2011, the balance in the TTM Schwab account was only $58,889.  (Exhs. at 159.)  The end of the day balance in the Bank of America account on February 1, 2011 was $12,072. (Exhs. at 33, 246.)  Defendant did eventually send the investor the requested $415,000 on or about February 4 ($100,000) and March 2, 2011 ($315,000), but only after he had received money from other investors that he could use to fund this withdrawal.[3]   (Exhs. at 246, 249.)

Defendant's denial of trading on margin was also false.  TTM frequently carried a margin loan balance, sometimes a significant one.  (Exhs. at 165, 167, 171.)

---

[3] Funds were wired into the TTM Bank of America account by other investors on February 3, 2011 ($300,000) and February 4, 2011 ($200,000).  (Exhs. at 32, 242, 246.)

      **b.** *Defendant's creation and dissemination of fraudulent account statements to conceal the losses from the victim investors*

Defendant sent detailed monthly and year-end reports to the investors which always reflected gains.[4]  These reports were not merely statements of account balances – they comprised an overview which highlighted aspects of the purported performance of the TTM investment fund, compared results for the current period with prior periods, and presented the investment strategy for the following year. (e.g., Exhs. at 76, 102-103.)

For instance, on the combined "Monthly & Year end Report, Dec. 2009" sent to investors in early January 2010, defendant provided a detailed analysis of the investors' returns.  First, defendant identified the "Net Profit/Income" for the full month ($880,545.51) and then provided the "Daily average [profit]" for the month ($40,024.79).  (Exhs. at 76.) Second, defendant touted the "gross profit/ income for the year" ($10,520,938.54) and calculated the rate of return (26.14%) that this profit represented.   (Id.)  Defendant then calculated the "net profits/income" (i.e., after a charitable contribution and "year end employee bonuses") that was "distributed in 2009 to the Investment Pool" ($10,400,938.54) and noted that this amount "represents an increase of 47.34% over the year 2008."  (Id.)  Defendant also provided daily average returns, which he compared with the returns for 2008.   (Id.)  Defendant then interpreted TTM's returns within the context of the overall stock market:

> Our Daily average for the year was $42,280.23 as compared [with] a daily average of $29,169.69 in 2008.  Our rate of

---

[4] Through approximately the beginning of 2010, defendant himself created the account statements; thereafter they were created by a TTM employee at defendant's direction.  (Exhs. at 32, 149-150.)

return, however, dropped from 33.62% to 26.14 % as all markets rose during 2009, requiring us to pay [a] premium on stock prices thus cutting our profit margin.

During 2009, we outperformed the major markets of DOW and S&P 500.

(Id.)

Next, defendant offered an analysis of growth in the TTM investment pool as a whole, noting that it "stood at $54,721,932.69 on December 31, 2009 as compared to $36,560.993.84 on December 31, 2008." (Id.) Defendant broke out the portion of the increase that was "net profit/income" ($10.40 million (57%)) and the portion that "came from new investments ($7.76 million (43%)). (Id.) Defendant then identified the profit/income that TTM had generated "to date" ($24,675,512.48) and noted that "[o]f this amount, $21,761,933 (88%) remains as deferred income in the investment pool." (Id.)

Finally, defendant commented on the "investment strategy" that would be used in 2010, indicating the investment levels that would be maintained, the use to be made of "Buy & Hold for short periods," and the decision to "slowly start trading another market." (Id.) Defendant also offered expectations for the U.S. economy and the Dow, and forecast returns for the following year in the 25-27% range. (Id.)

Defendant attached account statements to these reports. The first statement, entitled "Daily Performance Record," listed the purported Profit/Loss achieved on each trading date of the month of December 2009. (Exhs. at 77; see also Exhs. at 104-106.) The second statement, entitled "Account Deposit & Withdrawls [sic]," listed 24 accounts and the amounts deposited into or withdrawn from the accounts between December 1 and 24, 2009. (Exhs. at 78.) The third

7

statement (13 pages) purported to show the "capital share/profit" (both in absolute dollar amounts and in percentages) and balance in each investment account comprising the TTM pool on individual trading days. (Exhs. at 79-91; see also Exhs. at 107-108.) Other statements set forth the "Current Investment Level" of the investors' accounts comprising the TTM pool (Exhs. at 92), the capital gains allegedly earned in each of the investors' accounts in 2009 (Exhs. at 93), and daily and monthly performance records for the TTM pool (Exhs. at 94-08.). Finally, in a "Performance Summary," defendant set out myriad analyses of the returns purportedly earned by TTM, as well as "Rate of Return Calculations" concerning "Simple Rate of Return," "Compounded Rate of Return," and "Compounded Return." (Exhs. at 99-100.) Defendant also distributed a "Summary-Highlights Rate of Return Trading Records," which included further analyses of TTM's purported rate of return and compared the TTM returns to those of the Dow Jones, S&P 500 and the NASDAQ. (Exhs. at 101; see also Exhs. at 109-113.)

The investment pool values that defendant reported to the investors on these monthly statements were false. For instance, in January 2007, the account statements that defendant sent to investors stated an ending balance for the pooled investments of $6,928,608; in fact, the combined balances in the TTM Charles Schwab and Bank of America accounts was $2,230,510 or 32.19% of the claimed balance. (Exhs. at 158, 204-205.) Every month thereafter, the stated value of the TTM pool reported on the account statements provided by defendant to the investors was likewise significantly higher than the actual combined balances of TTM's accounts. (Exhs. at 158-159.) By December 2007, the actual balances were 1.8% of the stated value of

the TTM pool.  (Id.)  In 2008, 2009, and 2010, notwithstanding significant infusions of cash from investors, the actual balances continued to be far less than the stated value of the investment pool (under 10% for all of 2008 except for December (13.3%); approximately 10% for the first 5 months of 2009 and then under 5% for the rest of the year; under 2% for all of 2010).  (Id.)

Taking just one month as an example, in October 2009, defendant reported that the month-end value of the TTM pool was $50,733,070. In fact, the balance in the TTM Schwab account was $624,608, and the balance in the TTM Bank of America account was $203,556, for a total of $828,165, or 1.63% of the claimed value of the TTM pool.  (Exhs. at 159.) This was so notwithstanding the fact that, during the month of October 2009, net receipts from investors totaled approximately $1,229,955. (Exhs. at 231.)

Likewise, the monthly brokerage statements that defendant received from Charles Schwab showed that the net result of his trading activity was negative and that, although in some months a gain was shown, by March 2011, defendant had lost approximately $9 million through his unsuccessful trading.  (See Exhs. at 158-159.) Moreover, even in the months in which there were gains, the gains were far smaller than what defendant reported to his investors.  For example, the Schwab statement for July 2010 reported a month-end realized gain of $6,121.  In the account statement for the same period that defendant provided to his investors, defendant claimed a month-end profit of $1,215,203.  (Exhs. at 159.)

9

      c. *The scheme's collapse and defendant's further*
       *attempt to lull investors*

  Dr. Akbar Omar ("Investor Omar") invested approximately $10.6 million in TTM for himself (including investments made from his businesses), his wife and his children. (Exhs. at 39-40.) On or about February 2, 2010, Investor Omar asked for $2 million of his money back. (Exhs. at 41.) On March 9 and March 25, 2010, defendant obtained cashier's checks for $1 million and $500,000, respectively, made payable to Investor Omar. (Id.) Defendant paid for these checks with money in the TTM Bank of America account that was deposited just days earlier by another investor.[5] In a letter to Investor Omar, defendant asserted that on February 9, 2010 he had been visited by two IRS agents who were allegedly investigating Investor Omar's "business/es & activities," which had caused "TTM [to] come under scrutiny." Defendant stated: "TTM does not want to get entangled in this investigation & will be protecting its operations and other clients . . . Because of our long personal relationship, I will meet your withdrawl [sic] requests from my personal funds, to avoid any legal issues with the IRS, personal or business." (Exhs. at 35, 199B.)

---

  [5] On March 2, 2010, the balance in the TTM Bank of America account was $114,499.68. (Exhs. at 254.) On March 3, 2010, victim-investor M.B.A.(through his company Bristol Engineering Services) wired $999,965 (i.e., $1 million less the wiring fee) to TTM, bringing the balance in the account to $1,114,458. (Id.) On March 9, 2010, defendant purchased the $1 million cashier's check with TTM funds. (Id.) On March 21, 2010, the balance in the TTM Bank of America account was $46,413.88. (Exhs. at 256.) On March 22, 2010, victim-investor M.B.A. (again through Bristol Engineering Services) wired $999,958.50 to TTM, bringing the balance in the account to $1,046,372. (Id.) On March 25, 2010, defendant withdrew $500,000 from the TTM Bank of America account and that same day purchased the $500,000 cashier's check. (Id.)

These statements were entirely false.  First, no IRS agents had contacted defendant about a purported investigation into Investor Omar's taxes.  Second, the money for the cashier's checks did not come from defendant's "personal funds," but – as explained above – was a Ponzi payment funded with the investments from another victim-investor.

When Investor Omar demanded the return of all of his money, defendant continued to delay.  On March 22, 2011, Investor Omar sued defendant, defendant's wife, and TTM for breach of contract, fraud, and other causes of action (the "Civil Litigation"), and on April 18, 2011, obtained a writ of attachment for $9,124,435.90.  (Exhs. at 33, 178-179.)

On or about May 4, 2011, the day before defendant was to be deposed in the Civil Litigation, defendant produced in discovery purported statements for UBS brokerage accounts supposedly held in TTM's name in Switzerland.  (Exhs. at 33, 181-197.)  Defendant contended that the victims' money was in these accounts.  (Exhs. at 48, 70, 151.)  In fact, these statements were fabricated by defendant.[6]  When it became obvious that there was no money in any such accounts, defendant changed his story and claimed that the money had been stolen.  (PSR ¶ 25; Exhs. at 34, 48, 197B-197C.)

_____

[6] The statements included misspellings (e.g., "Netflex" instead of "Netflix" and "quiickly" for "quickly") including one that is a distinctive mistake that defendant made in his own correspondence ("withdrawl" instead of "withdrawal") (Compare Exhs. at 182, 189, 196 with Exhs. at 78, 175, 199B.).  In addition, a forensic analysis of defendant's computer revealed versions of the UBS statements demonstrating that the statements were cut-and-pasted together from generic statements appearing on the internet site www.banana.ch. (Exhs. 34, 150-151, 199; see also CR 51 at 17-19.)

2.   Underline False subscription to tax returns

Defendant's draws of cash from TTM and his use of TTM funds to pay his own expenses was reportable income, but none of this income was reported on defendant's tax returns.  Defendant's unreported income for 2006 through 2010 was in excess of $14 million, resulting in taxes due and owing of over $5 million.   (PSR ¶¶ 18-21; Exhs. at 206, 209.)

**B.   Prior Proceedings**

1.   Underline Indictment, Conviction and Sentencing

On October 25, 2012, a federal grand jury charged defendant with twelve counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of making a false statement to a government agency, in violation of 18 U.S.C. § 1001(a)(3); and three counts of falsely subscribing to a tax return, in violation of 26 U.S.C. § 7206(1). (CR 1.)

On February 25, 2013, defendant pleaded guilty to the wire fraud offense charged in count nine, and the false subscription offense charged in count 16 of the Indictment.  (CR 41; Exhs. 302-303.)   In his plea agreement and under oath at the hearing on his change of plea, defendant admitted that he had obtained over $49 million from investors in his company TTM based on false promises and representations.  (CR 40, 41; Exhs. 15-16, 293-297.)

On June 24, 2013, this Court sentenced defendant to 151 months' imprisonment on count nine and 36 months on count 16, to be served concurrently; a 3-year period of supervised release; and a mandatory special assessment of $200.  (CR 70.)  On September 9, 2013, this Court held a hearing and ordered restitution in the amount of

$31,945,064.47, payable to over 70 investors.  (CR 109; see also CR 46.)

   2.   Direct Appeal and Petition for Certiorari

Defendant appealed his sentence.  (United States v. Madad, CA 13-50311.)  He raised multiple issues regarding the application of the enhancement under Sentencing Guidelines § 2B1.1(b)(10)(C) (Nov. 2012) for an offense involving sophisticated means.  Defendant did not appeal his conviction, or raise any issue challenging the validity of his guilty pleas.  The Court of Appeals affirmed defendant's sentence.  (CA 40.)  The mandate issued on January 12, 2015.  (CA 41.)

Defendant's petition in the Supreme Court for a writ of Certiorari was denied on April 27, 2015.  United States v. Madad, 588 S. Ct. 1908.

   3.   The Instant § 2255 Motion

On April 12, 2016, defendant filed his Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, together with voluminous materials in support thereof (hereinafter, "Motion").  Defendant asserts four grounds for relief.  The first three grounds are all based on the same claim, namely that Investor Omar and certain other investors ("Investor-Witnesses") lied and withheld information from the government; the government was thus deprived of the "truth," and the resulting indictment was unjust; and the Investor-Witnesses lied to the government in order to frame defendant and steal TTM's intellectual property and the investment funds that

13

it held.[7]  Defendant's fourth claim is also related:  Defendant asserts that his lawyers were constitutionally ineffective primarily because they failed to fully investigate Investor Omar and the other Investor-Witnesses who allegedly framed defendant.  (Motion at 12, 31C-31F.)

## III. ARGUMENT

### A. Defendant's First Claim (Grounds One, Two, and Three) Is Procedurally Defaulted

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal."  Bousley v. United States, 523 U.S. 614, 621 (1998).  A defendant's failure to raise an issue on direct review amounts to procedural default of that claim.  United States v. Frady, 456 U.S. 154, 162, 164-65 (1982); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993).  Here, because defendant failed to raise on direct appeal his claim that the Investor-Witnesses lied and withheld information from the government, thereby resulting in the return of a flawed indictment, he has procedurally defaulted this claim unless he is able to show cause for failing to raise the issue and resulting prejudice.[8]  See Bousley, 523 U.S. at

---

[7] As Ground One, defendant states: "Witnesses lied, mirsrepresented, covered-up, and withheld material information & substantive facts . . . making both the FBI & AUSAs believe that they have heard all they need to know, to investigate & prosecute . . ." (Motion at 8.)

As Ground Two, defendant states:  "Grand Jury's decision to indict me was not based upon truth, but tainted material facts & information with lies."  (Motion at 9.)

As Ground Three, defendant states that two families, who entrusted money to defendant, "conspired & schemed over a period of time to strip my company of all its intellectual assets & Investment Pool, then planned to frame me, procure my indictment & get away free & clear with the loot."  (Motion at 11.)

[8] A demonstration of "actual innocence" could also excuse a procedural default, see Bousley, 523 U.S. at 622, but defendant does

*(footnote cont'd on next page)*

14

1  622; <u>Frady</u>, 456 U.S. at 167; <u>United States v. Ratigan</u>, 351 F.3d 957,

2  964 (9th Cir. 2003).

3      A defendant may show cause by demonstrating that the legal or

4  factual argument was "so novel" that it was utterly unavailable

5  previously.  <u>See</u> <u>Reed v. Ross</u>, 468 U.S. 1, 16 (1984).  Because

6  defendant's claim cites no new legal authority and relies solely on

7  facts that were known to defendant at the time of his offense and,

8  thus, well before the time of his appeal,[9] he cannot meet this

9  standard.  <u>Bousley</u>, 523 U.S. at 622-23 (finding no cause where

10  considerable case law on the issue was available at the time).  Thus,

11  defendant cannot show cause to excuse his default on his claim under

12  this theory.

13      A showing of constitutionally ineffective assistance of counsel

14  can also constitute sufficient cause to excuse a procedural default.

15  In order to make such a showing, defendant must demonstrate "that

16  counsel's performance was deficient" and "that deficient performance

17  prejudiced the defense."  <u>Strickland v. Washington</u>, 466 U.S. 668, 687

---

19  not assert such a claim.  Defendant argues that the Investor-
   Witnesses "were witness to what went on in my Office/Library" and

20  "knew how the Investment Pool performed & they traded their own
   accounts & kept coming for months" (Motion at 21) and that these

21  facts "go[] to the heart of the question[:] were the Investors lied
   to & defrauded?" (<u>Id.</u> at 20).  However, defendant never sought to

22  withdraw his plea of guilty to wire fraud, in which he admitted
   defrauding the investors.  In any case, defendant's argument

23  regarding a handful of investors does not reach all of the false
   statements he made, or all of the investors who were defrauded, as
   discussed more fully in Section III.B.2, <u>infra</u>.

24      [9] Indeed, defendant was presenting the information underlying

25  this claim to the government long before he was indicted.  When
   defendant was interviewed by the government pursuant to a proffer

26  agreement on March 8, 2012, more than seven months before the
   indictment was returned, defendant told the government that he had

27  given Investor Omar access to all of his (defendant's) databases.
   Defendant also told the government that Investor Omar made trades in

28  the TTM Investment Pool as late as 2010.  (Katzenstein decl. at ¶ 4.)

1  (1984).  Here, defendant says that his attorneys "failed to expose

2  falsity of the evidence & statements of my accusers, particularly

3  Akbar Omar [i.e., Investor Omar] . . . and totally mishandling of the

4  case in the end."  (Motion at 31C.)

5       As discussed below, however, the issues defendant now faults his

6  counsel for not raising are without merit.  "[C]learly we cannot hold

7  counsel ineffective for failing to raise a claim that is meritless."

8  Sexton v. Cozner, 679 F.3d 1150, 1157 (9th Cir. 2012).  Thus,

9  defendant cannot excuse his default under this theory either.

10       Because defendant is unable to show cause and prejudice excusing

11  his failure to raise his first claim on direct appeal, defendant's

12  claim is procedurally defaulted and should be dismissed.

13       **B.   Even if Not Procedurally Defaulted, Defendant's First Claim
             (Grounds One, Two, and Three) Is Without Merit**

14       Even if this Court considers defendant's procedurally defaulted

15  claims, they should be denied because they lack any merit.

16            1.   Defendant's Claims Fail in the Face of his Guilty Plea

17       Defendant argues that his convictions must be reversed because

18  the Investor-Witnesses conspired to withhold information that would

19  have exonerated him.[10]  According to defendant, the purportedly

20  withheld information shows that certain investors were frequently

21

22  _____

23       [10] Defendant is not alleging that his rights were violated by the
    government.  He states explicitly that "[t]he violators of my
    Constitutional Rights are not the Federal Bureau of Investigation who
24  investigated my case & allegations against me or the US Attorney's
    Office who prosecuted this case, or the Internal Revenue Service or
25  the members of the Grand Jury."  (Motion at 19.)  According to
    defendant, his rights were violated by five investors, a sixth
26  individual who visited defendant's Office on several occasions, and
    an ex-employee.  (Id.)  Defendant contends that these Investor-
27  Witnesses concealed information from the government.  Thus, defendant
    is not asserting any Brady violation or other prosecutorial
28  misconduct claim.

present at defendant's Office, where they could have seen defendant's

actual trading activity.   Thus, defendant appears to argue, defendant

could not have deceived or defrauded these investors about TTM's

activities.   (Motion at 19-21, 23-26.)   This argument fails.

Defendant admitted in his signed plea agreement and under oath

at the hearing on his change of plea that he defrauded his investors.

Among other facts, defendant admitted the following:

> Defendant MADAD held himself out as a successful investor
> who had not lost money in a single day of trading except
> one day in November 2006 and who used a day-trading
> technique that was consistently profitable.   Defendant
> MADAD told other investors that he did not and would not
> trade on margin, and that he would return any funds
> received from other investors, together with the profits
> that defendant MADAD would make for the investors, upon
> their request.   Defendant MADAD also told investors that he
> would not take any fees or compensation for managing the
> invested funds.

> Defendant MADAD received money from investors, who believed
> that defendant MADAD would invest their money in a way that
> would generate consistent profits.   After receiving their
> money, defendant MADAD provided monthly account statements
> to the investors which always showed gains in their
> investment accounts.

> In fact, as defendant MADAD knew, defendant had and did
> trade on margin; his trading activity was not consistently
> profitable; the account balances shown on the monthly
> account statements were false; and defendant MADAD used
> investor funds to pay for his own personal expenses and the
> expenses of his family, and to make cash distributions to
> himself and members of his family.

> Between October 2005 and March 2011, defendant MADAD
> received over $49 million from investors. . . . Between
> 2006 and 2011, defendant MADAD used over $15.5 million of
> the funds received from investors to, among other uses,
> purchase real estate, jewelry, and vehicles; to pay credit
> card balances; and to fund cash disbursements to himself
> and family members.   Defendant MADAD returned approximately
> $17.7 million to investors.   The remainder of the funds
> entrusted to defendant MADAD by the investors was lost in
> unsuccessful trading.

(Exhs. 15-16, 293-296.)

1    Defendant has never moved to withdraw his guilty pleas, and did

2    not challenge the voluntariness of the pleas on appeal.  He now

3    appears to claim that the facts he admitted under oath should be

4    discounted because, he asserts, he was unaware, before he pled

5    guilty, of the Investor-Witnesses' purported concealment from the

6    Grand Jury of material facts.  (Motion at 23.)  That is a non-

7    sequitur.  Defendant himself knew all the facts of the offense,

8    including the facts he asserts were concealed, but nonetheless

9    voluntarily pleaded guilty.

10    Defendant also appears to suggest that his guilty pleas should

11    not be taken at face value because he entered them under duress.

12    Defendant states that he was "apprehensive of retribution & for the

13    safety of my family abroad" because some of the investors who lost

14    money were related to political figures in Pakistan who are

15    "ruthless" and "corrupt."  (Motion at 31B.)  Defendant says he pled

16    guilty also because he wanted to "protect & spare" his immediate

17    family from the "harassment and oppression" of the Investor-Witnesses

18    who had deceived the Grand Jury and were defaming defendant and his

19    family, presumably in the Civil Litigation.  (Motion at 31C.)  But

20    defendant stated under oath at the hearing on his change of plea that

21    his pleas were voluntary and no threats had been made to induce them.

22    (Exhs. 292.)  In any case, defendant does not allege, much less

23    present any evidence, that his guilty pleas resulted from any actual

24    or threatened physical harm or mental coercion that overbore his

25    will.  See Brady v. United States, 397 U.S. 742, 750 (1970).

26

27

28

18

1        2.   <u>Defendant Has Not Shown That Any of the Allegedly</u>
<u>Concealed Information Was Exculpatory</u>

2

3      Defendant's claims that he would not have been indicted if the

4  Grand Jury had heard the information he alleges was concealed by the

5  Investor-Witnesses also fail because defendant has not shown that any

6  of the allegedly concealed information was exculpatory.

7  First, even if some investors came to defendant's office, that fact

8  would not mean those investors were not defrauded.  Defendant

9  contends that these investors saw his actual trading activity because

10  the activity was visible on the computers in his office, but

11  defendant presents no evidence other than his own unsworn assertions

12  of what if anything these investors actually saw or what

13  significance, if any, they attached to what they saw.[11]  Moreover,

14  even if some investors saw information from which they could have

15  realized that defendant was losing money on some trades, defendant

16  was falsely telling them that he was always making money for the

---

[11] In support of his claim, defendant cites to Sections 3.8.1 through 3.8.4 of his the attachments filed with the Motion.  (Motion at 23.)  These sections (Motion at 118-162) are comprised of defendant's own assertions and narrative of events.  Defendant says the following about his computer display:  "A rectangular bar on top of the Charles Schwab Street SmartPro Platform displayed the profit/loss figure of that account, which was updated, continuously. Another rectangular window at the bottom right corner of my screen displayed a combined profit/loss figure of both the UBS & Charles Schwab A/Cs on computer calculator separately."  (Motion at 129.) But defendant nowhere provides any evidence that any investors who came to his office actually saw these figures, or understood their significance.  Defendant asserts on page 123 that Investor Omar and another Investor-Witness came to defendant's office "for their own financial interest & benefits.  If they had realized I was lying or misrepresenting, and that what they saw on my Trading Computer screen was different from what I told them the gain or loss figure was, there was no reason to come, let alone invest their money in the [Investment] Pool."  Since defendant says Investor Omar and the other Investor-Witnesses <u>did</u> come to his office, defendant's own argument establishes that access to his computers did not alert the investors to the fraud.

investment pool as a whole, and was sending them monthly account statements that falsely showed consistent, overall gains.  These monthly account statements were replete with financial analyses that bolstered the impression that defendant was a knowledgeable and sophisticated trader whose promises of positive returns could be trusted.  Even if some investors glimpsed defendant's computer screens in his office, such glimpses would not have afforded the investors the information necessary to discredit the fraudulent financial picture defendant was painting for his investors.

In any case, defendant's false statements to the investors went beyond just the misrepresentations about the allegedly consistent profitability of defendant's trading.  Defendant also made false statements to the investors about other subjects that could not be corrected simply by looking at defendant's computer screens.  These additional false statements and representations included the assurance that defendant was not trading on margin, even though in fact he was; the promise to not to take any fees to manage the investors' money, even though defendant was actually misappropriating investors' funds to pay for personal expenses and make distributions to his own family; and the promise that the investments were completely liquid and the investors could get their money back at any time simply by asking for it, when in fact the defendant would not and did not return the investors' money when they requested it.

Finally, defendant bases his claims that the investors were not defrauded on only a small number of investors (the Investor-Witnesses) who he says came to his office.  But the Investor-Witnesses were not the only victims of defendant's criminal scheme.  More than 70 victims entrusted defendant with millions of dollars

based on his false statements, and lost significant sums due to his fraud.  Even if a handful of victims saw his actual trading activity on his office computers, dozens more did not.

### C.   Defendant Cannot Establish Ineffective Assistance of Counsel (Ground Four) Because He Was Not Prejudiced by the Alleged Deficiencies

Defendant argues that his trial counsel was constitutionally ineffective for "fail[ing] to understand the various aspects of the case properly, fail[ing] to expose falsity of the evidence & statements of my accusers [i.e., Investor Omar and the other Investor-Witnesses], . . . and totally mishandling the case in the end."  (Motion at 31C.)  Defendant lists 17 alleged failings of his counsel.  (Motion at 31C-31F.)  Six of the alleged failings pertain to counsel's handling of issues relating to Investor Omar (Nos. 1, 2, 3, 5, 7, and 13); seven relate to counsel's handling of Investor Omar and the other Investor-Witnesses (Nos. 8-12, 14, and 18); two relate to defense counsel's efforts to locate the alleged UBS accounts; and three assert that counsel had poor communication with defendant (Nos. 15, 16, 17).

In order to prevail on an ineffective assistance of counsel claim, defendant must demonstrate "that counsel's performance was deficient" and "that deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984).  Defendant's list of his counsel's alleged shortcomings fails to satisfy the minimal pleading requirements and does not even fairly present an ineffective assistance claim, much less comply with Strickland's demanding standard.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); Shah v. United

21

<u>States</u>, 878 F.2d 1156, 1161 (9th Cir. 1989) (mere conclusory allegations are insufficient to establish a claim of ineffective assistance); <u>United States v. Wynne</u>, No. CV-94-347-PA, 1996 WL 75287, at *1 (9th Cir. Feb. 21, 1996) (refusing to consider the merits of an ineffective assistance claim raised in "a single, vague statement" without citation to case law or statement of how the attorney's performance was defective).  Moreover, as previously explained, defendant's assertions about Investor Omar and the other Investor-Witnesses lack merit, and the UBS accounts did not exist.  Accordingly, defendant cannot show that his trial counsel's performance was deficient in failing to investigate meritless defenses or that the alleged deficiencies resulted in prejudice to defendant.  <u>See Sexton</u>, 679 F.3d ar 1157 (9th Cir. 2012); <u>Miller v. Keeney</u>, 882 F.2d 1482, 1434 (9th Cir. 1989).  Defendant's generic complaints about lack of communication also fail establish any prejudice.  Therefore, defendant's claim of ineffective assistance of counsel must fail.

///

///

///

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  Because the record in this case conclusively shows that defendant is entitled to no relief, this court should deny defendant's motion without an evidentiary hearing.  See Doganiere v. United States, 914 F.2d 165, 168 (9th Cir. 1990); United States v. Espinoza, 866 F.2d 1067, 1069 (9th Cir. 1988).

Dated: May 23, 2016                 Respectfully submitted,

                                    EILEEN M. DECKER
                                    United States Attorney

                                    LAWRENCE S. MIDDLETON
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                         /s/ Ranee A. Katzenstein
                                    RANEE A. KATZENSTEIN
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I, STEPHANIE SWISHER, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on 5/23/2016, I deposited in the United States mail at the United States Courthouse in the above-titled action, in an envelope bearing the requisite postage, a copy of:

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

Service was:

☒ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☒ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☐ By messenger, as follows:

☐ By Federal Express, as follows:

Syed Qaisar Madad
Reg # 63886-112, FO3 203L
F.C.I
PO Box 7000
Texarkana, TX 75505-7000

at his last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on 5/23/2016, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

/S/
_____
Stephanie Swisher
Legal Assistant